FILED
U.S. District Court
District of Kansas

JAN 0 6 2026

Clerk, U.S. District Court
By _SMH_____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

JULIE ROSE STROUD,                                      )

Plaintiff,                                              )

v.      Civil Action No. 6:26-cv-1004-DDC-GEB

CITY OF WICHITA;                                        )

SEDGWICK COUNTY;                                        )

WICHITA CHILDREN'S HOME;                                )

WESLEY MEDICAL CENTER, LLC;                             )

DCCCA, INC;                                             )

LAVANDRIA FOUNTAIN;                                     )

HONEY TREE ACADEMY LLC;                                 )

KIMBERLY FIELDING;                                      )

JOHN RYAN;                                              )

ROBERT DULOHERY;                                        )

MACKENZIE VAN PELT;                                     )

SAMUEL DUNCAN;                                          )

CALVIN RUSCH;                                           )

BLAKE SANCHEZ;                                          )

GABRIEL OHMART;                                         )

LORI CLARK;                                             )

ABILIBA EREKOSIMA;                                      )

JANA VINDUSKA;

LAQUILLA WILLIAMS;                                                                    )

ASHLIE THOMAS;                                                                        )

ELIZABETH GREGG;                                                                      )

DEE E. NIGHSWONGER;                                                                   )

GREGORY G FAIMON;                                                                     )

MEGAN MEIER;                                                                          )

WENDY HARTMAN;                                                                        )

DEBBIE A. DESILET-DOBBS;                                                              )

DOE OFFICER 1(Unidentified Law-Enforcement Officer);                                 )

BETH HEFLIN;                                                                          )

and DOE MEDICAL PROVIDER A (Unidentified Medical Provider)                           )

Defendants.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

(42 U.S.C. § 1983 and Supplemental State-Law claim)

JURY TRIAL DEMANDED

## I.    PARTIES

Plaintiff

1.    Plaintiff Julie Rose Stroud is a resident of Sedgwick County, Kansas, and the mother and lawful custodial parent of minor children A.A., Y.M., and M.N. Plaintiff brings this action solely on her own behalf for violations of her constitutional and statutory rights. References to Plaintiff's minor children are included to describe the factual circumstances underlying Defendants' conduct and to establish violations of Plaintiff's own rights and

resulting damages. Plaintiff does not purport to represent her children's independent legal interests.

Municipal and County Defendants

Plaintiff brings claims against municipal defendants pursuant to 42 U.S.C. § 1983. All individual law-enforcement defendants are sued in their individual capacities only. No Defendant officer is sued in an official capacity unless expressly stated.

2.      Defendant City of Wichita is a municipal corporation organized under the laws of the State of Kansas.  At all relevant times, the Wichita Police Department ("WPD") was a department of the City of Wichita.

3.      Defendant Sedgwick County is a political subdivision of the State of Kansas.

4.      Defendant John Ryan was, at all relevant times, a sergeant with the Wichita Police Department and acted under color of state law during the events commencing on January 8, 2024 involving Plaintiff's children. Ryan is sued in his individual capacity.

5.      Defendants Robert Dulohery, Mackenzie Van Pelt, Calvin Rusch, Samuel Duncan, Blake Sanchez, were, at all relevant times, City of Wichita WPD officers who acted under color of state law and participated in the events commencing on January 8, 2024 involving Plaintiff's children and are sued only in their individual capacities.

6.      Defendant Doe Officer 1 was, at all relevant times, a Wichita Police Department officer acting under color of state law on January 8, 2024. He is sued in his individual capacity.

7.      Defendant Gabriel Ohmart was, at all relevant times, a detective with the Wichita Police Department and acted under color of state law during the events at issue. Detective Ohmart is sued in individual capacity.

State Defendants

8. Defendants Elizabeth Gregg and Dee E. Nighswonger are, directors or senior officials within the Kansas Department of Children and Families ("DCF"). They are sued in their official capacities for prospective declaratory and injunctive relief pursuant to Ex parte Young.

9. Defendant Abiliba Erekosima was, at all relevant times, an employee of the Kansas Department for Children and Families ("DCF") assigned to child-welfare functions within the Wichita Region and acted under color of state law during the events at issue. Erekosima is sued in her individual capacity.

10. Defendants Jana Vinduska and Ashlie Thomas were, at all relevant times, supervisors or decision-making officials of the Kansas Department for Children and Families ("DCF") who acted under color of state law during the events at issue. Vinduska and Thomas are sued in their individual capacities.

11. Defendant Lori Clark was, at all relevant times, an employee or agent of the Kansas Department for Children and Families ("DCF") assigned to the Kansas Protection Report Center ("KPRC"), and acted under color of state law during the events at issue. Clark is sued in individual capacity.

12. Defendant LaQuilla Williams was, at all relevant times, an employee of the Kansas Department for Children and Families ("DCF") who acted under color of state law by jointly participating with, and/or exercising authority delegated by, state and municipal actors in the detention, placement, and continued control of Plaintiff's minor children. Williams is sued in her individual capacity.

Private Entity Defendants Acting Under Color of State Law

13. Defendant Wichita Children's Home ("WCH") is a private entity operating in Sedgwick County, Kansas. At all relevant times, WCH acted under color o state law in connection with the events at issue.

14. Defendant DCCCA, Inc. is a private contractor providing child-welfare services in Kansas. At all relevant times, DCCCA, Inc. acted under color of state law in connection with the events at issue.

15. Defendant Honey Tree Academy LLC is a Kansas limited liability company operating a licensed daycare facility in Sedgwick County, Kansas. At all relevant times, Honey Tree Academy LLC acted under color of state law in connection with the events at issue.

16. Defendant Wesley Medical Center, LLC, doing business as Wesley Woodlawn Hospital & ER ("the Hospital"), is a private hospital entity operating in Sedgwick County, Kansas. At all relevant times, the Hospital acted under color of state law in connection with the events at issue.

Individual Defendants

17. Gregory G. Faimon, MD is a physician identified in Wesley Woodlawn Hospital & ER records as the attending and/or ordering physician for medical evaluation and radiological imaging performed on Plaintiff's minor child during the January 8–9, 2024 hospital encounter. He is sued in his individual capacity.

18. Debbie A. Desilet-Dobbs, MD is a physician identified in Wesley Woodlawn Hospital & ER records as the interpreting and supervising radiologist who reviewed and signed radiological imaging studies of Plaintiff's minor child during the January 8–9, 2024 encounter. She is sued in her individual capacity.

19. Wendy Hartman, RN, was, at all relevant times, a registered nurse employed by Wesley Woodlawn Hospital & ER who provided nursing services to Plaintiff's minor child during the January 8-9, 2024 hospital encounter. She is sued in her individual capacity.

20. Defendant Megan Meier, RN was, at al relevant times, a registered nurse employed by or acting as an agent of Wesley Woodlawn Hospital & ER adna cted under color of state law during the events at issue. She is sued in her individual capacity.

21. Defendant Beth Heflin, MD is a physician identified on the Child Abuse Forensic Photography / Case Review Addendum dated January 9, 2024 as the individual who signed the "Case Reviewed By" section. She is sued in her individual capacity.

22. Doe Medical Provider A (Program Coordinator), sued in individual capacity, is an unidentified program coordinator or designee identified on the Child Abuse Forensic Photography / Case Review Addendum dated January 9, 2024 as the individual who signed the "Program Coordinator (or Designee)" section.

23. LaVandria Fountain was, at all relevant times, an employee or agent of DCCCA, Inc., and acted under color of state law during the events at issue. She is sued in her individual capacity.

24. Defendant Kimberly Fielding was, at all relevant times, was the owner and managing agent of Honey Tree Academy LLC, and acted under color of state law during the events at issue. She is sued in her individual capacity.

## II. JURISDICTION

25. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, as this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

26. This Court has supplemental jurisdiction over Plaintiff's Kansas law claim pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy.

27. No ongoing state judicial proceeding existed at the time this action was filed, and Plaintiff does not seek to enjoin or review any state-court custody determination.

## III. VENUE

28. Venue is proper in the United States District Court for the District of Kansas under 28 U.S.C. § 1391(b) because the events and omissions giving rise to Plaintiff's claims occurred in Sedgwick County, Kansas, and because Defendants performed the official acts challenged herein within this District through the administration, supervision, and enforcement of child-welfare practices governing the Wichita Region. Pursuant to D. Kan. Gen. R. 2.1, Plaintiff respectfully requests assignment to the Wichita Division because all material events occurred in Sedgwick County.

29. The designated place of trial is Wichita, Kansas, pursuant to D. Kan. Rule 40.2, because the events and omissions giving rise to Plaintiff's claims occurred in Sedgwick County, Kansas.

## IV. FACTUAL BACKGROUND

30. On January 8, 2024, Honey Tree Academy, LLC ("Honey Tree"), License No. 0061025-022, was the daycare attended by Plaintiff's minor child A.A. Honey Tree contacted Plaintiff through the Brightwheel application and reported observing "marks" on A.A.'s back. Honey Tree transmitted two photographs to Plaintiff: one depicting a faint bruise on A.A.'s cheek, and another depicting two superficial scratches and a healing scab on the center of A.A.'s back, approximately one-half inch by one-quarter inch in size, with surrounding adhesive residue consistent with a detached gauze pad.

31.    Plaintiff responded the same day stating that A.A. fell from a kitchen chair and injured her back, and that A.A. later tripped over a vacuum and fell onto a wooden bench in the living room.

32.    On January 8, 2024, Wichita Police Department ("WPD") Officers Robert Dulohery, John Ryan and Doe Officer 1, responded to a child-welfare referral concerning Plaintiff's two-year-old child, A.A. who lived with Plaintiff and her two older siblings. At no time were the children reported as runaways, missing persons, trafficking victims, or as experiencing a behavioral-health crisis.

33.    While Plaintiff was not at home, an unidentified WPD officer ("Doe Officer 1"), left Plaintiff's front walkway and walked into Plaintiff's backyard and around the exterior of her home. The body-worn camera footage does not reflect the officer stating a warrant, consent, or an emergency basis for that entry. (Doe Officer 1 body-worn camera, 00:01:10–00:04:17).

34.    After returning from the backyard, Doe Officer 1 reported to Officers Dulohery and Ryan, stating: "The only lights on are in the living room and the basement." Doe Officer 1 then addressed Officer Ryan as "boss," stating, "Boss, how you doing?" Officer Ryan did not attempt to stop Doe Officer 1 on body-worn camera footage (Doe Officer 1 body-worn camera, 00:04:52–00:04:58).

35.    Before meeting Plaintiff, Officers Ryan and Dulohery interviewed Kimberly Fielding, owner of Honey Tree Academy, LLC, who was acting on behalf of the daycare. The interview is recorded on body-worn camera and reflected in a corresponding transcript. (Officers Dulohery and Ryan body-worn cameras).

36.     Fielding told Officers Plaintiff was "withdrawn," "socially awkward," and "odd" and told Officers A.A. was not "filthy and crawling with bugs" but was "not always clean" (Officer Dulohery body-worn camera, 00:08:45–00:08:58).

37.     Later during the welfare check inside Plaintiff's home, Officer Dulohery referenced Plaintiff's demeanor, whispering "social awkwardness" to Officer Ryan. (Officer Dulohery body-worn camera, 00:36:03–00:36:10).

38.     Fielding told Officers "She came with this shirt on, and it was dirty and gross, but it had a burn hole in it. And that's what caught our attention. And so we took pictures of it. And the only reason we did is because under it, there was an old burn mark that was under there." (Officer Dulohery body-worn camera, 00:12:40–00:13:10).

39.     Fielding told Officers Plaintiff stated that she "didn't realize that she had that shirt on" and told Officers that Plaintiff said, "I think it was from a candle." Plaintiff did know A.A. was wearing the shirt because she dressed her in it that morning and sent A.A. to school with the sleeves rolled up on purpose. Plaintiff never said "I think" when providing information to Honey Tree about the sleeve with the burn hole (Officer Dulohery body-worn camera, 00:13:30–00:13:41).

40.     Police Protective Custody (PPC) Forms signed by Officers Dulohery and Rusch were provided to Plaintiff by DCF. The PPC forms documented the welfare check was requested after a report from a mandatory reporter was made alleging A.A. had "bruises and cuts on her back and arms," additional injuries dating back to November 2023, and a "burn mark." Honey Tree provided Officers with photographs, including images depicting healing or older injuries. The report also stated the officer "observed a number of healing injuries on the child." Plaintiff's other children were documented as present in

the home. The report further stated, "At Sgt Ryan's on-scene directive, we took all three children into police protective custody," and provided no information on the decision for the removal other than the allegations from Honey Tree and observed healing injuries.

41. A.A. had never sustained a burn injury, and Plaintiff had previously informed daycare staff, Shama Mahmood, that the burn mark referenced by Fielding related to damage on a shirt, not an injury to A.A and occurred weeks prior to A.A. wearing the shirt to school. Plaintiff observed no red mark on A.A.'s arm when rolling up the sleeve on the morning she wore the shirt. Later descriptions by daycare staff of a "burn mark" were inconsistent with Plaintiff's observations and stated explanations to Honey Tree. Fielding provided statements to police concerning Plaintiff's family, and A.A.'s attendance, development, and condition that Plaintiff disputes as inaccurate or misleading, including assertions regarding prior injuries, attendance gaps, developmental delay, and parental statements. Law enforcement relied on the reported allegations and photographs in initiating the welfare check and subsequent actions as referenced in the medical records of Plaintiff's children and police records. (Officers Dulohery and Ryan body-worn camera footage).

42. Fielding told Officers A.A. was "gone for several days" and did not tell Officers A.A. was prohibited from attending school if she had a runny nose. (Officer Dulohery body-worn camera, at multiple points including approximately 00:07:57–00:08:00; 00:11:11–00:11:15; 00:11:21–00:11:26; 00:11:30–00:11:33).

43. Fielding told Officers that A.A. "cannot communicate" and "doesn't talk." (Officer Dulohery body-worn camera, 00:15:04-00:15:08). In contrast, A.A. was verbal, communicated well, and spoke in short sentences

44. Fielding told Officers she decided she was "just going to look at her" and told Officers she started "pulling her shirt up" to look. She showed Officers the photos of A.A. she took after lifting A.A's shirt up. Fielding told Officers that A.A. had not been to school for 5 days. (Officer Dulohery body-worn camera, 00:15:54-00:17:27) Plaintiff gave no consent to Fielding or any daycare staff to examine, search, or inspect A.A.'s body for injuries. Plaintiff was not notified that any such examination would occur.

45. When questioned later by Officers Fielding clarified her previous statement regarding A.A.'s absences and stated the school was closed for the holidays. (Officer Dulohery body-worn camera, 00:22:19-00:22:35).

46. Officers Ryan and Dulohery arrived at Plaintiff's home. Plaintiff permitted Officers Ryan and Dulohery to enter. Officers stated they came "to check the welfare of a child." (Officer Ryan body-worn camera, 00:02:11–00:02:27). No DCF employee accompanied them.

47. No officer presented a warrant or stated that a warrant existed. No officer stated that a court order had been obtained authorizing removal. The only physical item provided before and during the removal was a handwritten WPD case number on a small piece of paper bearing the notations "Dulohery 2270" and "1/8/24." At the time of the removal, Plaintiff's minor children had never been adjudicated Children in Need of Care (CINC), and no CINC proceeding had ever been initiated.

48. Within minutes of entering the home, and while A.A. was not wearing a shirt, Officer Dulohery stated: "I need to take photos. And I'm going to do that without your interference." Plaintiff pointed to the residue and stated it was from a bandage. (Officer Dulohery body-worn camera, 00:05:38–00:05:55).

49.     Plaintiff requested a before-and-after photograph. Officer Dulohery stated: "I see what you want. You want a picture of it's just adhesive from a band-aid, and then it's adhesive from a band-aid gone. I understand exactly what you're asking."

50.     While Plaintiff was seated holding A.A., Officer Dulohery stood close in front of Plaintiff while a bright light was directed toward Plaintiff's face. Plaintiff stated, "You can take a photo, but I feel very threatened by you." (Officer Ryan body-worn camera, 00:05:38–00:06:14).

51.     Within less than 6 minutes after entering Plaintiff's home, Officer Ryan is heard stating "22-01" and "start up some other officers in here." (Officer Ryan body-worn camera, 00:06:07–00:06:14).

52.     Officer Dulohery stated that if Plaintiff continued trying to wipe the area before he took photos, she would "wind up in handcuffs" and that it would cost her "some charges." (Officer Dulohery body-worn camera, 00:08:24–00:08:46).

53.     After that statement, Plaintiff permitted the photographs, and Officer Dulohery took photographs of A.A. (Officer Dulohery body-worn camera, 00:08:57-00:11:14).

54.     Officer Dulohery asked how A.A. received the scratch. Plaintiff's son, Y.M. stated, "She was in the kitchen. She fell down from the chair." (Officer Dulohery body-worn camera, 00:09:02–00:09:16; Officer Ryan body-worn camera, 00:09:05–00:09:14).

55.     Plaintiff stated she had told Honey Tree that A.A. "fell off of the chair," and that on her face she hit a bench; Plaintiff pointed to a wooden chest near the front door and added, "cause she tripped over the vacuum." (Officer Dulohery body-worn camera, 00:10:52–00:11:22; Officer Ryan body-worn camera, 00:10:51–00:11:22).

56.    After the request for additional officers, Officers Mackenzie Van Pelt and Calvin Rusch arrived. Officer Van Pelt knocked, opened Plaintiff's front door, and asked for her "boss." Officer Ryan responded, "Yeah, come on in." (Officer Van Pelt body-worn camera, 00:00:29–00:00:38; Officer Ryan body-worn camera, 00:20:07–00:20:33).

57.    The footage does not reflect Plaintiff giving any express consent to Officers Van Pelt, Rusch, Duncan, and Sanchez to enter Plaintiff's residence. (Officers Ryan and Van Pelt body-worn cameras).

58.    Plaintiff stated she had food, running water, and working utilities, and asked Officer Dulohery to photograph food in the home. When referencing Plaintiff's home, Officer Dulohery later stated, "That's not what this is about today, ma'am." (Officer Dulohery body-worn camera, 00:43:42–00:44:27).

59.    Officer Ryan is heard telling Officer Rusch, "we're probably going to PPC." (Officer Ryan body-worn camera, 00:21:20–00:21:40).

60.    Plaintiff asked if they were preparing to take A.A. Officer Ryan responded, "Yeah, yeah we're going to take her up to a medical facility and get her checked out. Get medical clearance." (Officer Ryan body-worn camera, 00:21:21–00:21:50).

61.    Plaintiff asked if that was normal. Officer Ryan responded, "Yes, oh yeah. We do it all the time. Especially with that number of marks on her back." (Officer Ryan body-worn camera, 00:21:51–00:22:06).

62.    Plaintiff asked whether she could accompany A.A. or whether she was being arrested. Officer Ryan responded "no" and stated, "The children are going to come in police protective custody. All three of them." (Officer Ryan body-worn camera, 00:22:05–00:22:14).

63.    Plaintiff stated the children's father was available. Officer Ryan responded, "That's not police protective custody." (Officer Ryan body-worn camera, 00:22:14–00:22:21).

64.    Plaintiff asked, "Why are my kids in police protective custody?" Officer Ryan answered, "Oh, because of the totality of all the information we have. The injuries." (Officer Ryan body-worn camera, 00:22:22-00:22:34).

65.    When Plaintiff asked what "totality of information" meant, Officer Ryan said, "What we have been told by DCF." (Officer Ryan body-worn camera, 00:22:29-00:22:40).

66.    Plaintiff asked what DCF told him. Officer Ryan stated, "We can't tell you that." (Officer Ryan body-worn camera, 00:22:39–00:22:45).

67.    Plaintiff later requested parental access records from DCF, including the original KPRC intake report. DCF declined to provide the KPRC report.

68.    Plaintiff asked why the older children were being taken. Officer Dulohery stated, "They are juveniles, they are under 18 and we have to." Officer Ryan added, "when we take one, we normally take all the kids in the house. They all go into police protective custody." (Officer Dulohery body-worn camera, 00:22:53–00:23:14; Officer Ryan body-worn camera, 00:22:50–00:23:11).

69.    No officer communicated any concerns regarding Y.M. or M.N.

70.    In regards to the removal, Plaintiff stated "I'm still not understanding." Officer Ryan stated, "Well just to spell it out for you. What we see, in the way of the injuries on her, and the documented photos." Plaintiff stated, "This one mark on her back because the rest is from band-aid's." Officer Ryan responded, "Okay. Well I want a doctor to tell me that. The doctor's going to check her up." (Officer Ryan body-worn camera, 00:23:45-00:24:09; Officer Van Pelt body-worn camera, 00:03:46-00:04:07).

71. Plaintiff asked whether A.A. could rest before going for a medical check. Officer Ryan responded "No," adding, "We are responsible if anything happens from the time we walk out." (Officer Ryan body-worn camera, 00:24:07–00:24:17; Officer Van Pelt body-worn camera, 00:04:14–00:04:24).

72. Plaintiff asked to see paperwork. Officer Ryan stated Plaintiff could call 911 if she doubted they were police. Plaintiff asked Officers, "There's no documentation process with this? You just come in and take people's children?" Officer Dulohery responded, "Yes, I will give you the case number" Officer Ryan stated the children would be in PPC "for up to 72 hours" and that EMCU would investigate. (Officer Ryan body-worn camera, 00:24:19–00:25:10; Officer Van Pelt body-worn camera, 00:04:24–00:05:13).

73. Plaintiff told Officers that removing A.A. would be traumatic and raised breastfeeding-related concerns. Officer Ryan responded, "Yeah, we have to." (Officer Ryan body-worn camera, 00:26:08–00:26:35).

74. Plaintiff asked Officer Ryan, "In your honest opinion, do you think that she's in danger?" Officer Ryan replied, "I have no idea, but we always err on the side of caution. And take the child and do a medical clearance, take them into police protection." (Officer Ryan body-worn camera, 00:26:47-00:27:01; Exhibit 70, lines 369-370).

75. Officers Van Pelt, Duncan, Rusch, and Dulohery, were present inside the home when Officer Ryan stated he did not know whether A.A. was in danger. (Officer Van Pelt body-worn camera, 00:06:45-00:07:04; Officer Dulohery body-worn camera, 00:26:49-00:27:03).

76. Plaintiff asked Officer John Ryan if the decision to take the kids was his alone. Plaintiff asked, "so it's your overall call?" Officer John Ryan stated, "Yes, and this is a call I would

definitely make every time seeing that" (Officer Ryan body-worn camera, 00:27:01–00:27:34).

77.    Y.M. asked to speak to his father and asked if his father could pick him up. Officer Dulohery stated, "No we can't," and stated, "police protective custody means no one can take you from our safe place." (Officer Dulohery body-worn camera, 00:26:28–00:27:18).

78.    Plaintiff asked if the children could go with their father. Officer Ryan stated, "Not right now, no." (Officer Ryan body-worn camera, 00:29:03–00:29:32).

79.    Plaintiff provided Officers with contact information for the older children's father, Mohamed Mohamed before the children were removed by police from Plaintiff's home.

80.    Mohamed is Y.M.'s biological father and M.N.'s stepfather and held legally established parenting rights with respect to Y.M. and M.N., as set forth in a valid court order. Defendants acted without consulting, notifying, or accounting for those rights during the removal and detention of the child.

81.    Before taking her children, Plaintiff asked what options she had, Officer Mackenzie Van Pelt responded, "This is the only option as of now." (Officer Ryan body-worn camera, 00:27:35-00:28:07).

82.    Officer Ryan repeated a phrase stated earlier, "We always err on the side of caution." Officer Ryan added "If she has any old injuries that we can't see underneath the skin, the doctor will tell us that too." (Officer Ryan body-worn camera, 00:39:51–00:40:39).

83.    Officer Van Pelt carried A.A. outside. Officers Van Pelt and Samuel Duncan attempted to secure A.A. into a car seat. Officer Van Pelt stated the car seat was "too small." (Officer Van Pelt body-worn camera, 00:22:20–00:22:24).

84. For approximately three minutes and sixteen seconds, Officers Van Pelt and Duncan physically restrained A.A. by preventing her movement and forcibly securing her in a car seat while she resisted an attempted to avoid being placed there. During that period, the audio captures A.A. crying out "Mommy" and "I want Mommy" repeatedly. (Officer Van Pelt body-worn camera, 00:19:20–00:22:36; Officer Duncan body-worn camera, 00:19:40–00:22:07).

85. Officer Ryan and Officer Duncan transported A.A. to Wesley Woodlawn Hospital & ER in the car seat without fastening the straps. During the transport, Officer Duncan referred to Officer Ryan as "boss." (Officer Duncan body-worn camera, 00:25:52-01:01:54).

86. Officer Dulohery stated that DCF was working the case after hours and that he spoke with someone by phone. (Officer Ryan body-worn camera, 00:42:30–00:42:53).

87. Body-worn camera footage produced to Plaintiff does not depict an EMCU supervisor being contacted. In an email dated January 9, 2024 at 7:58 a.m., EMCU staff member Matthew Hall sent Officer Dulohery an email questioning the handling of the incident, including: "If the children had injuries, why wasn't this cut as a Child Abuse? Why wasn't the on-call EMCU supervisor contacted?"

88. Officer Rusch transported Y.M. and M.N. to Wesley Woodlawn Hospital & ER. The in-vehicle time display shown at departure reflects 22:02. (Officer Rusch body-worn camera, 00:01:36).

89. A PPS Combined Intake Report produced to Plaintiff from DCF reflects that no Child Protection Specialist was assigned that evening and that DCF did not record the incident as a joint investigation.

90.    DCF Wichita Region Assistant Regional Director of Programs, Elizabeth Gregg stated in email correspondence it was law enforcements decision based on what they see and determine at that time to leave Plaintiff's children in her home or temporarily place them in police protective custody. Gregg stated, "DCF was not involved in that in the moment decision they made".

91.    Gregg stated in email correspondence that the initial assessment was not initially determined to be a joint investigation with law enforcement due to it initially not meeting "alleges serious physical harm to, serious deterioration of or sexual abuse of the child."

92.    On January 8, 2024, at approximately 9:17 p.m., Officer Dulohery received an email containing three photographs of A.A. taken by Honey Tree Academy daycare staff, accompanied by a narrative. One photograph depicts A.A.'s shirt being lifted to expose her torso for the purpose of looking for injuries, reflecting a physical inspection conducted by daycare staff prior to any law enforcement or medical involvement.

Hospital Examination and Transport Without Documented PPC or Consent (Jan 8-9 2024)

93.    Officers Duncan, Van Pelt, Rusch, Dulohery, Ryan and Sanchez were present with Plaintiff's children at the hospital.

94.    Medical records for Plaintiff's three children taken during the Jan 8-9 2024 examinations, list the arrival by "police" for "Medical Clearance" / "Non-Urgent General Care" and do not document parental consent, a warrant, or court order authorizing the examinations, or documentation establishing law enforcement's custodial authority to request or consent to the examinations.

95.    Page 8 of A.A.'s medical report from the hospital visit states the following: "Presents for medical clearance to Wichita children's home and concern for abuse. Brought to the

emergency room in police custody after daycare provider reported concern for abuse. Daycare provider provided police pictures of bruising to child's face and injuries to her back. Mom reported to police that patient is active and suffered injuries while playing. No known past medical history."

96. Page 19 of A.A.'s medical record contains administrative-exam coding with a skeletal survey ordered for reasoning stated as "Multiple bruises, concern for abuse," completed at 11:57 p.m. on January 8, 2024. The findings of the X-ray skeletal survey reported no healing or displaced fractures and no abnormal bone production or destruction. The medical record further reflects that Gregory G. Faimon, M.D., ordered the skeletal X-rays, as documented elsewhere in the same record.

97. At least 14 X-ray images were taken of A.A. during the skeletal survey at the hospital.

98. Debbie A. Desilet-Dobbs, MD personally reviewed the radiological images of Plaintiff's minor child, corrected the resident physician's interpretation as necessary, and signed and finalized the diagnostic impression of the skeletal survey, knowing the imaging was conducted while the child was in police custody and based on information provided by law enforcement. Dr. Desilet-Dobb's signed interpretation was relied upon in the continued detention and placement decision conserving the child.

99. Y.M's medical record on page 8 contains the following: "Brought to the emergency room with 2 other siblings due to concern raised by daycare provider of one of his siblings for abuse."

100. M.N.'s medical record on page 2 states, "Concern was raised by daycare provider for possible abuse of sibling."

101. The medical records for each child reflect that the stated basis for emergency-room evaluation was Honey Tree provider's allegations, and do not document any independent police observations, assessments, or investigative findings supporting a medical concern separate from those allegations.

102. A.A.'s record states "There is no indication for acute hospitalization... the patient will be discharged."

103. While at the hospital, Officers kept the children in the public waiting area; M.N. appeared upset while Officer Rusch questioned her there. (Officer Rusch body-worn camera, at multiple points at approximately 00:38:48–00:45:27; 00:43:00–00:43:28).

104. Hospital video reflects Y.M. and M.N. were questioned and asked to remove clothing, by Gregory Faimon MD, and Officers were present during examinations. (Officer Van Pelt body-worn camera, 00:00:00–00:02:10; Officer Duncan body-worn camera, 01:14:18–01:22:18).

105. A.A.'s medical records produced by the hospital provider and provided to Plaintiff do not match the records later included in the Wichita Police Department ("WPD") investigative packet. The WPD packet contains pages identifying a different patient not associated with Plaintiff's children and includes "straddle injury" discharge language that does not appear in the hospital-produced medical chart for A.A. Detective Ohmart's narrative for the police removal and detainment quotes and relies upon the "straddle injury" discharge language associated with a different child.

106. A.A.'s medical record reflects that at 03:32 a.m. on January 9, 2024, Nurse Wendy Hartman, RN, was notified by Megan Meier, RN, that A.A. "needed Child Abuse Forensic Photography." The record notes that Meier was "with a patient currently." At

05:07 a.m., Hartman arrived at Wesley Woodlawn Hospital, entered the patient room, and observed A.A. resting in a car seat with Wichita Police Officers Ryan (#1667) and Dulohery (#2270) present. Officer Dulohery held A.A. while Hartman performed forensic photography, which Hartman completed before leaving the facility at 05:44 a.m.

107. Plaintiff was not provided body-worn camera footage depicting the forensic photographing as cited in medical record.

108. The hospital discharge times as cited in the medical records for Plaintiff's children were 11:19 p.m. on Jan. 8, 2024 for Y.M., 11:29 p.m. on Jan. 8, 2024 for M.N., and 5:29 a.m. on Jan. 9, 2024 for A.A. The discharge paperwork contains the words "Discharged to Home: Yes," and also includes "Medically cleared for admission to Wichita Children's Home."

109. Y.M. and M.N. were transported to WCH by Officers Van Pelt and Rusch, and A.A. was transported later by Officer Ryan. (Officers Van Pelt and Ryan body-worn camera footage).

110. The PPC form, provided by DCF, completed by Officer Rusch and Dulohery was signed after medical examinations and after arriving to WCH, and contains a date and a time on the signature line. The timestamps provided by Gregg documenting PPC match the time of PPC listed on the Police Protective Custody Form. The paperwork, however, does not contain the elements required for a Police Protective Custody application under K.S.A. 38-2232(c), including facts explaining why officers believed the children would be harmed if not immediately removed or documenting individualized findings of imminent danger. the PPC narrative references a skeletal exam to "look for old injuries."

111. Records provided to Plaintiff from WPD included a document titled "Child Abuse Forensic Photography Case Review Addendum To Exam," listing Wendy Hartman as the nurse. The addendum contains handwritten narrative statements, including "this is child physical abuse" and "she needs to be protected," and identifies Beth Heflin in a "Case Reviewed By" field without specifying whether that physician examined the child or otherwise authorized the narrative. The addendum also lists an additional name on a "Program Coordinator" line; the Program Coordinator name is not discernible from the document. For pleading purposes, the Program Coordinator is identified herein as Doe Medical Provider A.

112. Approximately two hours and fifty minutes after A.A. was discharged from the hospital, the addendum referenced in paragraph 111 was faxed to Detective Ohmart on January 9, 2024, at approximately 08:19, as reflected in A.A.'s medical record. However, Beth Heflin, M.D., did not sign the addendum until January 22, 2024.

113. According to WCH records, WCH accepted physical custody from WPD, completed admission, intake and foster placement documentation that was produced to Plaintiff, and those WCH records do not include a court order or other judicial authorization approving the placement at the time of intake.

Denial of Placement With Fit Parent

114. While the children were at the hospital, Mohamed spoke with Officer Van Pelt who told him that all three children had been placed into police protective custody due to "concerning marks" on A.A. and that it was "protocol" to remove all siblings. She did not describe any imminent or individualized danger to any child, did not identify any emergency medical condition, and did not state that Mohamed posed any safety risk or

was unfit. When Mohamed requested immediate release of the children to him, Officer Van Pelt responded that her supervisor had already "made the call," that "the answer would not change," and refused to disclose the children's location or permit visitation. (Officer Van Pelt body-worn camera, 00:00:34–00:04:04).

115.    Mohamed thereafter went to the hospital and again requested to see and take custody of the children. Hospital staff did not permit him to see or retrieve them.

116.    While at the hospital, Mohamed informed Officer Ryan of his parental and court-authorized custodial status. Officer Ryan stated that when police take one child into protective custody, "we take all the kids," and told Mohamed he could not see or take custody of the children. Mohamed left the hospital without seeing the children. (Officer Ryan, body-worn camera, 00:00:33–00:02:49)

117.    At the time, Mohamed shared joint legal custody of Y.M. and had court-ordered step-parent visitation with M.N. issued by the Eighteenth Judicial District Court, Sedgwick County, Kansas. Neither child was released to him despite his presence and existing court authorization.

WCH Custody, Placement, and Release Records

118.    Wichita Children's Home ("WCH") internal records reflect that staff observed the children, documented behavior and emotional state, prepared internal reports, and referenced photographs taken during custody. DCF later produced photographs of A.A. taken while she was at WCH. Plaintiff's oldest child reported that a CPS worker photographed her arm, but no photographs of M.N. have been produced.

119. WCH Admission and Narrative forms contain information regarding the alleged abuse made by Honey Tree, including a narrative that documents the allegations made by the reporting daycare and observations of healing injuries from Officer Rusch.

120. WCH admission records reflect that M.N. and Y.M. were admitted to WCH at 12:29 a.m. on January 9, 2024, and A.A. at 5:57 a.m. that same day. Law enforcement approved release for M.N. at 11:43 a.m. on January 9, 2024, and for Y.M. and A.A. at approximately 11:43–11:45 a.m. on January 10, 2024. All three children were documented as released at 3:38 p.m. on January 10, 2024.

121. Despite documented approval for release, M.N. was not released until approximately 28 hours later, and no explanation for the delay was provided to Plaintiff.

122. Foster placement agreements were prepared by WCH for all three children. The children were placed into a foster home on January 9, 2024 by WCH who represented they were authorized to place the children into the foster home and represented that WCH is a Foster Home. The children were placed into a private family foster home. At all relevant times, Deborah Kennedy served as Chief Executive Officer of WCH.

123. The children's placement at Wichita Children's Home and subsequent foster-home placement occurred while the children remained in Police Protective Custody, and followed law enforcement's routing decision rather than any court order or DCF custody determination.

124. Plaintiff requested licensing and placement-authority records from DCF relating to Wichita Children's Home ("WCH"), including records authorizing WCH to place children into foster homes absent DCF custody or a court order. To date, DCF has not produced any

records identifying licensing, statutory authority, or contractual authorization permitting WCH to place Plaintiff's children into foster homes under those circumstances.

WCH Authority and Counsel Admissions

125. On November 20, 2025, WCH's counsel, Corey Adams, stated in email correspondence that WCH receives contractual payments related to child placement, including through agreements with DCF; makes placement decisions when children are referred by state actors; and operates as a private shelter facility within the child-welfare system.

Detective Interview

126. While the children were at WCH, Plaintiff spoke by phone with Detective Gabriel Ohmart. On January 9, 2024, while the children were still detained, Detective Ohmart sent an email to Prevention and Protection Services (PPS) worker Abiliba Erekosima and Prevention and Protection Services Supervisor Jana Vinduska summarizing Plaintiff's statements regarding A.A.'s injuries, including, among other things, that Plaintiff did not believe medical attention was necessary. This communication occurred while the children remained in custody and did not identify any emergency medical condition or new basis requiring continued detention.

127. Following this call, the children remained at WCH before being transferred into foster homes.

128. Detective Ohmart's supplemental narrative of the WPD incident contains a January 9, 2024 timestamp and references events occurring on January 9–10, 2024. The narrative references and relies upon medical records included in the WPD file provided for this incident that contain information regarding a child unrelated to Plaintiff.

129.   Law-enforcement records for the incident include two versions. The reports describe the same incident, location, and custody outcome, but differ in the level of narrative detail and sequencing of observations. Both versions reflect that the decision to place all three children into Police Protective Custody was made by a supervising officer and that the children were transported for medical clearance and then to Wichita Children's Home.

DCF Interviews and Statements at WCH (Jan. 9, 2024)

130.   Erekosima called Plaintiff by phone the morning of January 9th and stated she was on her way to visit the children. She asked for and Plaintiff provided the contact information for the children's fathers and M.N.'s aunt.

131.   While the children were at WCH, a Kansas Department for Children and Families ("DCF") employee interviewed the children regarding A.A.'s injuries. Detective Ohmart summarized those findings in the narrative of the WPD incident report.

132.   Ohmart's report reflects that on January 9, 2024, A.A. stated she was injured after climbing onto and falling from a chair, and included similar statements regarding falls involving household furniture and play activity.

133.   Portions of the WPD incident report identifying at least one DCF worker are redacted.

134.   On the evening of January 9, 2024, DCF worker Erekosima contacted Fielding by telephone and recorded Honey Tree's statements, as documented in DCF conversation notes. Erekosima noted Fielding's statements, including that A.A. had a "speech delay" and said Plaintiff reported that "A.A. is terrible at home and she needs help." The DCF conversation note states that Fielding told Erekosima an altered version about the earlier referenced "burn mark" and noted it as a "small round flat, red mark on wrist. No blister-old mark" and documented that Plaintiff said she was folding clothes and the shirt got

burned when folding clothes. A.A. never had a mark as described by Fielding to Erekosima and documented on the DCF conversation note. A.A. did not have a speech delay and Plaintiff did not tell Honey Tree that A.A. was terrible at home or that she needed help. Plaintiff was not folding clothes when the shirt got burned and Plaintiff did not tell Honey Tree that.

DCF Interview With Plaintiff and Safety Plan (Jan. 10, 2024)

135. On January 10, 2024, Plaintiff met with Erekosima at the Sedgwick County DCF office. Erekosima told Plaintiff that A.A. stated the injury occurred after she fell from a chair.

136. Erekosima questioned Plaintiff regarding M.N. Plaintiff objected to the removal and requested immediate return of her children.

137. Plaintiff told Erekosima that her constitutional rights had been violated and stated her children should have never been taken. Plaintiff questioned why no DCF employee had investigated the allegation prior to law-enforcement involvement and stated that the children should be released to her custody immediately.

138. Erekosima asked Plaintiff whom she intended to sue and stated that the removal decision was made by law enforcement rather than DCF.

139. After Plaintiff stated her constitutional rights had been violated and requested her children to be released immediately, Erekosima presented Plaintiff with an "Immediate Safety Plan" stating DCF was concerned that A.A.'s activity level was resulting in injuries. Erekosima stated she did not believe abuse had occurred but told Plaintiff if she did not sign the plan release would be delayed until a hearing could take place.

140. Plaintiff told Erekosima that she believed no plan was necessary and did not agree with the plan's contents.

141.    Erekosima stated the plan would be presented to a judge for approval. Plaintiff signed the plan without counsel. The plan reflects an inadvertent handwritten date of "01/10/2023" and was signed by Erekosima on January 10, 2024.

142.    During the interview, Erekosima made comments regarding Plaintiff's mayoral candidacy, Plaintiff's proximity to a daycare, and told Plaintiff to "watch your back."

143.    During a later phone call on the same day, Erekosima questioned Plaintiff's employment and income and questioned a car incident and told Plaintiff the plan would be presented to the judge.

No Court order or Judicial Review

144.    During the January 2024 incident, no court assumed jurisdiction and no judicial determination of custody occurred. Custody, placement, and release decisions were instead handled administratively.

Administrative Handling of Police Protective Custody

145.    In a written email to Plaintiff, Gregg explained the local process used to handle the post-incident administrative process used to handle Police Protective Custody ("PPC") cases in Sedgwick County. Gregg stated that PPC cases are handled through an administrative process involving law enforcement, DCF, and staffing with the district attorney's office. According to Gregg, a detective may be assigned to a PPC case after the initial incident, and DCF and law enforcement jointly collect information for the case. Gregg further stated that PPC cases are staffed with the district attorney's office at approximately 4:00 p.m. on the working day the case is assigned, at which time DCF presents a proposed plan based on the information collected. The district attorney's office may either accept the proposed plan or request that a Child in Need of Care petition be filed. In Plaintiff's

case, the district attorney's office accepted a plan for the children to be returned home with family preservation services. No Child in Need of Care petition was filed, and no temporary custody hearing occurred. DCF thereafter requested that law enforcement release the children from police protective custody and implemented the agreed-upon plan.

146.    Kansas law permits law enforcement to take a child into Police Protective Custody ("PPC") to the Juvenile Intake and Assessment Center ("JIAC") for assessment of placement. In Sedgwick County, however, DCF has acknowledged in writing that when children are routed by law enforcement to Wichita Children's Home ("WCH"), WCH is responsible for arranging temporary placement, which often includes placement in short-term emergency foster homes licensed by DCF. DCF further acknowledged that DCF CPS does not decide where a child is physically placed during PPC, and that placement decisions are made by WCH when children are processed through WCH or, ultimately, by law enforcement based on routing decisions. The memorandum of agreement governing JIAC procedures in effect on January 8, 2024 does not assign WCH intake authority, custody-determination authority, or judicial functions. Under the described practice, children were routed directly to hospitals and shelter facilities without JIAC assessment, judicial review, or confirmation that statutory custody-application requirements had been satisfied, resulting in continued separation from parents based on administrative workflow rather than individualized emergency necessity.

Return of Children

147.    On January 10, 2024, Plaintiff was informed she could retrieve her children from WCH. Plaintiff picked up the children after 4:30 p.m. WCH records list a release time of 15:38 (3:38 p.m.).

148.    Tape residue visible on A.A.'s back is shown in photographs taken at WCH that were provided to Plaintiff by DCF. However, when Plaintiff picked her children up, the tape residue was no longer present on A.A.'s back. Plaintiff did not authorize removal of the tape residue.

149.    Following Plaintiff's withdrawal of her child from Honey Tree. Kimberly Fielding or a representative acting on behalf of her or Honey Tree, posted a response on Honey Tree's Yelp business page, on March 28, 2024, addressing Plaintiff by her first name and stating that Plaintiff withdrew her child immediately after the child was removed from Plaintiff's home. The post referenced circumstances relating to A.A.'s removal and child-welfare involvement and was publicly accessible to parents and community members associated with Honey Tree.

Continuation of Services Through DCCCA, Inc.

150.    On January 22, 2024, Plaintiff met with DCCCA, Inc. ("DCCCA") employee LaVandria Fountain. Plaintiff told Fountain she did not need services. Fountain told Plaintiff that the only reason the judge allowed you to get your kids back was because you agreed to these services.

151.    Fountain also commented on Plaintiff's red patchy skin insinuating there was something medically wrong with Plaintiff.

152. Fountain also looked at the bandages on Plaintiff's knuckles and made remarks implying concern about Plaintiff's well-being. Plaintiff had the bandages from home-renovation work and had recently completed tiling more than 800 square feet.

153. Fountain pressured Plaintiff to enroll in services repeating the same statements originally supplied to police by Honey Tree and Academy LLC's owner Kimberly Fielding including the injury to A.A.'s back and the car incident with her son.

154. Plaintiff requested to read the electronic service documents directly. Fountain did not allow Plaintiff to read the electronic documents directly. Fountain read selected portions aloud and had Plaintiff sign electronically. Fountain told Plaintiff copies would be provided after signing.

155. After the meeting with Fountain concluded, Plaintiff sent text messages to her mother describing the meeting. Plaintiff stated in messages to her mother that Fountain commented about her skin and the bandages on her knuckles. Plaintiff also wrote in text a message, "They are painting pictures of me in a negative light right in front of my face and it's not healthy for anyone to go through that."

156. On January 25, 2024, Plaintiff received the signed DCCCA documents and learned the services were not court-ordered. Plaintiff unenrolled the same day by email. Plaintiff notified DCF Regional Director Dee E. Nighswonger, who forwarded the information to Gregg.

Subsequent Communications Regarding Services

157. On January 30, 2024, Plaintiff received a letter from DCF Prevention and Protection Services Supervisor Jana Vinduska stating that DCF had "received notification that you have declined DCCCA, services as of Janaury 25, 2024." The letter further stated "If

DCF continues to receive reports on your child" A.A, "having unexplained marks and bruises, you will run the risk of having her removed from your home, due to not being compliant with DCCCA, services, and discontinuing those services."

158. The letter did not reference a court order or judicial proceeding.

159. After unenrolling, Plaintiff received phone calls from DCF personnel, including CPS Supervisor Ashlie Thomas, regarding reenrollment in services.

160. On February 16th 2024, after Plaintiff received a call from Ashlie Thomas, Plaintiff forwarded to Thomas the email previously sent to Regional Director Nighswonger requesting to be unenrolled from services. Nighswonger responded though email that Thomas had assumed supervisory responsibility over the case.

161. No further communication was provided to Plaintiff stating why further DCF involvement continued after receiving the letter that the findings were unsubstantiated, and after unenrolling from service and after DCF acknowledged the unenrollment.

DCF Findings, Intake Actions, and Record Discrepancies

162. DCF provided Plaintiff a PPS finding reflecting an allegation of "physical abuse" concerning A.A. with a disposition of "unsubstantiated" and "unknown perpetrator."

163. Between February 28, 2024 and November 2025, Hunter and Gregg corresponded with Plaintiff regarding the custody and placement status of Plaintiff's children and the associated medical bills.

164. Emails from Gregg contain timestamps showing the matter was assigned to a PPS worker on January 9, 2024 at approximately 9:22 a.m. A PPS Combined Intake Report produced by DCF states that a welfare check was "not warranted" and that there was "no indication [the] child is at risk of imminent danger." The report contains redactions obscuring the

identity of the employee who completed the assessment, identifies LaQuilla Williams as receiving the intake, and references a subsequent "override," later timestamps, reassigned complaint or event numbers, and involvement by Jana Vinduska. Plaintiff requested records reflecting intake, screening, override, and audit history, but DCF's counsel asserted through email that the information was confidential and not subject to disclosure.

165. The PPS Combined Intake Report reflects a report time of January 9, 2024 at 9:09 a.m. and states that A.A. "is still currently at Wesley Woodlawn." At that time and date A.A. was already discharged from the hospital and admitted to WCH.

166. Multiple complaint numbers appear in DCF records for the January 8–10, 2024 incident, and Defendants have not produced records explaining the reassignment of report numbers, overrides, or discrepancies between intake narratives and contemporaneous medical records. The report "Basis" section does not identify the information relied upon to support the intake assignment decision.

167. On January 10, 2024, Lori Clark, acting in her capacity at the Kansas Protection Report Center ("KPRC"), documented on the PPS Combined Intake Report that a PPM 1700 override requested by PPS Supervisor Jana Vinduska was approved. Under DCF policy, PPM 1700 overrides may be approved only by KPRC supervisory personnel.

168. DCF also produced a Session Staffing Report for the incident and the metadata fields of that report for "date" and "facilitator" are marked "hidden." The report states Plaintiff said she used "duck tape" in place of Band-Aids. Plaintiff did not use or say she used "duck tape." In addition, the report includes information provided by Honey Tree owner Fielding stating they "constantly watch mother and what is going on at the home" since the daycare backs up to the mothers back yard.

169. Plaintiff was provided with a Notice of Department Findings (PPS 2012) for event number 02349898 originally dated 01/19/2024 and amended with correct last name on 11/14/2025, reflecting an unsubstantiated finding and identifying the alleged perpetrator as unknown. DCF has not produced a session staffing report associated with event number 02349898.

170. DCF General Counsel Marc Altenbernt later produced a session staffing report associated with event number 2349962 but did not produce a PPS 2012 Notice of Findings for that event. DCF records indicate that event number 02349898 was overridden or reassigned to event number 2349962.

Medical Billing After Hospital Examination

171. Plaintiff received medical bills from Wesley Woodlawn Hospital & ER for the January 8–9, 2024 examinations and contacted DCF worker Erekosima to ask who was responsible. Erekosima responded though a text message "Miss, that's your bill to pay." Plaintiff thereafter informed Erica Hunter, who at the time was the Deputy Director of Safety and Thriving Families for DCF, that she did not consent to the examinations, did not authorize billing through her private insurance, and objected to personal financial responsibility. DCF advised that payment would have to be processed through Plaintiff's insurance, which Plaintiff refused. Despite this, the hospital later submitted charges through Plaintiff's insurance without Plaintiff's authorization, and Plaintiff received insurance-processed billing statements. DCF later stated that it paid the remaining balance of the medical bills. Plaintiff's subsequent request for complete medical and billing records from the hospital yielded only partial records, which did not identify the full scope of examinations or who authorized insurance billing.

HIPAA Records Requests and Forensic Photographs

172.    Between February and May 2024, Plaintiff submitted multiple HIPAA-compliant requests through Ciox Health, the contracted medical-records vendor for Wesley Woodlawn Hospital & ER, seeking her child's complete medical record, including forensic photographs referenced in the produced records. Plaintiff received partial records that referenced forensic photography, but no photographs were produced. Ciox Health repeatedly advised that a site representative had been contacted to request a rescan and later stated that it did not possess the photographs and had forwarded the request to the facility or radiology. In December 2025, Wesley's Forensic Nursing Program Coordinator informed Plaintiff that forensic photographs are not released to individuals. As of the filing of this Complaint, the referenced forensic photographs have not been produced.

Municipal Policy, Custom, and Practice

173.    In Sedgwick County, law enforcement officers, shelter providers, child-welfare personnel, and medical providers follow a recurring operational sequence when children are taken into Police Protective Custody ("PPC"), which includes warrantless removal, transport for non-emergency medical examination, delivery to Wichita Children's Home ("WCH"), and continued separation from parents pending DCF assessment and service planning, prior to any judicial review.

174.    On January 8, 2024, City of Wichita police officers removed Plaintiff's children from her residence and transported them to a hospital for "medical clearance" before delivering them to WCH and later to a foster placement. No officer presented a warrant or court

order authorizing removal. Officers observed a bruise on A.A.'s cheek and a scab and scratches on her back.

175.    Officer Ryan, the supervising officer on scene, stated on body-worn camera that he did not know whether A.A. was in danger and explained that officers "err on the side of caution" by taking children for medical clearance. Officer Ryan further stated that the decision to take the children was based on photographs of A.A. and information officers had been told by DCF. (Officer Ryan body-worn camera at 00:22:29-00:22:40 and 00:26:47-00:27:01).

Police Protective Custody as Routine Protocol

176.    WPD maintains PPC forms and training materials that do not reference K.S.A. 38-2232(c) or include the elements required for a police protective custody application under Kansas law.

177.    WPD Policies 507 and 508 govern child-abuse responses and PPC decisions. Policy 508 authorizes custody by reference to K.S.A. 38-1527, which has been repealed and superseded by the current Child in Need of Care Code, including K.S.A. 38-2231 and 38-2232. Neither policy references the current governing statutes or requires officers to document findings of imminent danger or immediate necessity prior to warrantless custody.

178.    As written and implemented, Policies 507 and 508 do not instruct officers that warrantless PPC is limited to emergency circumstances requiring immediate removal, nor do they address when continued custody is no longer authorized once initial safety concerns have been resolved.

179.   The training materials produced by WPD do not include instruction on the statutory limits governing warrantless PPC or on the procedural requirements following removal.

180.   Policies 507 and 508 do not require documentation of individualized assessment or separate findings for each child taken into PPC.

181.   Although Policy 508 permits supervisory consultation with DCF and authorizes leaving a child with a caregiver while offering voluntary services, it does not require officers to assess or document whether such alternatives could address identified concerns before resorting to PPC.

Automatic Medical Clearance Without Emergency

182.   Supervising Officer Ryan described non-emergency medical clearance as routine, stating they "do it all the time." (Officer Ryan body-worn camera, 00:21:51–00:22:06).

183.   DCF personnel confirmed in reference to the events that transpired with Plaintiff's children Jan 8-10 2024, that, in practice, children taken into PPC in Sedgwick County are routinely transported to emergency departments for medical and forensic evaluation prior to shelter placement, and that such examinations are considered part of the normal workflow.

184.   In this case, Wesley Woodlawn Hospital & ER conducted examinations on all three children, including X-rays of A.A., without documented medical emergency or parental consent, and medical evaluation functioned as a prerequisite to release from PPC.

Shelter Placement and Administrative Detention Without Statutory Verification

185.   Wichita Children's Home ("WCH") accepted Plaintiff's children from law enforcement, continued to house them, and facilitated placement into a foster home without requiring receipt or confirmation of a written Police Protective Custody application containing the

elements required by K.S.A. 38-2232(c), and without documentation that any such application had been delivered to the county or district attorney or that judicial authorization for custody or placement had been obtained.

186. Email communications with Gregg describe a regional workflow in which, after children are taken into Police Protective Custody without a court order, DCF conducts an assessment and develops a proposed plan that is staffed with the district attorney's office after assignment of the case and within the Police Protective Custody period. DCF has represented that such staffing occurs by the end of the assigned workday, but in practice occurs after DCF interviews and assessment are completed but before the 72 hour window, as in Plaintiff's case. If the district attorney accepts DCF's proposed plan, no Child in Need of Care petition is filed, and DCF requests that law enforcement release the children from Police Protective Custody.

187. Kansas law requires that when a child is taken into Police Protective Custody without a court order and delivered to a shelter facility designated by the court, a written application for custody containing the elements set forth in K.S.A. 38-2232(c) be delivered to the county or district attorney without unnecessary delay, and vests authority to release the child in law enforcement or the county or district attorney. The described workflow does not reflect that the district attorney was provided a written application containing the required statutory elements, nor that such an application was delivered at all.

188. Although law enforcement retained statutory authority to release the children, release did not occur in the absence of exigent circumstances or following medical clearance, but only after DCF completed its assessment and Plaintiff executed a

proposed plan. DCF has stated that it does not determine the legality of Police Protective Custody decisions, yet under established inter-agency practice, release decisions were deferred pending DCF investigation, staffing, and service planning, resulting in continued separation of the children from Plaintiff without judicial authorization.

Routine Hospital Processing of Children Transported by Law Enforcement

189. Gregg described in email that it was a routine practice in Sedgwick County for law enforcement officers to transport children taken into police protective custody through hospital emergency departments prior to placement at Wichita Children's Home. DCF further stated that, under this practice, Wesley forensic nurses (SANE nurses) are frequently involved in conducting head-to-toe assessments and photographing visible injuries, and that these steps are considered "normal processes" and "normal to the flow of the work."

190. As further reflected in written communications from Hunter, stated that the examinations performed in this context were not CARE exams, which Hunter indicated may only be conducted by designated CARE providers. Hunter further stated that Wichita Children's Home maintains specific policies regarding medical clearance of children taken into police protective custody, but DCF has not produced those policies in response to Plaintiff's KORA requests.

191. DCF has not produced any policy, protocol, or documentation describing the procedures followed for medical clearance or non-emergency medical examinations under those circumstances.

192.    The medical records and DCF records received by Plaintiff, do not reflect the submission of a Police Protective Custody application containing the elements described in K.S.A. 38-2232(c), nor do they reflect that any such application was presented to the county or the DA. Email correspondence from JIAC on December 4th 2025, stated that JIAC had no record of Plaintiff's children.

193.    At the time of placement, Wichita Children's Home accepted physical custody of the children as a shelter facility; however, the records do not reflect compliance with the statutory prerequisites set forth in K.S.A. 38-2232(c)–(e), including the absence of a written application by a law enforcement officer stating reasonable grounds for immediate custody, the absence of furnishing such application to the county or district attorney without unnecessary delay, and the absence of any court order authorizing continued custody.

194.    Plaintiff has not been provided documentation showing that the designation relied on for this placement was current and applicable to intake, or that WCH's acceptance occurred in compliance with K.S.A. 38-2232's written application and notice requirements. Accordingly, Defendants treated WCH as a court-designated PPC receiving facility without verifying that a valid, applicable designation was in effect or that the statutory conditions for lawful intake had been satisfied.

195.    Plaintiff requested records from the District Court of the Eighteenth Judicial District, Sedgwick County, Kansas concerning all Administrative Orders designating shelter facilities to receive children taken into police protective custody under K.S.A. 38-2232, including Administrative Order 07-MV-32 and any amendments or successors.

196.  In response, the Court produced an administrative order issued in 1995 authorizing Wichita Children's Home to receive children directly from law enforcement; that order expressly expired in 1999.

197.  The Court produced no administrative order, standing designation, or judicial authorization in effect during January 2024 authorizing Wichita Children's Home to receive children directly from law enforcement.

198.  The only other document produced by the Court was dated December 2025 and was created after Plaintiff's records request; it did not purport to retroactively authorize prior placements.

199.  At the time Plaintiff's children were delivered to WCH directly by police, no court designation authorized WCH to receive children directly from law enforcement under K.S.A. 38-2232(a)(2)(A)(i).

Second Removal in 2025 (No Relief Sought)

200.  In September 2025, law enforcement again removed Plaintiff's children without a warrant, court order, or exigent circumstances and routed them to Wichita Children's Home, where at least one child was placed overnight in a foster home before being returned to Plaintiff within approximately 72 hours. No Child in Need of Care petition was filed, and DCF later classified the incident as unsubstantiated. Before release, DCF proposed family preservation services; Plaintiff declined stating she did not need services and that during the Jan 2024 incident she had previously been coerced into services by the conditioning of her children's release on service compliance. Following Plaintiff's refusal and stated previous coercion, DCF did not pursue services and released the children without conditions. Plaintiff seeks no relief for this incident, which is included

solely as pattern evidence of repeated custodial placement involving WCH and foster homes absent judicial authorization.

Ongoing Harm and Continuing Effects of Defendants' Conduct

201. As a direct and proximate result of Defendants' actions, Plaintiff has suffered severe and ongoing harm extending well beyond the period of the children's physical detention.

202. From approximately 6:00 a.m. on January 8, 2024, until approximately 10:00 p.m. on January 10, 2024, Plaintiff remained awake continuously—approximately sixty-four (64) hours—while attempting to locate her children, obtain information regarding their status, and secure their release. Plaintiff regained physical custody of her children at approximately 5:00 p.m. on January 10, 2024, but did not sleep until later that evening. This prolonged sleep deprivation occurred while Defendants continued to detain Plaintiff's children without court order and without providing clear information or lawful justification, exacerbating the coercive nature of Defendants' conduct and impairing Plaintiff's ability to meaningfully advocate for her family during the period of detention.

203. Plaintiff continues to suffer ongoing emotional and psychological harm arising from learning of the conditions under which her children were held, including unnecessary physical intrusions, prolonged separation of siblings, sleep disruption, and lack of transparency while her children were in custody. These experiences have caused Plaintiff persistent anxiety, hypervigilance, and a reasonable fear of recurrence, given Defendants' continued defense and justification of the same practices. Plaintiff's family security and sense of parental autonomy remained impaired, and absent prospective relief, Plaintiff faces a credible risk that similar unlawful actions will be repeated under the same defended policies and practices.

204. Following the incident, Plaintiff has experienced persistent and reasonable fear of future state intervention. Plaintiff avoids contact with law enforcement, alters her daily activities to avoid police presence, and experiences ongoing anxiety in public spaces after encountering officers involved in the incident. Plaintiff no longer permits school personnel or other mandatory reporters to interact with her children outside her presence due to fear of retaliation, misinterpretation, or renewed escalation. Plaintiff has withdrawn from civic and public life, including discontinuing her pursuit of public office, out of concern that visibility could expose her family to further targeting.

205. Plaintiff also experiences ongoing fear regarding her child A.A.'s safety in ordinary childhood activities. As a direct result of Defendants' actions, Plaintiff now experiences persistent and reasonable fear that any minor injury to her child A.A. could again be misinterpreted, escalated, or used to justify state intervention without court oversight. Plaintiff finds herself hypervigilant during ordinary childhood play and restricts A.A.'s normal exploration out of fear that even accidental injuries could trigger renewed seizure, investigation, or removal. This state-imposed fear has materially altered Plaintiff's parenting, impaired A.A.'s freedom to engage in age-appropriate activity, and thereby caused Plaintiff ongoing emotional distress and loss of parental autonomy.

206. Defendants' actions also caused lasting emotional harm to Plaintiff's children and to Plaintiff as their parent. Prior to the January 2024 removal, Plaintiff's oldest daughter expressed a profound fear of being placed into foster care. Plaintiff reassured her child that she would never allow that to happen. Despite Plaintiff's assurances, Defendants removed the children and placed them into foster care.

207. As a result, Plaintiff's children were forced to confront the sudden reality that their family could be broken apart by state action, even in the absence of court oversight or emergency. Plaintiff has been left to carry the emotional weight of having been unable to protect her children from that outcome, despite her efforts and assurances. This experience undermined the children's sense of safety, trust, and stability, and altered the parent-child relationship by introducing fear and insecurity where reassurance once existed.

208. These harms were not speculative, incidental, or subjective. They were foreseeable consequences of Defendants' seizure, detention, medical examination, and placement of Plaintiff's children without lawful authority, judicial oversight, or adherence to constitutional and statutory safeguards. Plaintiff continues to live with the effects of Defendants' conduct on her health, her parenting, her family relationships, and her ability to participate freely in public life.

209. As a direct result of Defendants' actions, Plaintiff reasonably believes that she has been perceived as an unfit parent because state actors treated her as such—removing her children, subjecting them to investigation, and placing them into foster care without court oversight or lawful cause, and sending threatening letters to enroll in services.

210. Plaintiff's ongoing harm is intensified by the profound disruption to her identity and role as a parent. Plaintiff breastfed each of her children and has consistently taken deliberate steps to provide them with a healthy, stable environment, including prioritizing their education, safety, and emotional well-being. Learning that her children were subjected to intrusive handling, separation, and placement by the state—despite Plaintiff having done nothing to warrant such intervention—has caused Plaintiff deep distress, shame, and a

lasting sense of moral injury. Plaintiff continues to struggle with the emotional impact of having her parental care overridden and her children treated as though they were unsafe in her custody when no lawful basis existed for that conclusion.

211.    Plaintiff avoids public spaces, limits social interaction, and experiences anxiety in ordinary settings such as grocery stores, schools, and community events. Plaintiff has encountered law enforcement officers involved in the incident in public places and experiences fear and distress upon seeing them, reinforcing her perception that she is being watched, judged, or targeted.

212.    This reputational and psychological harm is not speculative. It flows directly from Defendants' actions, which effectively branded Plaintiff as unfit in the community without judicial findings, due process, or substantiation, and left Plaintiff to live indefinitely with the social consequences of an unlawful state intervention.

213.    As a result of Defendants' conduct, Plaintiff's professional life was materially disrupted. Plaintiff is a music producer who released thirteen (13) songs in 2023. After the January 2024 seizure of her children and the ensuing trauma and state interference, Plaintiff's ability to produce music was severely impaired. Plaintiff released only two (2) songs in 2024 and only one (1) song in 2025 to date. Plaintiff was forced to redirect substantial time, energy, and emotional resources away from her creative work toward protecting her children, responding to Defendants' actions, and coping with the resulting trauma.

214.    Plaintiff is employed as an Environmental Health, Safety, and Quality ("EHSQ") Manager. In addition to her primary employment, Plaintiff is a published author, music producer, and poet who was actively engaged in creative and community-based work prior to the events described herein. Plaintiff was publicly listed as a candidate for mayor

during the 2023 election cycle and had previously volunteered as a coach for her sons' basketball and soccer teams.

215. Plaintiff's residence is located in immediate and unavoidable proximity to Honey Tree Academy LLC. From Plaintiff's home, the daycare facility, its parking lot, and associated outdoor areas are directly visible from Plaintiff's deck, dining room, and living room windows. Daily daycare operations—including staff presence, vehicle traffic, playground noise, and routine activities—are audible and observable from within Plaintiff's home. As a result, Plaintiff experiences heightened anxiety and distress whenever she is at home, and she feels she is being watched by the daycare. As a result of this proximity, Plaintiff has been unable to avoid ongoing reminders of Defendants' actions, including the events that led to the removal of her children and the subsequent public disclosures made by Defendants. The physical closeness between Plaintiff's residence and the daycare has deprived Plaintiff of any meaningful opportunity to create distance from the source of her trauma, rendering her home—a place ordinarily associated with safety and privacy—a constant site of distress. This proximity has prolonged and intensified the emotional and psychological impact of Defendants' conduct and has interfered with Plaintiff's ability to regain a sense of security, stability, and normalcy following the events at issue.

216. Plaintiff's injuries are ongoing and continuing. Following the removal and detention of her children, Plaintiff repeatedly contacted Defendant Elizabeth Gregg, Wichita Region Assistant Regional Director of Programs, seeking information and corrective action regarding the absence of court authorization, the use of foster homes during police protective custody, the nonconsensual medical examinations and forensic photography, and the lack of transparency surrounding placement decisions.

217. In response, Gregg did not treat these concerns as irregularities requiring intervention. Instead, she affirmatively defended the practices at issue as normal, routine and cited Kansas laws; disclaimed agency responsibility to prevent or correct them; and justified continued secrecy and lack of parental access. By defending and reinforcing the system rather than correcting it, Gregg ratified and perpetuated the unconstitutional practices that caused Plaintiff's injury.

218. Plaintiff further alleges that official DCF staffing records documenting the removal and related decision-making were generated through the agency's live case-management system in a manner that concealed key identifying information, including the date of the staffing session and the identity of the facilitator or decision-maker. Plaintiff has been unable to determine who authored, approved, or relied upon these statements, or when they were made, despite repeated efforts to obtain clarification. This lack of transparency has prevented Plaintiff from correcting inaccurate statements, understanding the basis for agency actions taken against her family, and obtaining assurance that similar undocumented decisions will not recur. The continued existence and defense of these nontransparent recordkeeping practices contributes to Plaintiff's ongoing harm and her reasonable fear of future deprivation of parental rights without due process.

219. As a result, Plaintiff continues to suffer ongoing harm, including continued deprivation of parental rights without due process, inability to obtain full medical information regarding what her children endured, financial consequences flowing from state-directed actions, and a reasonable fear that her family remains subject to the same unconstitutional practices in the future. Prospective declaratory and injunctive relief is therefore necessary to prevent continued enforcement of these practices

## V. LEGAL FRAMEWORK

220.    Warrantless Seizure of Children. The Fourth Amendment permits state actors to remove a child from a parent without a warrant only when they possess specific, articulable facts showing the child faces imminent danger of serious harm and that immediate removal is necessary.  Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1240-47 (10th Cir. 2003); PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1197-98 (10th Cir. 2010).

221.    The Fourth Amendment prohibits not only the initial warrantless seizure of a child absent exigent circumstances, but also the continued detention of a child once the justification for the seizure has ended. Speculation, generalized concerns, or administrative convenience cannot satisfy this standard.  Once any exigency ends, continued detention becomes an unreasonable seizure.  Jones v. Hunt, 410 F.3d 1221, 1229-30 (10th Cir. 2005).

222.    Child-welfare agencies lack independent authority to detain children absent judicial authorization or a properly filed petition. Where state law vests custody or release authority in law enforcement or the court, CPS or DCF officials may not prolong separation by delaying release pending investigation, staffing, service planning, or execution of safety plans. Once no exigent circumstances exist—or where none ever existed—continued detention constitutes an unreasonable seizure under the Fourth Amendment and a deprivation of family integrity without due process under the Fourteenth Amendment. State actors who cause or prolong such detention through administrative practice or inter-agency workflow are liable regardless of formal custody labels.

223. Refusal to Release to an Available, Fit Parent. When a fit, available parent is present, willing, and able to assume custody, officials must release the child unless they can point to specific, articulable facts showing the parent poses an imminent danger to the child. Blanket refusals, administrative convenience, or generalized concerns are unconstitutional, and any continued detention must be independently justified for each child. Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1244–48 (10th Cir. 2003).

224. By January 8, 2024, it was clearly established that officials may not deny release to a fit, available parent absent a warrant, court order, or exigent circumstances; qualified immunity does not protect such conduct. Roska, 328 F.3d at 1244-48; Jones, 410 F.3d at 1228-30.

225. Warrantless Entry onto the Curtilage; Scope of Consent. The Fourth Amendment protects the home and its curtilage to the same degree as the home itself. Florida v. Jardines, 569 U.S. 1, 6–9 (2013); United States v. Carloss, 818 F.3d 988, 993–95 (10th Cir. 2016). Officers may not enter a backyard or side yard to investigate without a warrant, voluntary consent, or a true exigency. Any consent given is limited in scope, and officers violate the Fourth Amendment when they exceed that scope or escalate an encounter into a search or investigative entry without independent justification. See United States v. Kimoana, 383 F.3d 1215, 1221–22 (10th Cir. 2004); United States v. Cos, 498 F.3d 1115, 1125–26 (10th Cir. 2007).

226. Consent to enter a home or its curtilage is limited to the officers expressly permitted entry; summoning and admitting additional officers without separate consent, a warrant, or exigent circumstances exceeds the scope of consent and constitutes a warrantless entry in

violation of the Fourth Amendment. Kimoana, 383 F.3d at 1221–22; Cos, 498 F.3d at 1125–26.

227. Excessive Force Against Children. All physical force during a seizure is judged under the Fourth Amendment's objective-reasonableness standard. Graham v. Connor, 490 U.S. 386, 395-97 (1989). Very young children are incapable of meaningful resistance, an involuntary movement, crying, or reflexive behavior does not constitute resistance. Because children are uniquely vulnerable, force that might be reasonable against an adult may be excessive when used on a minor, particularly a toddler. Any force used to prolong an unlawful seizure is unconstitutional. Roska, 328 F.3d at 1247-48.

228. Investigative Exams Are Fourth-Amendment Searches. Any non-emergency photographing, physical inspection, or radiological imaging of a child's body for evidentiary or placement purposes is a search. Investigative photography performed for law-enforcement, child-protection, or placement decision-making purposes—rather than for diagnosis or treatment—constitutes evidence gathering and is subject to the Fourth Amendment's warrant requirement when is primary purpose is investigative or custodial rather than diagnostic or therapeutic. Dubbs v. Head Start, Inc., 336 F.3d 1194, 1206-07 (10th Cir. 2003); Winston v. Lee, 470 U.S. 753, 760-61 (1985).

229. Warrant Requirement. Non-emergency searches require (a) a warrant, (b) a court order, (c) voluntary parental consent, or (d) a true medical emergency. Administrative convenience or investigative interest is not an exigency. Dubbs, 336 F.3d at 1215-17.

230. X-Rays Are Invasive. Compelled x-rays of a medically stable child absent judicial or parental authorization are per se unreasonable and expose the child to radiation without constitutional justification and intrude upon both the child's bodily integrity and the

parent's protected liberty interest in medical decision-making.  Winston, 470 U.S. at 760-61.

231.    Private Day-Care Providers as State Actors. A mandatory reporter becomes a § 1983 actor when it supplies false or embellished information, coordinates with police, or performs bodily inspections beyond routine care that officers then rely on without independent investigation. Bodily inspections exceeding routing caregiving and undertaken for investigatory purposes constitute searches subject to Fourth Amendment constraints. Dennis v. Sparks, 449 U.S. 24, 27-28 (1980); Price-Cornelison v. Brooks, 524 F.3d 1103, 1115-16 (10th Cir. 2008).

232.    Fundamental Right to Family Integrity. Parents have a Fourteenth-Amendment liberty interest in the care, custody, and control of their children. Troxel v. Granville, 530 U.S. 57, 65–66 (2000). Interference with that relationship—including refusal to place or release a child to a fit, available parent without individualized justification—violates substantive due process, particularly where no court order or exigent circumstances exist. Jones v. Hunt, 410 F.3d 1221, 1229–30 (10th Cir. 2005); Croft v. Westmoreland Cnty. CYS, 103 F.3d 1123, 1126–30 (3d Cir. 1997).

233.    Kansas PPC Statutes. K.S.A. 38-2231 & 38-2232 permit only temporary protective custody upon imminent danger and require immediate delivery to statutorily authorized recipients; non-emergency medical exams or private-shelter placement without lawful custody and statutory delivery are ultra vires.

234.    Clearly Established Law. By January 2024, the principles stated above were firmly established in Supreme Court and Tenth Circuit precedent. No objectively reasonable officer, medical provider, or private actor acting jointly with the state could have believed

that continuing detention after the absence of exigent circumstances, non-emergency medical examinations or x-rays without consent or judicial authorization, warrantless entry onto curtilage, or force used to prolong an unlawful seizure comported with the Fourth or Fourteenth Amendments. Qualified immunity therefore does not apply.

235. Private Entities Acting Under Color of State Law. A private entity acts under color of state law when it performs functions traditionally reserved to the state, is significantly encouraged or directed by the state, or is entwined with governmental policies or decision-making. Lugar v. Edmondson Oil Co., 457 U.S. 922, 939–42 (1982); Dennis v. Sparks, 449 U.S. 24, 27–28 (1980); Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296–302 (2001). Child-welfare contractors, family-preservation providers, medical providers, hospitals, and daycare or childcare entities act under color of state law when they jointly participate with law enforcement or child-protection agencies; perform delegated investigative, medical, placement, detention, or reunification functions; or implement, enforce, or threaten custody consequences, safety plans, medical examinations, photographic documentation, or services at the direction of, in coordination with, or with delegated authority from the state. When acting in this capacity, such private actors are subject to the same First and Fourteenth Amendment constraints as state officials and may not misrepresent judicial or statutory authority, coerce parental consent, conduct or facilitate non-emergency investigative examinations, condition reunification or continued custody on non-court-ordered services, or threaten removal absent lawful process.

236. Core Government Functions. The seizure, detention, supervision, and placement of children are core governmental functions. A private entity that receives children from

police, holds them during protective custody, controls supervision or placement, or conditions reunification performs a public function and acts under color of state law. See West v. Atkins, 487 U.S. 42, 54–57 (1988); Johnson v. Rodrigues, 293 F.3d 1196, 1205 (10th Cir. 1999).

237.    Joint Action Between Police and WCH. Joint action exists where a private entity is a willful participant in state conduct or where state actors rely on the private entity's participation to carry out a seizure or detention. Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447–48 (10th Cir. 1995); Price-Cornelison v. Brooks, 524 F.3d 1103, 1115–16 (10th Cir. 2008).

238.    Private Facilities Cannot Exercise Custodial Authority Without Authorization. Kansas law strictly limits who may receive, detain, or place children taken into police protective custody. Absent court designation or statutory authorization, a private shelter has no authority to accept children from law enforcement, detain children, arrange foster placement, or control release decisions. Actions taken without such authority are ultra vires and violate the Fourth and Fourteenth Amendments.

239.    WCH's Participation in Detention and Placement Subjects It to § 1983 Liability. When a private shelter accepts children directly from police, holds them during an alleged protective-custody period, facilitates or arranges foster placement, or defers to police or agency directives rather than judicial authorization, it becomes an integral part of the state's seizure and detention process and acts under color of state law. See Wittner v. Banner Health, 720 F.3d 770, 776–77 (10th Cir. 2013).

240.    Medical Providers Acting Under Color of State Law. When a private medical provider performs, authorizes, or ratifies non-emergency medical examinations or radiological

imaging of a child at the request of law enforcement, while the child is under police control and without a warrant, court order, parental consent, or true medical emergency, the provider is a willful participant in state action and acts under color of state law for purposes of 42 U.S.C. § 1983. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 939–42 (1982); Dennis v. Sparks, 449 U.S. 24, 27–28 (1980); Dubbs v. Head Start, Inc., 336 F.3d 1194, 1207–15 (10th Cir. 2003); Winston v. Lee, 470 U.S. 753, 760–61 (1985).

241. Qualified immunity may extend to private medical providers only when they perform discretionary functions while acting under color of state law. Filarsky v. Delia, 566 U.S. 377, 383–84 (2012). Such providers are not entitled to qualified immunity when they engage in conduct that violates clearly established constitutional rights, including non-emergency medical examinations or investigative procedures performed for law-enforcement or child-protection purposes without a warrant, court order, or valid consent. Dubbs v. Head Start, Inc., 336 F.3d 1194, 1215–16 (10th Cir. 2003). Where the constitutional limits on medical examinations of children are clearly established, qualified immunity does not shield participating medical personnel. Id.

242. Qualified Immunity Does Not Apply to WCH's Conduct. As of January 2024, it was clearly established that only statutorily authorized entities may receive or detain children in protective custody, and participation in unlawful detention violates clearly established Fourth and Fourteenth Amendment rights. No reasonable private actor operating as part of a child-welfare detention pipeline could believe it was lawful to detain or place children absent statutory or judicial authority. Qualified immunity therefore does not apply.

243. Qualified Immunity (Officers). Qualified immunity shields officers from liability unless their conduct violates a clearly established constitutional right of which a reasonable officer would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A right is clearly established when existing precedent places the unlawfulness of the conduct beyond debate. Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). By January 2024, it was clearly established that officers may not (a) seize or continue to detain children absent exigent circumstances or judicial authorization, including refusing to release a child to a fit, available parent absent specific, articulable facts of imminent danger, or (b) use physical force or restraints that are objectively unreasonable, including restraining a young, non-threatening, non-resisting child to effectuate or prolong custody. Qualified immunity does not protect officers who exceed clearly established limits on warrantless seizures or excessive force.

244. Failure to Intervene and Supervisory Liability. It is clearly established that a state actor who observes or has reason to know that a constitutional violation is occurring and has a realistic opportunity to prevent it may be held liable under 42 U.S.C. § 1983 for failing to intervene. See Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1247–48 (10th Cir. 2003); Jones v. Hunt, 410 F.3d 1221, 1229–30 (10th Cir. 2005); PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1197–98 (10th Cir. 2010).

245. Supervisory personnel who reviewed body-worn camera footage, received medical findings negating abuse, were present during detention or hospital procedures, or were notified that no emergency existed, yet failed to order release, stop examinations, or correct unlawful custody, are liable for affirmatively allowing the violation to continue.

246. The duty to intervene was clearly established well before January 2024. No reasonable official could believe it was lawful to allow custody after medical clearance, non-emergency medical exams or x-rays, coercive safety planning, or placement without judicial authorization, once the absence of imminent danger was known or should have been known. Qualified immunity therefore does not apply.

Public Disclosure of Private Facts — Kansas Law

247. Kansas recognizes the tort of public disclosure of private facts, which occurs when a defendant gives publicity to private facts concerning another that would be highly offensive to a reasonable person and are not of legitimate public concern. Froelich v. Adair, 213 Kan. 357, 360–61, 516 P.2d 993 (1973) (adopting Restatement (Second) of Torts § 652D).

248. "Publicity" does not require disclosure to the general public at large; disclosure to a sufficient number of persons, or in a manner substantially certain to become public knowledge, is sufficient. Rinsley v. Brandt, 700 F.2d 1304, 1307–08 (10th Cir. 1983) (applying Kansas law).

249. Information concerning child-welfare investigations, abuse allegations, medical conditions, family relationships, and custody status constitutes private facts protected under Kansas law and is not a matter of legitimate public concern. Werner v. Kliewer, 238 Kan. 289, 293–94, 710 P.2d 1250 (1985).

250. Statutory confidentiality provisions governing child-welfare and medical records restrict disclosure and do not authorize dissemination beyond a lawful purpose absent express statutory authorization or judicial order. Disclosure outside those limits supports liability where it would be highly offensive to a reasonable person. Froelich, 213 Kan. at 360–61.

251. State actors and private entities acting under color of state law may be held liable under Kansas law when they disclose or cause the disclosure of protected private information beyond the scope of lawful purpose, including disclosure to schools, childcare providers, contractors, or other third parties, where such disclosure is not required by statute and is unrelated to immediate safety needs. Rinsley, 700 F.2d at 1307–08.

First Amendment—Retaliation for Protected Speech in the Child-Welfare Context

252. The First Amendment prohibits government officials from retaliating against an individual for engaging in protected speech, including objecting to government conduct, refusing to consent to non-mandatory programs, or expressing intent to seek legal redress.

253. In the child-welfare context, threats of custody interference or continued separation conditioned on silence or compliance constitute adverse action sufficient to support a First Amendment retaliation claim.

254. To state a claim for First Amendment retaliation under 42 U.S.C. § 1983, a plaintiff must allege protected activity, adverse action, and a causal connection between the protected activity and the adverse action. Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000); Shero v. City of Grove, 510 F.3d 1196, 1203 (10th Cir. 2007).

255. An adverse action need not be independently unlawful and may include threats, intimidation, coercion, misuse of discretionary authority, or the leveraging of state power to punish or deter protected speech.

256. Retaliation may include escalation or reinforcement of existing conduct in response to protected activity, even if the underlying conduct began before the protected speech occurred.

257. In the child-welfare setting, adverse action may include conditioning reunification or family integrity on compliance with non-court-ordered services, threatening renewed removal or investigation, continuing monitoring or service pressure absent lawful authority, or invoking or implying state custody power to deter objection.

258. Because parents face the extraordinary consequence of losing custody of their children, even implied threats or discretionary pressure are sufficient to chill a person of ordinary firmness.

259. Where coercive conduct precedes protected speech, it may independently violate the Fourteenth Amendment. Where that same conduct is escalated, reinforced, or leveraged after a parent objects, refuses services, or asserts constitutional rights, the escalation constitutes a distinct First Amendment violation.

260. A plaintiff may therefore plead both Fourteenth Amendment coercion for the initial conduct and First Amendment retaliation for the subsequent threats, pressure, or punitive actions taken in response to protected activity.

261. Child-welfare officials may not condition reunification, custody, or family integrity on compliance with non-court-ordered services or "safety plans" absent a warrant, court order, or exigent circumstances. Leveraging continued separation to compel parental compliance constitutes coercion and violates the Fourteenth Amendment's protection of family integrity. PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1197–1201 (10th Cir. 2010); Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1244–48 (10th Cir. 2003); Croft v. Westmoreland Cnty. CYS, 103 F.3d 1123, 1126–30 (3d Cir. 1997).

262. By January 2024, this prohibition was clearly established. No reasonable child-welfare official could believe it was lawful to delay reunification or condition release on

execution of non-court-ordered safety plans or services where no warrant, court order, or exigent circumstances existed. Qualified immunity therefore does not shield child-welfare workers who engaged in or enforced such coercive practices. PJ ex rel. Jensen, 603 F.3d at 1197–1201; Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1244–48 (10th Cir. 2003); Jones v. Hunt, 410 F.3d 1221, 1228–30 (10th Cir. 2005).

Municipal Liability (Monell Doctrine)

263. A municipality is liable under 42 U.S.C. § 1983 when a constitutional violation is caused by an official policy, widespread custom or practice, failure to train or supervise, unlawful delegation of authority, or ratification by a final policymaker. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–91 (1978). Municipal liability attaches only where the challenged policy, custom, or omission was the moving force behind the constitutional violation, meaning there is a direct causal link between the municipality's action or inaction and the deprivation of federal rights. Monell, 436 U.S. at 694; City of Canton v. Harris, 489 U.S. 378, 385 (1989).

264. Municipal liability under § 1983 applies equally to counties and county-operated systems, including juvenile intake, prosecutorial referral, and child-welfare oversight functions, where constitutional violations result from the county's policies, customs, or deliberate failure to enforce statutory safeguards.

265. Failure to Train or Supervise. A municipality's failure to train or supervise its employees gives rise to § 1983 liability where the failure reflects deliberate indifference to the known or obvious risk that constitutional violations would occur. City of Canton, 489 U.S. at 388–89. Deliberate indifference may be shown where municipal policymakers were on notice that existing training or supervision was inadequate and likely to result in

constitutional injury, yet failed to take corrective action. Connick v. Thompson, 563 U.S. 51, 61 (2011).

266. A municipality may be liable under § 1983 where the need for training is so obvious, and the lack of training so likely to result in constitutional violations, that deliberate indifference may be inferred even from the obviousness of the risk, even in the absence of a pattern of prior violations. City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989). Where officers are entrusted with warrantless child seizure, continued detention, placement, and release decisions, the failure to train on statutory limits, exigency requirements, and release authority presents an obvious and highly predictable risk of constitutional injury.

267. Ratification by Final Policymakers. Municipal liability also arises where a final policymaker knowingly approves, condones, or ratifies unconstitutional conduct by subordinates, including by failing to intervene, discipline, or correct known violations, thereby adopting the conduct as municipal policy. City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); Bryson v. City of Oklahoma City, 627 F.3d 784, 790 (10th Cir. 2010).

268. Unlawful Delegation of Governmental Authority.
Municipal liability attaches where a municipality delegates core governmental functions—such as child custody, detention, placement, medical clearance, or release decisions—to private entities without adequate safeguards, oversight, or judicial authorization, and such delegation causes constitutional injury. See Monell, 436 U.S. at 694; West v. Atkins, 487 U.S. 42, 56 (1988).

Clearly Established Constitutional Limits Relevant to Municipal Liability

269. At all relevant times, it was clearly established that: Children may not be seized absent specific, articulable facts demonstrating imminent danger; Custody must end once any exigency dissipates; Continued detention without judicial authorization violates the Fourth and Fourteenth Amendments; Warrantless searches of the home or curtilage are presumptively unreasonable absent consent or exigent circumstances; Non-emergency medical examinations, photographs, and radiological imaging of children require parental consent, a court order, or true medical emergency; and Private entities performing delegated child-welfare or detention functions may act under color of state law.

270. Municipal policies, customs, training failures, and ratification that permit or encourage conduct violating these clearly established principles give rise to municipal liability under § 1983. Municipal causation is established where the policy, custom, or omission sets in motion a predictable chain of events that results in constitutional injury, even if intervening actors participate in the violation.

## VI. COUNTS

(All Counts arise under 42 U.S.C. § 1983 unless otherwise stated)

## VII. COUNT I

Warrantless Seizure of A.A., Y.M., and M.N.

(Fourth Amendment — Against Officers Robert Dulohery, John Ryan, Mackenzie Van Pelt, Calvin Rusch, Samuel Duncan, Blake Sanchez in their individual capacities )

271. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32, 46, 47, 51, 56- 59-66, 68-85, 88, 220, 221, 223, 224, 229, 233, 243,, as though fully set forth herein.

272. Officers Dulohery, Ryan, Van Pelt, Rusch, Duncan, and Sanchez seized Plaintiff's minor children, A.A., Y.M., and M.N., from her custody without a warrant or court order or exigency.

273. At no time were the children reported as runaways, missing persons, trafficking victims, or as experiencing a behavioral-health crisis.

274. Officer Ryan radioed, "22-01", and asked for additional officers. He did not broadcast a signal for emergency backup.

275. Officer Van Pelt and Duncan referred to Officer Ryan as "boss."

276. Defendants made no individualized observations, findings, or assessments concerning Y.M. or M.N. before seizing them or placing them into Police Protective Custody.

277. Defendants did not identify or document any facts indicating immediate harm at the time of removal.

278. Defendants did not personally report or observe any emergency or dangerous condition at Plaintiff's home, nor did they observe or document any facts indicating an imminent risk of serious bodily harm requiring immediate removal at the time of seizure.

279. During the encounter, Defendant Officer Ryan was asked whether he believed A.A. was in danger, and Officer Ryan responded that he had no idea.

280. Officer Ryan stated that officers "always err on the side of caution" by removing the child for medical clearance and placing the child into police protective custody.

281. Defendants refused Plaintiff's request for a brief delay to obtain medical evaluation and executed removal immediately, despite the absence of individualized facts establishing exigent circumstances.

282. The right to be free from warrantless seizure of one's children absent exigent circumstances was clearly established at the time of the conduct, and no reasonable officer could have believed the seizure alleged herein was lawful.

## VIII. COUNT II

Continued Detention and Failure to Release A.A., Y.M., and M.N.

(Fourth and Fourteenth Amendments — 42 U.S.C. § 1983 — Against Officer Robert Dulohery, Officer John Ryan, Officer Mackenzie Van Pelt, Officer Calvin Rusch, Officer Samuel Duncan, Officer Blake Sanchez; Detective Ohmart; Abiliba Erekosima, Jana Vinduska, and LaQuilla Williams, in their individual capacities; and, as joint actors and causal participants, Kimberly Fielding and Honey Tree Academy, LLC; Wichita Children's Home; and Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER)

283. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32, 40, 47, 58, 63-75, 77-85, 88, 93-124, 126-147 173-194, 220-224, 232- 243, as though fully set forth herein.

284. After the initial seizure, Defendants Dulohery, Ryan, Van Pelt, Rusch, Duncan, Sanchez, and, Ohmart, participated in, caused, facilitated, or allowed the continued detention of A.A., Y.M., and M.N., despite the absence of any exigent circumstances, medical emergency, warrant, court order, or judicial authorization, at any time during the detention.

285. Defendants Kimberly Fielding and Honey Tree Academy, LLC knowingly supplied false and misleading allegations law enforcement and DCF, which were incorporated into Police Protective Custody documentation and hospital records and were relied upon by

Defendants to justify the continuation of PPC and detention for A.A., Y.M., and M.N.,, despite the absence of any exigent circumstances or judicial authorization.

286. Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER, acting jointly with law enforcement, conducted non-emergency examinations and coordinated disposition and placement decisions rather than facilitating release to Plaintiff, thereby contributing to the continued detention.

287. Despite medical clearance, Defendant Officers transported the children from the hospital to Wichita Children's Home and continued detention rather than releasing them to Plaintiff, or a fit, available parent.

288. Wichita Children's Home accepted physical custody of the children from law enforcement, retained physical custody, and facilitated their foster placement, despite the absence of any court order, judicial authorization, or valid administrative order or standing designation authorizing Wichita Children's Home to (a) receive children directly from police protective custody or (b) place or transfer the children into foster care, and while knowing that no exigent circumstances justified continued detention.

289. LaQuilla Williams received the Combined Intake Report which stated that a welfare check was "not warranted" and that there was "no indication [the] child is at risk of imminent danger."

290. As described in this Count, Defendants knew or were informed that the children had been medically cleared, that no court order existed, and that no exigent circumstances justified continued detention, yet continued to cause, facilitate, or allow the detention to persist through DCF's investigative and staffing workflow rather than effectuate release.

291. At no time during the Jan 8-10 incident did Defendants initiate court proceedings, obtain judicial approval, or complete the statutory prerequisites required to authorize continued Police Protective Custody.

292. No Defendant initiated court proceedings, obtained judicial approval, or completed the statutory prerequisites required to authorize continued Police Protective Custody. No Defendant had statutory authority to deliver the children directly to Wichita Children's Home, and Wichita Children's Home lacked statutory authority to receive or hold the children from law enforcement.

293. Defendants, including DCF worker Abiliba Erekosima, and supervisor Jana Vinduska caused and prolonged the detention of Plaintiff's children by conditioning their release on Plaintiff's execution of an "Immediate Safety Plan," despite admitting abuse was not believed and without judicial authorization.

294. The detention of A.A., Y.M., and M.N. constituted an unreasonable and ongoing seizure from its inception and throughout its duration, in violation of the Fourth Amendment, and interfered with Plaintiff's fundamental liberty interest in family integrity under the Fourteenth Amendment.

295. The unlawfulness of continuing to detain children without judicial authorization after any exigency has ended was clearly established at the time of Defendants' conduct.

## IX. COUNT III

Unreasonable Search of a Child

(Fourth Amendment — 42 U.S.C. § 1983)—Against Honey Tree Academy LLC, and Kimberly Fielding

296. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs  30, 44, 47, 70, 92, 95, 227, 229, 231, 235, 243, as though fully set forth herein.

297. On or about January 8, 2024, Defendant Kimberly Fielding, acting individually and/or through employees of Honey Tree Academy, LLC, physically manipulated A.A.'s clothing and exposed portions of her body to inspect for alleged injuries, exceeding routine visual observation associated with ordinary childcare.

298. Plaintiff did not consent to any such examination, was not notified it would occur, and no medical emergency existed requiring examination without parental consent.

299. The examination was conducted for the purpose of identifying or documenting information for reporting to authorities, and law enforcement relied on information arising from the examination in initiating or continuing police action involving A.A.

300. By conducting or directing this nonconsensual physical inspection in coordination with state actors and for law-enforcement use, Defendants acted under color of state law.

301. The search was objectively unreasonable within the meaning of the Fourth Amendment and caused constitutional injury to Plaintiff and A.A.

## X. COUNT IV

Warrantless Home Entry and Escalation Beyond Scope of Consent

(Fourth Amendment — Against Officers Van Pelt, Rusch, Duncan, Sanchez in their individual capacities)

302. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32, 46-47, 51, 56-57, 225-226, 243, as though fully set forth herein.

303. Plaintiff gave limited consent for Officers Dulohery and Ryan into her home.

304. Without a warrant, court order, or Plaintiff's consent, Officers Van Pelt, Duncan, Rusch, and Sanchez entered and remained inside Plaintiff's home and on the surrounding property, exceeding the scope of the consent given.

305. Officers present, including Dulohery and Ryan, observed and did not object to or prevent this expansion of entry without intervening or obtaining additional consent.

306. Defendants' entry and continued presence constituted an unreasonable search and seizure in violation of the Fourth Amendment.

307. The right to be free from warrantless home entry and from expansion beyond the scope of consent was clearly established at the time of the conduct.

## XI. COUNT V

Warrantless Search of the Curtilage of Plaintiff's Home

(Fourth Amendment — Against Doe Officer 1 in his individual capacity)

308. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32-34, 47, 225, 243, as though fully set forth herein.

309. Doe Officer 1 physically entered and searched the curtilage of Plaintiff's home, including the backyard, without a warrant.

310. Doe Officer 1 entered areas of the property not open to the general public.

311. At the time of entry, Plaintiff was not present at the residence.

312. Doe Officer 1 entered the curtilage without a warrant and without Plaintiff's consent.

313. The warrantless entry into the curtilage constituted an unreasonable search in violation of the Fourth Amendment.

314. The right to be free from warrantless searches of the curtilage of one's home was clearly established at the time of the conduct.

## XII. COUNT VI

Unreasonable Search — Unlawful Radiological Imaging (X-Rays) of A.A.

(Fourth and Fourteenth Amendments — 42 U.S.C. § 1983 — Against Defendant Officers Dulohery, Ryan in their individual capacities; Defendant Gregory G. Faimon, MD; Defendant Debbie A. Desilet-Dobbs, MD and Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER)

315. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32, 47, 70, 74, 81, 85, 93, 94, 95, 96, 97, 98, 107, 228-230, 232, 233, 234, 235, 240, 241, 243, as though fully set forth herein.

316. Defendant Officers Ryan and Dulohery, caused and affirmatively facilitated the performance of radiological imaging (X-rays) of Plaintiff's minor child, A.A.. by transporting her to the hospital for investigative purposes, maintaining custodial authority, and permitting and acquiescing in the imaging, without a warrant, court order, judicial authorization, or parental consent.

317. Officer Ryan transported A.A. to the hospital and Officers Ryan and Dulohery remained present and in custodial control at the time the radiological imaging was performed.

318. Defendant Gregory G. Faimon MD, ordered the X-rays for A.A.

319. Defendant Debbie A. Desilet-Dobbs, MD personally reviewed the radiological images of A.A., corrected the resident physicians interpretation as necessary, and signed and finalized the diagnostic impression of the skeletal survey performed while A.A. was in police control.

320. Plaintiff did not provide voluntary, informed consent, and no exigent medical circumstances existed requiring immediate imaging.

321. The radiological imaging was performed in connection with the custody/placement process and law enforcement referral, rather than in response to emergent clinical presentation.

322. The compelled X-rays constituted a search that was objectively unreasonable under the Fourth Amendment.

323. The same conduct interfered with Plaintiff's clearly established Fourteenth Amendment rights to parental autonomy and to make medical decisions on behalf of her child.

324. It was clearly established at the time of the conduct that non-emergency radiological imaging of a child for investigative or administrative purposes, absent voluntary parental consent, a court order, or exigent circumstances, violates the Fourth Amendment.

## XIII. COUNT VII

Unlawful Non-Emergency Medical Examinations of Plaintiff's Minor Children and Investigative Photography of A.A.

(Fourth and Fourteenth Amendments — 42 U.S.C. § 1983 — Against Officers Ryan, Dulohery, Rusch, Van Pelt, Duncan, and Sanchez in their individual capacities; Honey Tree Academy LLC, and Kimberly Fielding; Gregory G. Faimon, MD; Wendy Hartman, RN; Megan Meier, RN; Beth Heflin MD, Medical Doe Provider A; and Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER)

325. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32, 44, 47, 72, 74-75, 81, 82, 86, 89-92, 93-108, 110-112, 228, 229, 231, 232, 235, 240, 241, 243, as though fully set forth herein.

326. On January 8, 2024, Kimberly Fielding acting on behalf of Honey Tree Academy LLC, admitted on body camera to officers that she took photos of A.A. after lifting her shirt to look.

327. On January 8–9, 2024, while asserting Police Protective Custody, Officer Defendants Dulohery and Ryan caused, facilitated, or compelled non-emergency medical examinations of all Plaintiff's minor children, at Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER, including examinations requiring removal of clothing, and caused investigative photographing of Plaintiff's minor child A.A., all without a warrant, court order, judicial authorization, or exigent medical necessity.

328. At the time of the examinations and photographing, the children were medically stable and not experiencing conditions requiring immediate emergency intervention. Plaintiff did not provide voluntary, informed consent, and any purported consent was coerced and therefore invalid.

329. Defendant Wendy Hartman, RN, conducted and/or directly performed investigative and forensic photography of A.A.'s body while A.A. was under law-enforcement control, acting jointly with Officer Defendants and for investigative rather than emergent medical purposes.

330. Defendant Megan Meier, RN acted jointly with law enforcement and other medical defendants by facilitating, assisting, or enabling the initiation and continuation of the non-emergency medical examinations of the children and the investigative photography of A.A. while the children were under police control.

331. Defendant Gregory G. Faimon, MD; Medical Doe Providers A–B; and Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER participated in, authorized,

approved, or ratified the non-emergency medical examinations of the children and the investigative photography of A.A., including requiring removal of clothing for inspection, despite the absence of exigent medical circumstances.

332. Beth Heflin MD, and Doe Medical Provider A reviewed, approved, and signed medical and forensic documentation after A.A. had already been discharged, including the, "Case Reviewed By" and "Program Coordinator (or Designee)" approvals, thereby retrospectively authorizing and ratifying the conduct.

333. The examinations of the children and the photographic documentation of A.A. were performed in coordination with law enforcement and for investigative, administrative, or placement-related purposes rather than for emergent medical treatment.

334. The non-emergency medical examinations of the children and the investigative photography of A.A. constituted searches that were objectively unreasonable under the Fourth Amendment.

335. The same conduct interfered with Plaintiff's clearly established Fourteenth Amendment rights to family integrity and to make medical decisions on behalf of her children.

336. At the time of the conduct, it was clearly established that non-emergency medical examinations of children and investigative or forensic photography of a child, including requiring removal of clothing, may not be compelled absent voluntary parental consent, a court order, or true exigent circumstances.

## XIV. COUNT VIII

Unreasonable Search — Warrantless Investigative Photography of A.A. by Wichita Children's Home (Fourth Amendment — 42 U.S.C. § 1983)

337. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 47, 94, 113-125, 108, 118, 148, 174, 233, 234, 236, 239, 240, 247, as though fully set forth herein.

338. While A.A. remained in Police Protective Custody following her transfer from law enforcement, personnel of Wichita Children's Home conducted non-emergency photographic documentation of A.A.'s body for investigative or administrative purposes, unrelated to immediate medical treatment.

339. No warrant, court order, or judicial authorization existed, and Plaintiff did not provide voluntary consent for the photographing.

340. At the time of the photographing, no medical emergency existed, and WCH personnel were exercising custodial authority in coordination with law enforcement and child-welfare agencies.

341. The photographing constituted an unreasonable search in violation of the Fourth Amendment.

342. It was clearly established at the time of the conduct that non-emergency investigative photography of a child in police protective custody, absent voluntary parental consent or judicial authorization, violates the Fourth Amendment.

## XV. COUNT IX

Excessive Force and Unreasonable Physical Restraint of A.A.

(Fourth Amendment — 42 U.S.C. § 1983 — Against Officer Mackenzie Van Pelt and Officer Samuel Duncan in their individual capacities)

343. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32, 47, 72, 74-75, 83, 84, 85, 227, 243, as though fully set forth herein.

344. Defendants Officer Mackenzie Van Pelt and Officer Samuel Duncan physically restrained Plaintiff's minor child, A.A., by forcibly securing her into a car seat during removal and transport, preventing her movement.

345. The restraint continued for an extended period while A.A. cried, called out for her mother, and resisted, and Defendants used a car seat that was not properly sized or suited to A.A., despite her visible distress.

346. A.A. posed no threat to officer safety or others, no exigent circumstances existed, and the restraint occurred in a non-emergency setting, yet Defendants declined less intrusive alternatives and denied Plaintiff's request to accompany her child.

347. Defendants further subjected A.A. to an unreasonable risk of harm by transporting her without ensuring the use of a properly sized and safely secured car seat.

348. Under the totality of the circumstances, the physical restraint of a non-threatening child, forced separation from her mother, and unsafe method of transport constituted excessive force and an unreasonable seizure in violation of the Fourth Amendment.

349. It was clearly established at the time of the conduct that officers may not use objectively unreasonable force against a non-threatening child or restrain a child in a manner disproportionate to any legitimate governmental interest.

## XVI. COUNT X

Denial of Placement With a Fit, Available Parent

(Fourth and Fourteenth Amendments — 42 U.S.C. § 1983 — Against Officers Ryan, Dulohery, Van Pelt, Duncan, Rusch, Sanchez and Child-Welfare Defendants in their individual capacites)

350. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32, 47, 60-63, 68-69, 72-75, 77-81, 114-118, 124, 125, 128, 129, 221, 222, 223, 224, 232, 243, as though fully set forth herein.

351. Plaintiff asked if she could attend A.A. to the hospital, Officer Ryan told her "no".

352. Before and during the detention, Plaintiff and the children's father—a fit, non-offending parent—requested that the children be released to him, and Defendants were informed that a valid custody agreement existed authorizing such placement.

353. The father appeared in person, requested immediate custody, and no emergency medical condition, court order, or judicial authorization existed prohibiting release or requiring continued detention or third-party placement.

354. Defendants made not individualized finding that the father posed a risk, and there was no statue order, or medical necessity preventing release.

355. The refusal of a fit parent caused continued detention and third-party placement.

356. Despite the availability of a fit parent and the absence of exigent circumstances, Defendants with authority over custody and placement refused release and continued the children's detention and third-party placement.

357. Defendant Officers and child-welfare defendants joint decided to deny placement with a fit parent.

358.  This refusal constituted an unreasonable continued seizure under the Fourth Amendment and violated Plaintiff's Fourteenth Amendment rights to family integrity and parental decision-making.

## XVII. COUNT XI

Coercion, Deceptive Safety Planning, Forced Services, and Retaliation

(Fourteenth and First Amendments — 42 U.S.C. § 1983 — Against Individual DCF Employees in their individual capacities and, Defendants DCCCA, Inc.,)

359.  Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32, 47, 68, 69, 72, 74, 75, 102, 108, 130, 132-145, 147, 150-170, 220-231, 232, 234, 235, 236, 252-262, as though fully set forth herein.

360.  While Plaintiff's children remained out of her custody and in state-controlled placement, and in the absence of any court order, judicial proceeding, or exigent circumstances, Defendants conditioned reunification on Plaintiff's agreement to a non-court-ordered "Immediate Safety Plan" and associated services.

361.  Defendant Abiliba Erekosima, acting as a DCF caseworker, refused to authorize reunification unless Plaintiff signed the safety plan, despite knowing the children were medically cleared, no emergency existed, and no Child in Need of Care proceeding had been initiated or authorized.

362.  Defendants misrepresented or implied judicial authority, including that refusal to sign would delay reunification and that a judge would approve or had approved the plan, when no court proceeding or judicial authorization existed, rendering any purported consent coerced and involuntary.

363.  After the children were returned to Plaintiff's custody, Defendants continued to enforce the non-court-ordered safety plan and services, despite the absence of any court order or lawful basis for continued state control.

364.  Defendant DCCCA, Inc., acting under color of state law, implemented and enforced the plan through Defendant LaVandria Fountain, who falsely stated that a judge required the services and pressured Plaintiff to comply as a condition of avoiding renewed custody interference.

365.  After Plaintiff learned the services were not court-ordered and unenrolled, DCF supervisory officials, including Jana Vinduska and Ashlie Thomas, threatened renewed removal and pressured re-enrollment, despite no open CINC case, no new allegations, and no judicial authorization.

366.  By coercing agreement to a non-court-ordered safety plan while the children were out of custody, and by threatening renewed removal after reunification absent lawful authority, Defendants violated Plaintiff's clearly established Fourteenth Amendment rights to family integrity and parental decision-making.

367.  Defendants' threats and pressure in response to Plaintiff's refusal to comply with non-court-ordered services and vocalization of her plan to sue constituted retaliation for the exercise of protected activity, in violation of the First Amendment.

368.  It was clearly established at the time of the conduct that child-welfare officials and their contractors may not coerce safety plans, misrepresent judicial authority, condition reunification or continued custody on non-court-ordered services, or threaten removal absent lawful authority.

## XVIII. COUNT XII

Failure to Intervene and Supervisory / Decision-Maker Liability

(Fourth and Fourteenth Amendments —42 U.S.C. § 1983 — Against Officer Ryan, Dulohery, Rusch, Van Pelt, Duncan, Sanchez, Detective Gabriel Ohmart, Jana Vinduska, Lori Clark in their individual capacities)

369.    Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32-34, 47, 56, 59-76, 85, 126, 135-143, 147, 164, 167 Factual Background and paragraphs 221-229, 232-234, 239, 243, 250- 253, 261-262, as though fully set forth herein.

370.    During the incident Officers Van Pelt, Duncan, and Doe Officer 1, referred to Officer Ryan as "boss".

371.    Defendants Officers Dulohery, Van Pelt, Duncan, Rusch, Sanchez were physically present during the seizure and participated in the removal of Plaintiff's children. No warrant or court order authorizing removal was present, and no exigent circumstances existed. During the encounter, Officer Ryan stated that he did not know whether A.A. was in danger. None of the other Officers took action to stop or prevent the removal.

372.    Officer Ryan observed Doe Officer 1 enter Plaintiff's property without a warrant or consent and took no action to stop or prevent that entry.

373.    Defendants Jana Vinduska, Lori Clark, and Detective Gabriel Ohmart possessed decision-making authority over intake, placement, or release following the seizure and, while the children remained detained and separated from Plaintiff, knowingly allowed the detention to continue despite the absence of judicial authorization.

374. Lori Clark approved an override at a time when the children had already been seized and detained without a warrant, court order, or judicial custody determination, and no court authorization for continued custody or placement had been issued.

375. Defendants Vinduska, Ohmart, and Clark identified in this count had a reasonable opportunity to but instead took no action to stop, reverse, or terminate the seizure, detention, placement, or related actions while they were ongoing.

376. Defendants Officers Dulohery, Rusch, Van Pelt, Duncan, and Sanchez had a realistic opportunity to halt the unconstitutional seizure but chose not to act; their inaction constituted a failure to intervene that proximately caused Plaintiff's continued deprivation of rights under the Fourth and Fourteenth Amendments.

377. Officer Ryan exercised supervisory authority at the scene and thereafter ratified and continued the unconstitutional seizure and detention; his conduct constitutes supervisory liability under the Fourth and Fourteenth Amendments.

## XIX. COUNT XIII

42 U.S.C. § 1983 — Private Entities Acting Under Color of State Law

(Fourth and Fourteenth Amendments — Against WCH, DCCCA, Inc., Wesley Medical Defendants, and Daycare Defendants)

378. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 35-45, 47, 92-108,110-113,118-123, 127, 144-154, 220-223, 228, 229, 230, 231, 232, 233, 234, 235, 237-242, as though fully set forth herein.

379. Defendants Wichita Children's Home ("WCH"), DCCCA, Inc, Wesley Medical Center, LLC d/b/a Wesley Woodlawn Hospital & ER, are private entities that acted under color of

state law. Gregory G. Faimon, MD, Wendy Hartman, RN, Debbie A. Desilet-Dobbs, MD, Megan Meier, RN, Beth Heflin MD, Doe Medical Provider A, Honey Tree Academy LLC, and Kimberly Fielding are private actors who personally participated in, facilitated, or ratified the unconstitutional conduct described herein.

380. These Defendants performed or assisted with functions traditionally reserved to the State, including maintaining custody, effectuating placement decisions, conducting investigative medical examinations, and enforcing coercive safety planning, without judicial authorization, lawful custody, valid parental consent, or exigent circumstances.

381. WCH accepted and maintained physical custody of Plaintiff's children following police transfer, arranged foster placement, and exercised custodial authority without a court order or statutory transfer of custody, thereby prolonging the unlawful seizure.

382. The Wesley Medical Defendants accepted the children while in Police Protective Custody and conducted non-emergency medical examinations, forensic photography, and radiological imaging for investigative or custody-related purposes, in coordination with state actors and absent judicial authorization or valid parental consent.

383. DCCCA, Inc. implemented and enforced coercive safety planning and services imposed in connection with the children's detention and separation from Plaintiff, despite the absence of any court order or lawful basis for continued state control.

384. Honey Tree Academy LLC and Kimberly Fielding supplied false, misleading, and materially incomplete information used to initiate Police Protective Custody and continued to communicate with state actors after the initial report and provided additional false information, with the knowledge or reckless disregard that it would be relied upon to justify continued detention and custody.

385. Through joint participation, delegation of custodial authority, state compulsion, and ratification, Defendants became integral participants in the unconstitutional seizure, continued detention, and deprivation of familial integrity.

386. By virtue of this conduct, Defendants acted under color of state law and are liable under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments.

## XX. COUNT XIV

False Reporting, Joint Action, and Causation of Unreasonable Seizure and Detention

(Fourth and Fourteenth Amendments — 42 U.S.C. § 1983 — Against Honey Tree Academy LLC and Kimberly Fielding, Detective Gabriel Ohmart in his individual capacity, Beth Heflin MD, Doe Medical Provider A, and Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER)

387. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 30-32, 35-47, 92, 94-95, 99-102,111, 112, 118-124, 128, 134, 220-221, 231, 233-236, 238, 240, 241, 251, as though fully set forth herein.

388. Beth Heflin MD and Doe Medical Provider A acting within the scope of their roles at Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER, signed and approved a Child Abuse Forensic Photography Case Review Addendum that characterized Plaintiff's child as having suffered physical abuse and as requiring protection. The addendum was prepared for investigative and custody-related purposes with knowledge if would be transmitted to or relied upon by law enforcement and child-welfare officials, rather than for medical diagnosis or treatment, exceeded the providers'

clinical treatment role, and was relied upon by law enforcement and child-welfare officials in decisions to continue Police Protective Custody and placement.

389.  Defendant Detective Gabriel Ohmart relied upon and incorporated medical information into the police report narrative that pertained to a child unrelated to Plaintiff. That information was included as part of the factual basis supporting continued Police Protective Custody and was reasonably relied upon by law enforcement and child-welfare officials in decisions that resulted in the prolonged detention of Plaintiff's children.

390.  Defendant Honey Tree Academy, LLC operated a licensed daycare facility. At all relevant times, Defendant Kimberly Fielding acted on behalf of Honey Tree Academy, LLC in connection with the events at issue, and her actions were undertaken within the scope of her authority and are attributable to Honey Tree Academy LLC.

391.  Fielding personally conducted a visual inspection on A.A.'s back lifting her shirt up, took photos, made the state reporting phone call, showed officers the photo of her back and photos from months back and said A.A. wore a shirt with a burn hole and had a "burn mark" on her arm. Fielding omitted that the burn hole occurred when A.A. was not wearing the shirt and misrepresented the "burn mark" to police.

392.  Officer Dulohery is heard on body-camera repeating character observations originally supplied by Defendant Fielding, demonstrating law-enforcement reliance on daycare-generated subjective characterizations in assessing custody.

393.  Honey Tree allegations were carried over into hospital and third-party intake documents, further amplifying their effect.

394.  Defendant Fielding was not a passive reporter. She conducted a physical inspection of A.A.'s body beyond routine childcare, personally initiated and communicated the report,

spoke directly with law-enforcement officers, and provided factual assertions concerning Plaintiff and A.A. that were false, misleading, or incomplete in material respects.

395.  In doing so, Fielding relayed and vouched for unverified allegations and omitted material facts known to daycare staff, including benign explanations previously provided by Plaintiff and information concerning alleged injuries, attendance, development, and communication abilities.

396.  Fielding further made subjective characterizations of Plaintiff, and generated photographs, none of which were disclosed to Plaintiff or conducted with parental consent.

397.  After removal, Fielding continued to communicate with DCF and investigators, supplying additional statements that were inconsistent with or expanded beyond prior allegations, which were relied upon by state actors in assessing continued custody, placement, and release. These communications occurred after medical clearance and in the absence of any exingent circumstances or judicial authorization.

398.  Law-enforcement officers and child-welfare officials relied on statements, omissions, and materials provided by Defendant Fielding, in initiating Police Protective Custody, continuing detention after medical clearance, and refusing release of the children to a fit, available parent.

399.  Through reporting, physical inspection and photography, provision of allegations and statements that were false, misleading, or incomplete in material respects, and were relied upon by law-enforcement and child-welfare officials, and continued supplementation of allegations after removal, Defendant Fielding, while acting on behalf of Honey Tree

Academy LLC, participated in joint action with state officials and acted under color of state law.

400. Defendants' conduct was a substantial and proximate cause of the unreasonable seizure and continued detention of Plaintiff's children and interfered with Plaintiff's constitutionally protected right to family integrity and parental decision-making, in violation of the Fourth and Fourteenth Amendments.

401. It was clearly established at the time of the conduct that private actors may be held liable under 42 U.S.C. § 1983 when they knowingly supply false or materially misleading information, omit material facts, or otherwise participate in child-custody or abuse investigations that causes or prolongs the seizure or detention of children by state officials.

402. Each Defendant knew or reasonably should have known that the information supplied was false, misleading, incomplete, or unrelated, and that it would be relied upon by law-enforcement and child-welfare officials to justify continued seizure and detention.

## XXI. COUNT XV

Municipal Liability (Monell)

(42    U.S.C. § 1983 — Against Municipal and County Defendants)

403. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32, 40, 46-47, 51, 56-66, 68-82, 85, 86, 88, 93-147, 150-200, 220-224, 229, 231- 246, 263-270 of the Legal Framework paragraphs alleging the underlying constitutional violations.

City of Wichita — Wichita Police Department

404.    Plaintiff alleges the following jointly adopted, final policymaking decisions and widespread practices that caused the constitutional deprivation.

A. Formal written policies (WPD Policies 507 & 508)

405.    At all relevant times, the Wichita Police Department ("WPD"), an operating division of the City of Wichita, maintained written policies, training, and supervisory practices governing Police Protective Custody ("PPC"), placement, and release, including WPD Policies 507 and 508. The Chief of Police is the municipal official vested with final policymaking authority for WPD.

406.    Policies 507 and 508 governed the initiation of PPC but (i) do not require officers to document findings of imminent danger or immediate necessity, (ii) do not address the statutory limits on warrantless PPC once any exigency resolved, and (iii) do not require judicial authorization for continued detention or placement.

407.    Policy 508 identified Wichita Children's Home ("WCH") as a receiving facility for children taken into PPC and treated WCH as court-designated for purposes of placement, without requiring verification that a current judicial designation was in effect.

408.    WPD policies, training, and supervisory practices permitted officers to remove children without a court order and to deliver them to a shelter facility without requiring completion of a written statutory PPC application, delivery of that application to the county or district attorney, or prompt judicial review.

409.    WPD policies and training did not require individualized assessment or separate findings for each child removed into PPC.

410.    By authorizing warrantless seizure without any documented exigency and by eliminating the mandatory K.S.A. 38-2232 application that would force prompt judicial review, the

written policies described in paragraphs 405-409 and referenced in the factual background, caused (a) the initial unconstitutional seizure, (b) its unlawful prolonged detention, and (c) the denial of procedural safeguards guaranteed to parents and children, in violation of the Fourth and Fourteenth Amendments.

B. Unwritten customs of the City of Wichita

411. City of Wichita WPD officers maintained customs reflected in officer statements such as, "When we take one, we normally take all the kids that are in the house", "we always err on the side of caution", and in reference to placing the child with a fit parent, "no one can take you from our safe place".

412. Supervisory personnel were involved during the incident and did not require judicial authorization or terminate PPC following medical clearance.

413. By treating these repeated, supervisor-ratified practices as the standard operating procedure for warrantless child removals, the City's unwritten customs caused officers to seize and detain Plaintiffs' children without a warrant, court order, probable cause, or exigency, and to omit the mandatory K.S.A. 38-2232 application, thereby prolonging the unconstitutional detention in violation of the Fourth and Fourteenth Amendments.

"Take-All" Pattern

414. The September 17, 2025 removal described in paragraph 200 is pled solely to show an ongoing City/County custom of removing children without court approval, placing them at Wichita Children's Home, and then conditioning reunification on services. Plaintiff seeks no damages or other relief for that 2025 incident; it is included only as evidence that the unconstitutional practices alleged in this complaint are part of a persistent municipal policy rather than an isolated event.

Inter-agency policymaking by Sedgwick County and DCF

415.   Sedgwick County, through its statutorily designated child-welfare and juvenile intake framework, was responsible for receiving, reviewing, and acting upon written Police Protective Custody applications and related information required by K.S.A 38-2232.

416.   In practice, Sedgwick County maintained or tolerated an inter-agency arrangement in which law enforcement routed children to hospitals and Wichita Children's Home without submitting the required written application to the County or district attorney and without initiating juvenile intake or court review.

417.   No court assumed jurisdiction over Plaintiff's children during the period of Police Protective Custody, and no County-initiated juvenile proceeding was opened.

418.   Sedgwick County did not require submission of a written K.S.A. 38-2232 application, did not initiate juvenile intake, and did not seek judicial review before or during the children's detention.

419.   Following medical clearance, reunification timing and conditions were not determined through any court order or CINC adjudication, and the County did not intervene to require judicial authorization.

420.   County officials and supervisors did not exercise their statutory gatekeeping authority to terminate unlawful administrative custody or to compel judicial review.

421.   Kansas law requires that when a child taken into PPC is placed with a receiving facility, a written application and related information be furnished to the county or district attorney without unnecessary delay. The records produced to Plaintiff contain no documentation reflecting that any such application or information was furnished in this case.

422. By maintaining and enforcing a mutually understood inter-agency practice in which the statutorily required K.S.A. 38-2232 application, juvenile intake, and court review were omitted—and by failing to require submission of those materials or initiate judicial oversight—Sedgwick County and DCF implemented and ratified a final policy of non-enforcement that caused Plaintiff's children to be seized and detained without probable cause, exigency, or procedural safeguards, in violation of the Fourth and Fourteenth Amendments.

423. Municipal and County Defendants are therefore liable under Monell v. Department of Social Services, 436 U.S. 658 (1978).

## XXII. COUNT XVI

Prospective Declaratory and Injunctive Relief (Ex parte Young)

(Fourth and Fourteenth Amendments — Against DCF Supervisory Officials in Their Official Capacities)

424. Plaintiff incorporates by reference all preceding factual and legal allegations, including the Factual Background and Legal Framework, as though fully set forth herein.

425. Defendants Elizabeth Gregg and Dee E. Nighswonger are DCF supervisory officials responsible for administering and supervising child-welfare intake, investigation, safety planning, placement practices, and related procedures within the Wichita Region.

426. Defendants are sued solely in their official capacities for prospective declaratory and injunctive relief under Ex parte Young, and Plaintiff seeks no monetary damages or retrospective relief in this Count.

427. As alleged herein, Defendants maintain and enforce ongoing extra-judicial practices under which DCF conducts investigation, staffing, and service planning following Police

Protective Custody and effectively influences reunification timing without judicial authorization, while disclaiming responsibility for the legality of the underlying custody. These practices include (i) conditioning reunification or family integrity on non-court-ordered safety plans or services, (ii) misrepresenting or implying court authority where none exists, (iii) threatening custody or service consequences in response to parental objection or protected activity, and (iv) permitting or acquiescing in the placement of children in Police Protective Custody into DCF-licensed foster homes when routed to Wichita Children's Home, absent a court order or CINC petition.

428. DCF knows of, endorses, or treats as routine the practice of medical/forensic exams of children in PPC without a warrant, court order, consent, or exigency.

429. These practices are ongoing and capable of repetition, and create a real and immediate threat of future constitutional injury to Plaintiff and her children. Plaintiff seeks prospective relief only to prevent ongoing and future violations.

430. Plaintiff seeks a declaration that DCF officials may not (a) condition reunification on non-court-ordered plans or services absent exigent circumstances or judicial authorization; (b) misrepresent or imply legal mandates or court authority when communicating with parents; or (c) continue or facilitate detention or placement, including foster placement, after medical clearance and in the absence of imminent danger where no lawful custody or court order exists.

431. Plaintiff seeks a permanent injunction prohibiting Defendants and those acting in concert with them from engaging in the practices described above absent judicial authorization or lawful custody. The requested relief is narrowly tailored, prospective, and Plaintiff has no adequate remedy at law.

## XXIII. COUNT XVII

Invasion of Privacy — Public Disclosure of Private Facts

(Kansas Common Law — Against Honey Tree Academy LLC and Kimberly Fielding)

432.  Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 31, 150, 248-252, as though fully set forth herein.

433.  Defendants obtained private, non-public information concerning Plaintiff and her minor child through their role as the child's daycare provider and through child-welfare communications not available to the general public.

434.  In or about January 2024, Defendants publicly disclosed private facts concerning Plaintiff and her minor child on a public internet platform, Yelp, in a response posted on behalf of Honey Tree to Plaintiff's review.

435.  The disclosure stated, in substance, that Plaintiff withdrew her child from Honey Tree immediately after the child was removed from Plaintiff's home, and referenced circumstances relating to that removal.

436.  The disclosed facts were private, not of legitimate public concern, and not necessary to respond to Plaintiff's review or defend Defendants' business practices.

437.  Defendants knew or reasonably should have known that Plaintiff and her minor child could be readily identified from the contextual details disclosed, despite reference to Plaintiff by first name only.

438.  The disclosure was public, foreseeably accessible to the community and prospective parents,  and would be highly offensive to a reasonable person, particularly given that it concerned a minor child and child-welfare involvement.

439. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages, including emotional distress and loss of privacy.

440. Defendants' conduct constitutes invasion of privacy by public disclosure of private facts under Kansas common law

**PRAYER FOR RELIEF**

441. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and grant the following relief:

442. Plaintiff further requests leave to amend any claim or allegation found deficient, in the interest of justice and to avoid prejudice where statutes of limitation may otherwise bar refiling.

443. Declaratory Relief. Plaintiff seeks the following declaratory relief:

444. A declaration that Defendants' acts and omissions, as alleged herein, violated Plaintiff's rights under the First, Fourth and Fourteenth Amendments to the United States Constitution, including:

   a. the right to be free from unreasonable seizure and continued detention of her children absent exigent circumstances, judicial authorization, or other lawful basis;

   b. the right to family integrity and parental decision-making, including the right to placement with a fit, available parent and freedom from extra-judicial separation and placement;

   c. the right to be free from unreasonable searches, including warrantless home and curtilage intrusion and non-emergency investigative photography, medical

examinations, and radiological imaging of Plaintiff's children absent voluntary consent, a court order, or exigent circumstances;

    d.   the right to bodily integrity of Plaintiff's children as protected through parental authority; and

    e.   the right to be free from coercion, intimidation, deception, and retaliation, including the use of non-court-ordered safety plans, service requirements, or threats of renewed removal to compel compliance or suppress the exercise of constitutional rights.

445. A declaration that Defendants' conduct violated clearly established law at the time of the events alleged.

446. Injunctive and Prospective Relief. Plaintiff requests preliminary and permanent injunctive relief prohibiting Defendants from:

    a.   seizing or detaining Plaintiff's children absent a warrant, court order, or true exigent circumstances;

    b.   subjecting Plaintiff's children to non-emergency medical examinations, forensic photography, or radiological imaging without parental consent or judicial authorization;

    c.   coercing Plaintiff into safety plans, services, or agreements absent court order or statutory authority; and

    d.   misrepresenting or implying the existence of judicial or statutory authority in child-welfare interactions.

Plaintiff further requests an order requiring Municipal and County Defendants to:

e.  adopt and enforce constitutionally compliant policies governing police protective custody;

f.  train officers and child-welfare personnel on the statutory limits of K.S.A. 38-2231 and 38-2232;

g.  prohibit routine hospital or shelter placement absent lawful custody;

h.  ensure prompt release of children to fit, available parents when no exigency exists; and

i.  implement safeguards to prevent continued detention, placement, or medical examination without judicial oversight.

447.  Compensatory Damages. Plaintiff requests compensatory damages in an amount to be determined at trial for all injuries proximately caused by Defendants' unlawful conduct, including but not limited to:

a.  emotional distress, humiliation, anxiety, fear, loss of dignity, and ongoing psychological harm;

b.  trauma suffered by Plaintiff, including trauma arising from witnessing and learning about the unlawful seizure, detention, forced separation, coercive state action, and non-consensual medical intrusion involving her minor children;

c.  interference with family integrity, parental autonomy, and Plaintiff's ability to parent free from state intimidation, coercion, and threat of renewed custody interference;

d.  reputational harm and community stigma, including Plaintiff's reasonable fear that she is perceived as an unfit or "bad" parent, resulting in social withdrawal, isolation, and lasting reputational injury;

e. loss of use and enjoyment of Plaintiff's home and residential environment, including the destruction of Plaintiff's sense of safety, privacy, and emotional security within her own residence as a direct result of Defendants' conduct and its continuing effects;

f. constructive displacement and forced relocation harms, including damages arising from Plaintiff's inability to reasonably avoid ongoing exposure to Defendants, their operations, and the associated trauma without relocating her household;

g. diminution in the value, utility, and habitability of Plaintiff's property resulting from Defendants' actions, the resulting stigma, and the unavoidable proximity and continuing impacts of Defendants' conduct;

h. economic losses, including but not limited to:

i. lost wages and missed workdays;

j. daycare tuition and fees charged after withdrawal, including amounts exceeding $1,300;

k. costs incurred to relocate Plaintiff's child to a new daycare;

l. reasonable past and future costs incurred to mitigate, respond to, and recover from Defendants' conduct, including costs associated with securing alternative housing or relocation to comparable housing;

m. out-of-pocket expenses incurred in protecting Plaintiff's family, pursuing information, and responding to Defendants' actions; and

n. other consequential financial harms proximately caused by Defendants' conduct.

o. Compensatory damages for loss of professional, creative, and expressive activity. Plaintiff is a music producer and active member of the local poetry and spoken-word community, whose work depends on sustained creative focus, emotional stability, and public engagement. Prior to Defendants' unlawful conduct, Plaintiff maintained consistent creative and performance activity. In calendar year 2023, Plaintiff released thirteen (13) original songs and performed at multiple poetry and spoken-word events, including a public performance at the Wichita Art Museum.

p. Following the January 2024 seizure of Plaintiff's children and the resulting trauma, disruption, reputational stigma, and ongoing fear of state re-intervention, Plaintiff's creative and expressive activity sharply declined. In 2024, Plaintiff released only two (2) songs, and in 2025 to date, only one (1) song. Since the removal of her children, Plaintiff has not performed at a single poetry or spoken-word event.

q. This significant reduction in creative output and complete cessation of public performance was not voluntary, cyclical, or market-driven, but was directly and proximately caused by Defendants' conduct, including emotional distress, psychological burden, reputational harm, loss of personal safety, and the diversion of time, attention, and mental capacity required to respond to Defendants' actions and protect her family. Plaintiff suffered measurable professional, expressive, and personal losses as a result.

r. Compensatory damages reflecting the heightened reputational, professional, and personal injury suffered by Plaintiff due to her public profile. Plaintiff was

publicly listed as a candidate for mayor from approximately March 2022 through the conclusion of the 2023 election cycle. Defendants' actions subjected Plaintiff to amplified stigma, scrutiny, and reputational harm beyond that experienced by a private individual, intensifying the personal and professional consequences of Defendants' unlawful conduct.

448.    Punitive Damages. Plaintiff requests punitive damages against all Defendants who acted under color of state law in their individual capacities for conduct that was malicious, reckless, callously indifferent, or in knowing disregard of Plaintiff's clearly established constitutional rights, in an amount sufficient to punish and deter similar misconduct.

449.    Statutory and Common-Law Relief. Plaintiff requests:

   a. All relief available under 42 U.S.C. § 1983 for the constitutional violations alleged herein.

   b. All relief available under Kansas common law for invasion of privacy and related torts, including damages for emotional distress and loss of privacy.

450.    Costs and Fees. Plaintiff requests:

   a. An award of taxable costs as permitted by law and, if applicable, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

451.    Interest. Plaintiff requests:

   a. Pre-judgment and post-judgment interest as permitted by law.

452.    Other Relief. Plaintiff requests:

   a. Such other and further relief as the Court deems just, proper, and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Julie Rose Stroud

Plaintiff, pro se

2115 N. Teal Brook Ct

Wichita, KS, 67235

Telephone: 316-204-8786

Email: JulieRoseStroud@gmail.com

Date: 01/06/2026