**FILED**
**U.S. District Court**
**District of Kansas**
04/13/2026
**Clerk, U.S. District Court**
**By:** MSB **Deputy Clerk**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

JULIE ROSE STROUD,                                                            )

Plaintiff,

v.      Civil Action No. 6:26-cv-01004-DDC-GEB

CITY OF WICHITA;                                                             )

SEDGWICK COUNTY;                                                             )

WICHITA CHILDREN'S HOME;                                                     )

WESLEY MEDICAL CENTER, LLC;                                                  )

DCCCA, INC;                                                                  )

LAVANDRIA FOUNTAIN;                                                          )

HONEY TREE ACADEMY LLC;                                                      )

KIMBERLY FIELDING;                                                           )

JOHN RYAN;                                                                   )

ROBERT DULOHERY;                                                             )

MACKENZIE VAN PELT;                                                          )

SAMUEL DUNCAN;                                                               )

CALVIN RUSCH;                                                                )

BLAKE SANCHEZ;                                                               )

GABRIEL OHMART;                                                              )

LORI CLARK;                                                                  )

ABILIBA EREKOSIMA;                                                           )

JANA VINDUSKA;                                                               )

LAQUILLA WILLIAMS;                                                                                                    )

ASHLIE THOMAS;                                                                                                        )

ELIZABETH GREGG;                                                                                                      )

DEE E. NIGHSWONGER;                                                                                                   )

GREGORY G FAIMON;                                                                                                     )

MEGAN MEIER;                                                                                                          )

WENDY HARTMAN;                                                                                                        )

DEBBIE A. DESILET-DOBBS;                                                                                              )

BETH HEFLIN;                                                                                                          )

JASON LANE – WICHITA POLICE OFFCIER (BODY-WORN CAMERA OFFICER);    )

and MEDICAL PROVIDER DOE 1 – HOSPITAL MEDICAL PROVIDER (MEDICAL

ADDENDUM SIGNATORY),                                                                                          )

Defendants.

SECOND AMENDED COMPLAINT

FOR DECLARATORY, INJUNCTIVE, AND DAMAGES

(42 U.S.C. § 1983 and Supplemental State-Law claim)

JURY TRIAL DEMANDED

I.      PARTIES

Plaintiff

1.      Plaintiff Julie Rose Stroud is a resident of Sedgwick County, Kansas, and the mother and

lawful custodial parent of minor children M.N. (age 14 at the time of the events), Y.M.

(age 11 at the time of the events), and A.A. (age 2 at the time of the events).  Plaintiff

brings this action solely on her own behalf for violations of her constitutional and statutory rights. References to Plaintiff's minor children are included to describe the factual circumstances underlying Defendants' conduct and to establish violations of Plaintiff's own rights and resulting damages. Plaintiff does not purport to represent her children's independent legal interests.

Municipal and County Defendants

Plaintiff brings claims against municipal defendants pursuant to 42 U.S.C. § 1983. All individual law-enforcement defendants are sued in their individual capacities only. No Defendant officer is sued in an official capacity unless expressly stated. No claims for damages are asserted against municipal entities based solely on the acts of their employees, and Plaintiff proceeds against municipal defendants only on the basis of policy, custom, or practice as alleged herein.

2. Defendant City of Wichita is a municipal corporation organized under the laws of the State of Kansas. At all relevant times, the Wichita Police Department ("WPD") was a department of the City of Wichita.

3. Defendant Sedgwick County is a political subdivision of the State of Kansas.

4. Defendant John Ryan was, at all relevant times, a sergeant with the Wichita Police Department and acted under color of state law during the events commencing on January 8, 2024, involving Plaintiff's children. Ryan is sued in his individual capacity.

5. Defendants Robert Dulohery, Mackenzie Van Pelt, Calvin Rusch, Samuel Duncan, Blake Sanchez, were, at all relevant times, City of Wichita WPD officers who acted under color of state law and participated in the events commencing on January 8, 2024, involving Plaintiff's children and are sued only in their individual capacities.

6.     Defendant previously identified as John Doe 1 is now identified as Officer Jason Lane, who, at all relevant times was a Wichita Police Department officer acting under color of state law on January 8, 2024. Officer Lane is sued in his individual capacity. Plaintiff obtained Officer Lane's identity after the filing of the original Complaint.

7.     Defendant Gabriel Ohmart was, at all relevant times, a detective with the Wichita Police Department and acted under color of state law during the events at issue. Detective Ohmart is sued in individual capacity.

State Defendants

8.     Defendants Elizabeth Gregg and Dee E. Nighswonger are directors or senior officials within the Kansas Department for Children and Families ("DCF"). They are sued in their official capacities for prospective declaratory and injunctive relief pursuant to Ex parte Young.

9.     Defendant Abiliba Erekosima was, at all relevant times, an employee of the Kansas Department for Children and Families ("DCF") assigned to child-welfare functions within the Wichita Region and acted under color of state law during the events at issue. Erekosima is sued in her individual capacity.

10.    Defendants Jana Vinduska and Ashlie Thomas were, at all relevant times, supervisors or decision-making officials of the Kansas Department for Children and Families ("DCF") who acted under color of state law during the events at issue. Vinduska and Thomas are sued in their individual capacities.

11.    Defendant Lori Clark was, at all relevant times, an employee or agent of the Kansas Department for Children and Families ("DCF") assigned to the Kansas Protection Report

Center ("KPRC") and acted under color of state law during the events at issue. Clark is sued in individual capacity.

12.    Defendant LaQuilla Williams was, at all relevant times, an employee of the Kansas Department for Children and Families ("DCF") who acted under color of state law by jointly participating with, and/or exercising authority delegated by, state and municipal actors in the detention, placement, and continued control of Plaintiff's minor children. Williams is sued in her individual capacity.

Private Entity Defendants Acting Under Color of State Law

13.    Defendant Wichita Children's Home ("WCH") is a private entity operating in Sedgwick County, Kansas. At all relevant times, WCH acted under color of state law by jointly participating with, and/or exercising authority delegated by, state and municipal actors in the detention, placement, and continued control of Plaintiff's minor children.

14.    Defendant DCCCA, Inc. is a private contractor providing child-welfare services in Kansas. At all relevant times, DCCCA, Inc. acted under color of state law by jointly participating with DCF and other state actors in the implementation and enforcement of safety planning, service conditions and reunification decisions that affected the custody, detention, and continued control of Plaintiff's minor children.

15.    Defendant Honey Tree Academy LLC is a Kansas limited liability company operating a licensed daycare facility in Sedgwick County, Kansas. At all relevant times, Honey Tree Academy LLC acted under color of state by jointly participating with law enforcement and child-welfare officials, including by conducting physical inspection of a child, creating and transmitting photographs, and providing information that was relied upon in the decision to initiate and continue Police Protective Custody.

16.    Defendant Wesley Medical Center, LLC, doing business as Wesley Woodlawn Hospital & ER ("the Hospital"), is a private hospital entity operating in Sedgwick County, Kansas. At all relevant times, the Hospital acted under color of state law by jointly participating with law enforcement and child-welfare officials, including by conducting non-emergency medical examinations, forensic photography, and radiological imaging while the child(ren) were in police custody, and by generating and transmitting information used in custody, detention, and placement decisions.

Individual Defendants

17.    Defendant Gregory G. Faimon, MD is a physician identified in Wesley Woodlawn Hospital & ER records as the attending and/or ordering physician for medical evaluation and radiological imaging performed on Plaintiff's minor child during the January 8–9, 2024 hospital encounter. At all relevant times, Dr. Faimon acted under color of state law by ordering and directing non-emergency medical evaluation and radiological imaging while the child(ren) were in police custody and for investigative and custody-related purposes in coordination with law enforcement. He is sued in his individual capacity.

18.    Defendant Debbie A. Desilet-Dobbs, MD is a physician identified in Wesley Woodlawn Hospital & ER records as the interpreting and supervising radiologist who reviewed and signed radiological imaging studies of Plaintiff's minor child during the January 8–9, 2024 encounter. At all relevant times, Dr Desilet-Dobbs acted under color of state law by reviewing and approving radiological imaging obtained while the child(ren) were in police custody and for purposes related to investigation and custody determination, in coordination with law enforcement and child-welfare officials. She is sued in her individual capacity.

19. Defendant Wendy Hartman, RN, was, at all relevant times, a registered nurse employed by Wesley Woodlawn Hospital & ER who provided nursing services to Plaintiff's minor child during the January 8-9, 2024, hospital encounter. At all relevant times, Harman acted under color of state law by participating in and assisting with non-emergency medical examination and/or documentation of the child while the child was in police custody and for investigative or custody-related purposes in coordination with law enforcement. She is sued in her individual capacity.

20. Defendant Megan Meier, RN was, at all relevant times, a registered nurse employed by or acting as an agent of Wesley Woodlawn Hospital & ER and acted under color of state law by participating in the examination, documentation, and handling of the child while the child was in police custody and for investigative or custody-related purposes in coordination with law enforcement. She is sued in her individual capacity.

21. Defendant Beth Heflin, MD is a physician identified on the Child Abuse Forensic Photography / Case Review Addendum dated January 9, 2024, as the individual who signed the "Case Reviewed By" section. At all relevant times, Dr. Heflin acted under color of state law by reviewing and approving forensic findings for investigative and custody-related purposes and authorizing their communication to law enforcement, with knowledge that such information would be relied upon in decisions concerning continued detention, placement, and custody of Plaintiff's child. She is sued in her individual capacity.

22. Defendant Medical Provider Doe 1 (Program Coordinator), sued in individual capacity, is an unidentified program coordinator or designee identified on the Child Abuse Forensic Photography / Case Review Addendum dated January 9, 2024, as the individual who

signed the "Program Coordinator (or Designee)" section. At all relevant times, this Defendant acted under color of state law by reviewing, coordinating, and/or approving forensic documentation and case findings for investigative and custody-related purposes and facilitating their transmission to law enforcement and child-welfare officials for use in detention, placement, and custody decisions.

23.     Defendant LaVandria Fountain was, at all relevant times, an employee or agent of DCCCA, Inc., and acted under color of state law by jointly participating with DCF and other state actors in enforcing service requirements and safety planning conditions tied to custody and reunification, including pressuring Plaintiff to comply with non-court-ordered services affecting the control and custody of her children. She is sued in her individual capacity.

24.     Defendant Kimberly Fielding was, at all relevant times, was the owner and managing agent of Honey Tree Academy LLC and acted under color of state law by jointly participating with law enforcement and child-welfare officials, including by conducting a physical inspection of A.A.'s body, creating and transmitting photographs, and providing statements and allegations that were relied upon in the decision to initiate and continue Police Protective Custody.  She is sued in her individual capacity.

II. JURISDICTION

25.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, as this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

26.     This Court has supplemental jurisdiction over Plaintiff's Kansas law claim pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy.

27.    No ongoing state judicial proceeding was initiated, pending, or ongoing at any time in connection with the seizure or detention of Plaintiff's children. Plaintiff does not seek to enjoin, review, or interfere with any state-court custody determination, because no such proceeding or determination ever existed.

## III. VENUE

28.    Venue is proper in the United States District Court for the District of Kansas under 28 U.S.C. § 1391(b) because the events and omissions giving rise to Plaintiff's claims occurred in Sedgwick County, Kansas, and because Defendants performed the official acts challenged herein within this District through the administration, supervision, and enforcement of child-welfare practices governing the Wichita Region. Pursuant to D. Kan. Gen. R. 2.1, Plaintiff respectfully requests assignment to the Wichita Division because all material events occurred in Sedgwick County.

29.    The designated place of trial is Wichita, Kansas, pursuant to D. Kan. Rule 40.2, because the events and omissions giving rise to Plaintiff's claims occurred in Sedgwick County, Kansas.

## IV. FACTUAL BACKGROUND

30.    On January 8, 2024, Honey Tree Academy, LLC ("Honey Tree"), License No. 0061025-022, the daycare attended by Plaintiff's minor child A.A., contacted Plaintiff via the Brightwheel application and reported observing "marks" on A.A.'s back. Honey Tree transmitted two photographs to Plaintiff: (a) one depicting a faint bruise on A.A.'s cheek; and (b) one depicting two superficial scratches and a healing scab on the center of A.A.'s back, approximately one-half inch by one-quarter inch in size, with surrounding adhesive residue consistent with a detached gauze pad.

31.   Plaintiff responded the same day stating that A.A. fell from a kitchen chair and injured her back, and that A.A. later tripped over a vacuum and fell onto a wooden bench in the living room.

32.   On January 8, 2024, Wichita Police Department ("WPD") Officers Robert Dulohery, John Ryan and John Doe 1, responded to a child-welfare referral concerning Plaintiff's two-year-old child, A.A., who lived with Plaintiff and her two older siblings. At no time were the children reported as runaways, missing persons, trafficking victims, or as experiencing a behavioral-health crisis.

33.   While Plaintiff was not at home, Officer Jason Lane left Plaintiff's front walkway and walked into Plaintiff's backyard and around the exterior of her home. The body-worn camera footage does not reflect the officer stating a warrant, consent, or an emergency basis for that entry. (Officer Lane body-worn camera, 00:01:10–00:04:17).

34.   After returning from the backyard, Officer Lane reported to Officers Dulohery and Ryan, stating: "The only lights on are in the living room and the basement." Officer Lane then addressed Officer Ryan as "boss," stating, "Boss, how you doing?" Officer Ryan did not attempt to stop Officer Lane on body-worn camera footage (Officer Lane body-worn camera, 00:04:52–00:04:58).

35.   One the same day, January 8th 2024, and before meeting Plaintiff, Officers Ryan and Dulohery interviewed Kimberly Fielding, owner of Honey Tree Academy, LLC, who was acting on behalf of the daycare. The interview is recorded on body-worn camera. (Officers Dulohery and Ryan body-worn cameras).

36.  Fielding told Officers Plaintiff was "withdrawn," "socially awkward," and "odd" and told Officers A.A. was not "filthy and crawling with bugs" but was "not always clean" (Officer Dulohery body-worn camera, 00:08:45–00:08:58).

37.  Later during the welfare check inside Plaintiff's home, Officer Dulohery referenced Plaintiff's demeanor, whispering "social awkwardness" to Officer Ryan. (Officer Dulohery body-worn camera, 00:36:03–00:36:10).

38.  Fielding told Officers "She came with this shirt on, and it was dirty and gross, but it had a burn hole in it. And that's what caught our attention. And so we took pictures of it. And the only reason we did is because under it, there was an old burn mark that was under there." (Officer Dulohery body-worn camera, 00:12:40–00:13:10).

39.  Fielding told Officers Plaintiff stated that she "didn't realize that she had that shirt on" and told Officers that Plaintiff said, "I think it was from a candle" (Officer Dulohery body-worn camera, 00:13:30–00:13:41). Plaintiff did know A.A. was wearing the shirt because Plaintiff dressed A.A. and sent A.A. to school with the sleeves rolled up on purpose. Plaintiff never said "I think" when providing information to Honey Tree about the sleeve with the burn hole.

40.  Police Protective Custody ("PPC") forms signed by Officers Dulohery and Rusch were provided to Plaintiff by DCF. The PPC forms documented that the welfare check was requested after a report from a mandatory reporter alleging that A.A. had "bruises and cuts on her back and arms," additional injuries dating back to November 2023, and a "burn mark."

41.    According to the PPC forms, officers were provided photographs of A.A., including images depicting healing or older injuries. Body-camera footage shows Defendant Kimberly Fielding providing photographs to officers.

42.    During her communication with law enforcement, Defendant Kimberly Fielding stated, "I didn't want mom to see it. I just wanted the documentation," in reference to photographs she had taken of A.A.

43.    The photographs were not all made available to Plaintiff but were instead retained and later provided to law enforcement.

44.    The report further states that the officer "observed a number of healing injuries on the child."

45.    Plaintiff's other children were documented as present in the home.

46.    The report further states, "At Sgt. Ryan's on-scene directive, we took all three children into police protective custody," and provides no information supporting the decision for removal other than the allegations from Honey Tree Academy and the observation of healing injuries.

47.    A.A. had never sustained a burn injury, and Plaintiff had previously informed daycare staff, Shama Mahmood, that the burn mark referenced by Fielding related to damage on a shirt, not an injury to A.A., and occurred weeks prior to A.A. wearing the shirt to school. Plaintiff observed no red mark on A.A.'s arm when rolling up the sleeve on the morning she wore the shirt. Later descriptions by daycare staff of a "burn mark" were inconsistent with Plaintiff's observations and stated explanations to Honey Tree. Fielding provided statements to police concerning Plaintiff's family, and A.A.'s attendance, development, and condition that Plaintiff disputes as inaccurate or misleading, including assertions

regarding prior injuries, attendance gaps, developmental delay, and parental statements. Law enforcement relied on the reported allegations and photographs in initiating the welfare check and subsequent actions as referenced in the medical records of Plaintiff's children and police records. (Officers Dulohery and Ryan body-worn camera footage).

48.    Fielding told Officers A.A. was "gone for several days" and did not tell Officers A.A. was prohibited from attending school if she had a runny nose and was prohibited from attending because of a runny nose on multiple occasions. (Officer Dulohery body-worn camera, at multiple points including approximately 00:07:57–00:08:00; 00:11:11–00:11:15; 00:11:21–00:11:26; 00:11:30–00:11:33).

49.    Fielding told Officers that A.A. "cannot communicate" and "doesn't talk." (Officer Dulohery body-worn camera, 00:15:04-00:15:08). In contrast, A.A. was verbal, communicated well, and spoke in short sentences

50.    Fielding told Officers she decided she was "just going to look at her" and told Officers she started "pulling her shirt up" to look. Fielding showed Officers the photographs on her device. A responding Officer then requested that Fielding provide the photographs, and Fielding subsequently transmitted the photographs to law enforcement via email. At the time Fielding conducted the inspection, took the photographs, displayed them, and transmitted the photographs to law enforcement, Officers had not yet conducted any independent physical examination of A.A. Fielding told Officers that A.A. had not been to school for 5 days (Officer Dulohery body-worn camera, 00:15:54-00:17:27). Plaintiff gave no consent to Fielding or any daycare staff to examine, search, or inspect A.A.'s body for injuries. Plaintiff was not notified that any such search or examination would occur.

51.    When questioned later by Officers, Fielding clarified her previous statement regarding one of A.A.'s absences and stated the school was closed for the holidays. (Officer Dulohery body-worn camera, 00:22:19-00:22:35).

52.    Later the same day on January 8th 2024, Officers Ryan and Dulohery arrived at Plaintiff's home. Plaintiff permitted Officers Ryan and Dulohery to entry. Officers Dulohery and Ryan entered at approximately 9:20 p.m. local time, and once inside stated they came "to check the welfare of a child." (Officer Ryan body-worn camera,  00:02:11–00:02:27). No DCF employee accompanied them.

53.    No officer presented a warrant or stated that a warrant existed. No officer stated that a court order had been obtained authorizing removal. The only physical item provided before and during the removal was a handwritten WPD case number on a small piece of paper bearing the notations "Dulohery 2270" and "1/8/24." At the time of the removal, Plaintiff's minor children had never been adjudicated Children in Need of Care (CINC), and no CINC proceeding had ever been initiated.

54.    Within minutes of entering the home, and while A.A. was not wearing a shirt, Officer Dulohery stated: "I need to take photos. And I'm going to do that without your interference." Plaintiff pointed to the residue and stated it was from a bandage. (Officer Dulohery body-worn camera, 00:05:38–00:05:55).

55.    Plaintiff requested a before-and-after photograph. Officer Dulohery stated: "I see what you want. You want a picture of it's just adhesive from a band-aid, and then it's adhesive from a band-aid gone. I understand exactly what you're asking."

56.    While Plaintiff was seated holding A.A., Officer Dulohery stood close in front of Plaintiff while a bright light was directed toward Plaintiff's face. Plaintiff stated, "You can take a

photo, but I feel very threatened by you." (Officer Ryan body-worn camera, 00:05:38–00:06:14).

57. Within less than 6 minutes after entering Plaintiff's home, Officer Ryan is heard stating "22-01" and "start up some other officers in here." (Officer Ryan body-worn camera, 00:06:07–00:06:14).

58. Officer Dulohery stated that if Plaintiff continued trying to wipe the area before he took photos, she would "wind up in handcuffs" and that it would cost her "some charges." (Officer Dulohery body-worn camera, 00:08:24–00:08:46).

59. After the threat of arrest and charges, Plaintiff submitted to the photographing of A.A. and Officer Dulohery took photographs of A.A. (Officer Dulohery body-worn camera, 00:08:57-00:11:14).

60. Officer Dulohery asked how A.A. received the scratch. Plaintiff's son, Y.M. stated, "She was in the kitchen. She fell down from the chair." (Officer Dulohery body-worn camera, 00:09:02–00:09:16; Officer Ryan body-worn camera, 00:09:05–00:09:14).

61. Plaintiff stated she had told Honey Tree that A.A. "fell off of the chair," and that on her face she hit a bench; Plaintiff pointed to a wooden chest near the front door and added, "cause she tripped over the vacuum." (Officer Dulohery body-worn camera, 00:10:52–00:11:22; Officer Ryan body-worn camera, 00:10:51–00:11:22).

62. After the request for additional officers, Officers Mackenzie Van Pelt and Calvin Rusch arrived. Officer Van Pelt knocked, opened Plaintiff's front door, and asked for her "boss." Officer Ryan responded, "Yeah, come on in." (Officer Van Pelt body-worn camera, 00:00:29–00:00:38; Officer Ryan body-worn camera, 00:20:07–00:20:33).

63. The footage does not reflect Plaintiff giving any express consent to Officers Van Pelt, Rusch, Duncan, and Sanchez to enter Plaintiff's residence. (Officers Ryan and Van Pelt body-worn cameras).

64. Plaintiff stated she had food, running water, and working utilities, and asked Officer Dulohery to photograph food in the home. When referencing Plaintiff's home, Officer Dulohery later stated, "That's not what this is about today, ma'am." (Officer Dulohery body-worn camera, 00:43:42–00:44:27).

65. Officer Ryan is heard telling Officer Rusch, "we're probably going to PPC." (Officer Ryan body-worn camera, 00:21:20–00:21:40).

66. Plaintiff asked if they were preparing to take A.A. Officer Ryan responded, "Yeah, yeah we're going to take her up to a medical facility and get her checked out. Get medical clearance." (Officer Ryan body-worn camera, 00:21:21–00:21:50).

67. Plaintiff asked if that was normal. Officer Ryan responded, "Yes, oh yeah. We do it all the time. Especially with that number of marks on her back." (Officer Ryan body-worn camera, 00:21:51–00:22:06).

68. Plaintiff asked whether she could accompany A.A. or whether she was being arrested. Officer Ryan responded "no" and stated, "The children are going to come in police protective custody. All three of them." (Officer Ryan body-worn camera, 00:22:05–00:22:14).

69. Plaintiff stated the children's father was available. Officer Ryan responded, "That's not police protective custody." (Officer Ryan body-worn camera, 00:22:14–00:22:21).

70. Plaintiff asked, "Why are my kids in police protective custody?" Officer Ryan answered, "Oh, because of the totality of all the information we have. The injuries." (Officer Ryan body-worn camera, 00:22:22-00:22:34).

71. When Plaintiff asked what "totality of information" meant, Officer Ryan said, "What we have been told by DCF." (Officer Ryan body-worn camera, 00:22:29-00:22:40).

72. Plaintiff asked what DCF told him. Officer Ryan stated, "We can't tell you that." (Officer Ryan body-worn camera, 00:22:39–00:22:45).

73. Plaintiff later requested parental access records from DCF, including the original KPRC intake report. DCF declined to provide the KPRC report.

74. Plaintiff asked why the older children were being taken. Officer Dulohery stated, "They are juveniles, they are under 18 and we have to." Officer Ryan added, "when we take one, we normally take all the kids in the house. They all go into police protective custody." (Officer Dulohery body-worn camera, 00:22:53–00:23:14; Officer Ryan body-worn camera, 00:22:50–00:23:11).

75. No officer communicated any concerns regarding Y.M. or M.N.

76. In regards to the removal, Plaintiff stated "I'm still not understanding." Officer Ryan stated, "Well just to spell it out for you. What we see, in the way of the injuries on her, and the documented photos." Plaintiff stated, "This one mark on her back because the rest is from band-aids." Officer Ryan responded, "Okay. Well I want a doctor to tell me that. The doctor's going to check her up." (Officer Ryan body-worn camera, 00:23:45-00:24:09; Officer Van Pelt body-worn camera, 00:03:46-00:04:07).

77. Plaintiff asked whether A.A. could rest before going for a medical check. Officer Ryan responded "No," adding, "We are responsible if anything happens from the time we walk

out." (Officer Ryan body-worn camera, 00:24:07–00:24:17; Officer Van Pelt body-worn camera, 00:04:14–00:04:24).

78.    Plaintiff asked to see paperwork. Officer Ryan stated Plaintiff could call 911 if she doubted they were police. Plaintiff asked Officers, "There's no documentation process with this? You just come in and take people's children?" Officer Dulohery responded, "Yes, I will give you the case number" Officer Ryan stated the children would be in PPC "for up to 72 hours" and that EMCU would investigate. (Officer Ryan body-worn camera, 00:24:19–00:25:10; Officer Van Pelt body-worn camera, 00:04:24–00:05:13).

79.    Plaintiff told Officers that removing A.A. would be traumatic and raised breastfeeding-related concerns. Officer Ryan responded, "Yeah, we have to." (Officer Ryan body-worn camera, 00:26:08–00:26:35).

80.    Plaintiff asked Officer Ryan, "In your honest opinion, do you think that she's in danger?" Officer Ryan replied, "I have no idea, but we always err on the side of caution. And take the child and do a medical clearance, take them into police protection." (Officer Ryan body-worn camera, 00:26:47-00:27:01).

81.    Officers Van Pelt, Duncan, Rusch, and Dulohery, were present inside the home when Officer Ryan stated he did not know whether A.A. was in danger. (Officer Van Pelt body-worn camera, 00:06:45-00:07:04; Officer Dulohery body-worn camera, 00:26:49-00:27:03).

82.    Plaintiff asked Officer John Ryan if the decision to take the kids was his alone. Plaintiff asked, "so it's your overall call?" Officer John Ryan stated, "Yes, and this is a call I would definitely make every time seeing that" (Officer Ryan body-worn camera, 00:27:01-00:27:34).

83.   Y.M. asked to speak to his father and asked if his father could pick him up. Officer Dulohery stated, "No we can't," and stated, "police protective custody means no one can take you from our safe place." (Officer Dulohery body-worn camera, 00:26:28–00:27:18).

84.   Plaintiff asked if the children could go with their father. Officer Ryan stated, "Not right now, no." (Officer Ryan body-worn camera, 00:29:03–00:29:32).

85.   Plaintiff provided Officers with contact information for the older children's father, Mohamed Mohamed before the children were removed by police from Plaintiff's home.

86.   Mohamed is Y.M.'s biological father and M.N.'s stepfather and held legally established parenting rights with respect to Y.M. and M.N., as set forth in a valid court order. Defendants acted without consulting, notifying, or accounting for those rights during the removal and detention of the child.

87.   Before taking her children, Plaintiff asked what options she had, Officer Mackenzie Van Pelt responded, "This is the only option as of now." (Officer Ryan body-worn camera, 00:27:35-00:28:07).

88.   Plaintiff asked law enforcement what the "medical clearance" would involve and was told it would consist of a "standard medical procedure," comparable to a routine doctor's visit such as checking blood pressure.

89.   Officer Ryan repeated a phrase stated earlier, "We always err on the side of caution." Officer Ryan added "If she has any old injuries that we can't see underneath the skin, the doctor will tell us that too." (Officer Ryan body-worn camera, 00:39:51–00:40:39).

90.    Officer Van Pelt carried A.A. outside. Officers Van Pelt and Samuel Duncan attempted to secure A.A. into a car seat. Officer Van Pelt stated the car seat was "too small." (Officer Van Pelt body-worn camera, 00:22:20–00:22:24).

91.    For approximately three minutes and sixteen seconds, Officers Van Pelt and Duncan physically restrained A.A. by preventing her movement and forcibly securing her in a car seat while she resisted and attempted to avoid being placed there. During that period, the body-camera audio captures A.A. crying out "Mommy" and "I want Mommy" repeatedly. (Officer Van Pelt body-worn camera, 00:19:20–00:22:36; Officer Duncan body-worn camera, 00:19:40–00:22:07).

92.    Officer Ryan and Officer Duncan transported A.A. to Wesley Woodlawn Hospital & ER in the car seat without fastening the straps. During the transport, Officer Duncan referred to Officer Ryan as "boss." (Officer Duncan body-worn camera, 00:25:52-01:01:54).

93.    Officer Dulohery stated that DCF was working the case after hours and that he spoke with someone by phone. (Officer Ryan body-worn camera, 00:42:30–00:42:53).

94.    Body-worn camera footage produced to Plaintiff does not depict an EMCU supervisor being contacted. In an email dated January 9, 2024 at 7:58 a.m., EMCU staff member Matthew Hall sent Officer Dulohery an email questioning the handling of the incident, including: "If the children had injuries, why wasn't this cut as a Child Abuse? Why wasn't the on-call EMCU supervisor contacted?"

95.    Officer Rusch transported Y.M. and M.N. to Wesley Woodlawn Hospital & ER. The in-vehicle time display shown at departure reflects 22:02. (Officer Rusch body-worn camera, 00:01:36).

96.   A PPS Combined Intake Report produced to Plaintiff from DCF reflects that no Child Protection Specialist was assigned that evening and that DCF did not record the incident as a joint investigation.

97.   DCF Wichita Region Assistant Regional Director of Programs, Elizabeth Gregg stated in email correspondence it was law enforcements decision based on what they see and determine at that time to leave Plaintiff's children in her home or temporarily place them in police protective custody. Gregg stated, "DCF was not involved in that in the moment decision they made".

98.   Gregg stated in email correspondence that the initial assessment was not initially determined to be a joint investigation with law enforcement due to it initially not meeting "alleges serious physical harm to, serious deterioration of or sexual abuse of the child."

99.   On January 8, 2024, at approximately 9:17 p.m., and before entering Plaintiff's home, Officer Dulohery received an email containing three photographs of A.A. taken by Honey Tree Academy daycare staff, accompanied by a narrative. One photograph depicts A.A.'s shirt being lifted to expose her torso for the purpose of looking for injuries, reflecting a physical inspection conducted by daycare staff prior to any law enforcement or medical involvement.

Hospital Examination and Transport Without Documented PPC or Consent (Jan 8-9 2024)

100.   Officers Duncan, Van Pelt, Rusch, Dulohery, Ryan and Sanchez were present with Plaintiff's children at the hospital.

101.   Medical records for Plaintiff's three children taken during the Jan 8-9 2024 examinations, list the arrival by "police" for "Medical Clearance" and "Non-Urgent General Care" and do not document parental consent, a warrant, or court order authorizing the examinations,

or documentation establishing law enforcement's custodial authority to request or consent to the examinations.

102.    Page 8 of A.A.'s medical report from the hospital visit states the following: "Presents for medical clearance to Wichita children's home and concern for abuse. Brought to the emergency room in police custody after daycare provider reported concern for abuse. Daycare provider provided police pictures of bruising to child's face and injuries to her back. Mom reported to police that patient is active and suffered injuries while playing. No known past medical history."

103.    Page 19 of A.A.'s medical record contains administrative-exam coding with a skeletal survey ordered for reasoning stated as "Multiple bruises, concern for abuse," completed at 11:57 p.m. on January 8, 2024. The findings of the X-ray skeletal survey reported no healing or displaced fractures and no abnormal bone production or destruction. The medical record further reflects that Gregory G. Faimon, M.D., ordered the skeletal X-rays, as documented elsewhere in the same record.

104.    At least 14 X-ray images were taken of A.A. during the skeletal survey at the hospital.

105.    Debbie A. Desilet-Dobbs, MD personally reviewed the radiological images of Plaintiff's minor child, corrected the resident physician's interpretation as necessary, and signed and finalized the diagnostic impression of the skeletal survey, knowing the imaging was conducted while the child was in police custody and based on information provided by law enforcement. Dr. Desilet-Dobb's signed interpretation was relied upon in the continued detention and placement decision conserving the child.

106. Y.M's medical record on page 8 contains the following: "Brought to the emergency room with 2 other siblings due to concern raised by daycare provider of one of his siblings for abuse."

107. M.N.'s medical record on page 2 states, "Concern was raised by daycare provider for possible abuse of sibling."

108. The medical records for each child reflect that the stated basis for emergency-room evaluation was Honey Tree provider's allegations, and do not document any independent police observations, assessments, or investigative findings supporting a medical concern separate from those allegations.

109. A.A.'s record states "There is no indication for acute hospitalization… the patient will be discharged."

110. While at the hospital, Officers kept the children in the public waiting area; M.N. appeared upset while Officer Rusch questioned her there. (Officer Rusch body-worn camera, at multiple points at approximately 00:38:48–00:45:27; 00:43:00–00:43:28).

111. Hospital video reflects Y.M. and M.N. were questioned and asked to remove clothing, by Gregory Faimon MD, and Officers were present during examinations. (Officer Van Pelt body-worn camera, 00:00:00–00:02:10; Officer Duncan body-worn camera, 01:14:18–01:22:18).

112. A.A.'s medical records produced by the hospital provider and provided to Plaintiff do not match the records later included in the Wichita Police Department ("WPD") investigative packet. The WPD packet contains pages identifying a different patient not associated with Plaintiff's children and includes "straddle injury" discharge language that does not appear in the hospital-produced medical chart for A.A. Detective Ohmart's narrative for

the police removal and detainment quotes and relies upon the "straddle injury" discharge language associated with a different child.

113. A.A.'s medical record reflects that at 03:32 a.m. on January 9, 2024, Nurse Wendy Hartman, RN, was notified by Megan Meier, RN, that A.A. "needed Child Abuse Forensic Photography." The record notes that Meier was "with a patient currently." At 05:07 a.m., Hartman arrived at Wesley Woodlawn Hospital, entered the patient room, and observed A.A. resting in a car seat with Wichita Police Officers Ryan (#1667) and Dulohery (#2270) present. Officer Dulohery held A.A. while Hartman performed forensic photography, which Hartman completed before leaving the facility at 05:44 a.m.

114. Plaintiff was not provided body-worn camera footage depicting the forensic photographing as cited in medical record.

115. The hospital discharge times as cited in the medical records for Plaintiff's children were 11:19 p.m. on Jan. 8, 2024 for Y.M., 11:29 p.m. on Jan. 8, 2024 for M.N., and 5:29 a.m. on Jan. 9, 2024 for A.A. The discharge paperwork contains the words "Discharged to Home: Yes," and also includes "Medically cleared for admission to Wichita Children's Home."

116. Y.M. and M.N. were transported to WCH by Officers Van Pelt and Rusch, and A.A. was transported later by Officer Ryan. (Officers Van Pelt and Ryan body-worn camera footage).

117. The PPC form, provided by DCF, completed by Officer Rusch and Dulohery was signed after medical examinations and after arriving to WCH, and contains a date and a time on the signature line. The timestamps provided by Gregg documenting PPC match the time of PPC listed on the Police Protective Custody Form. The paperwork, however, does not

contain the elements required for a Police Protective Custody application under K.S.A. 38-2232(c), including facts explaining why officers believed the children would be harmed if not immediately removed or documenting individualized findings of imminent danger. The PPC narrative references a skeletal exam to "look for old injuries."

118. Records provided to Plaintiff from WPD included a document titled "Child Abuse Forensic Photography Case Review Addendum To Exam," listing Wendy Hartman as the nurse. The addendum contains handwritten narrative statements, including "this is child physical abuse" and "she needs to be protected," and identifies Beth Heflin in a "Case Reviewed By" field without specifying whether that physician examined the child or otherwise authorized the narrative. The addendum also lists an additional name on a "Program Coordinator" line; the Program Coordinator name is not discernible from the document. For pleading purposes, the Program Coordinator is identified herein as Medical Provider Doe 1.

119. Approximately two hours and fifty minutes after A.A. was discharged from the hospital, the addendum referenced in paragraph 118 was faxed to Detective Ohmart on January 9, 2024, at approximately 08:19, as reflected in A.A.'s medical record. However, Beth Heflin, M.D., did not sign the addendum until January 22, 2024.

120. According to WCH records, WCH accepted physical custody from WPD, completed admission, intake and foster placement documentation that was produced to Plaintiff, and those WCH records do not include a court order or other judicial authorization approving the placement at the time of intake.

Denial of Placement With Fit Parent

121. While the children were at the hospital, Mohamed spoke with Officer Van Pelt who told him over the phone that all three children had been placed into police protective custody due to "concerning marks" on A.A. and that it was "protocol" to remove all siblings. She did not describe any imminent or individualized danger to any child, did not identify any emergency medical condition, and did not state that Mohamed posed any safety risk or was unfit. When Mohamed requested immediate release of the children to him, Officer Van Pelt responded that her supervisor had already "made the call," that "the answer would not change," and refused to disclose the children's location or permit visitation. (Officer Van Pelt body-worn camera, 00:00:34–00:04:04).

122. Mohamed thereafter went to the hospital and again requested to see and take custody of the children. Hospital staff did not permit him to see or retrieve them.

123. While at the hospital, Mohamed informed Officer Ryan of his parental and court-authorized custodial status. Officer Ryan stated that when police take one child into protective custody, "we take all the kids," and told Mohamed he could not see or take custody of the children. Mohamed left the hospital without seeing the children. (Officer Ryan, body-worn camera, 00:00:33–00:02:49)

124. At the time, Mohamed shared joint legal custody of Y.M. and had court-ordered step-parent visitation with M.N. issued by the Eighteenth Judicial District Court, Sedgwick County, Kansas. Neither child was released to him despite his presence and existing court authorization.

WCH Custody, Placement, and Release Records

125. Wichita Children's Home ("WCH") internal records reflect that staff observed the children, documented behavior and emotional state, prepared internal reports, and referenced

photographs taken during custody. DCF later produced photographs of A.A. taken while she was at WCH. Plaintiff's oldest child reported that a CPS worker photographed her arm, but no photographs of M.N. have been produced to Plaintiff.

126. WCH Admission and Narrative forms contain information regarding the alleged abuse made by Honey Tree, including a narrative that documents the allegations made by the reporting daycare and observations of healing injuries from Officer Rusch.

127. WCH admission records reflect that M.N. and Y.M. were admitted to WCH at 12:29 a.m. on January 9, 2024, and A.A. at 5:57 a.m. that same day. Law enforcement approved release for M.N. at 11:43 a.m. on January 9, 2024, and for Y.M. and A.A. at approximately 11:43–11:45 a.m. on January 10, 2024. All three children were documented as released at 3:38 p.m. on January 10, 2024.

128. Despite documented approval for release, M.N. was not released until approximately 28 hours later, and no explanation for the delay was provided to Plaintiff.

129. Foster placement agreements were prepared by WCH for all three children. The children were placed into a foster home on January 9, 2024 by WCH who represented they were authorized to place the children into the foster home and represented that WCH is a Foster Home. The children were placed into a private family foster home. At all relevant times, Deborah Kennedy served as Chief Executive Officer of WCH.

130. The children's placement at Wichita Children's Home and subsequent foster-home placement occurred while the children remained in Police Protective Custody, and followed law enforcement's routing decision rather than any court order or DCF custody determination.

131. Plaintiff requested licensing and placement-authority records from DCF relating to Wichita Children's Home ("WCH"), including records authorizing WCH to place children into foster homes absent DCF custody or a court order. To date, DCF has not produced any records identifying licensing, statutory authority, or contractual authorization permitting WCH to place Plaintiff's children into foster homes under those circumstances.

WCH Authority and Counsel Admissions

132. On November 20, 2025, WCH's counsel, Corey Adams, stated in email correspondence that WCH receives contractual payments related to child placement, including through agreements with DCF; makes placement decisions when children are referred by state actors; and operates as a private shelter facility within the child-welfare system.

Detective Interview

133. While the children were at WCH, Plaintiff spoke by phone with Detective Gabriel Ohmart. On January 9, 2024, while the children were still detained, Detective Ohmart sent an email to Prevention and Protection Services (PPS) worker Abiliba Erekosima and Prevention and Protection Services Supervisor Jana Vinduska summarizing Plaintiff's statements regarding A.A.'s injuries, including, among other things, that Plaintiff did not believe medical attention was necessary. This communication occurred while the children remained in custody and did not identify any emergency medical condition or new basis requiring continued detention.

134. Following this call, the children remained at WCH before being transferred into foster homes.

135. Detective Ohmart's supplemental narrative of the WPD incident contains a January 9, 2024 timestamp and references events occurring on January 9–10, 2024. The narrative

references and relies upon medical records included in the WPD file provided for this incident that contain information regarding a child unrelated to Plaintiff.

136.    Law-enforcement records for the incident include two versions. The reports describe the same incident, location, and custody outcome, but differ in the level of narrative detail and sequencing of observations. Both versions reflect that the decision to place all three children into Police Protective Custody was made by a supervising officer and that the children were transported for medical clearance and then to Wichita Children's Home.

DCF Interviews and Statements at WCH (Jan. 9, 2024)

137.    Erekosima called Plaintiff by phone the morning of January 9th and stated she was on her way to visit the children. She asked for and Plaintiff provided the contact information for the children's fathers and M.N.'s aunt.

138.    While the children were at WCH, a Kansas Department for Children and Families ("DCF") employee interviewed the children regarding A.A.'s injuries. Detective Ohmart summarized those findings in the narrative of the WPD incident report.

139.    Ohmart's report reflects that on January 9, 2024, A.A. stated she was injured after climbing onto and falling from a chair, and included similar statements regarding falls involving household furniture and play activity.

140.    Portions of the WPD incident report identifying at least one DCF worker are redacted.

141.    On the evening of January 9, 2024, DCF worker Erekosima contacted Fielding by telephone and memorialized Fielding's statements, as documented in DCF conversation notes. Erekosima noted Fielding's statements, including that A.A. had a "speech delay" and said Plaintiff reported that "A.A. is terrible at home and she needs help." The DCF conversation note states that Fielding told Erekosima an altered version about the earlier

referenced "burn mark" and noted it as a "small round flat, red mark on wrist. No blister-old mark" and documented that Plaintiff said she was folding clothes and the shirt got burned when folding clothes. However, A.A. never had a mark and A.A. never had a speech delay. Furthermore, Plaintiff never told Fielding or any other daycare employee that A.A. was terrible at home or that she needed help. Plaintiff was not folding clothes when the shirt got burned and Plaintiff did not tell Honey Tree that.

DCF Interview With Plaintiff and Safety Plan (Jan. 10, 2024)

142. On January 10, 2024, Plaintiff met with Erekosima at the local DCF office. Erekosima told Plaintiff that A.A. stated the injury occurred after she fell from a chair.

143. Erekosima questioned Plaintiff regarding M.N. Plaintiff objected to the removal and requested immediate return of her children.

144. Plaintiff told Erekosima that her constitutional rights had been violated and stated her children should have never been taken. Plaintiff questioned why no DCF employee had investigated the allegation prior to law-enforcement involvement and stated that the children should be released to her custody immediately.

145. Erekosima asked Plaintiff whom she intended to sue and stated that the removal decision was made by law enforcement rather than DCF.

146. After Plaintiff stated her constitutional rights had been violated and requested her children to be released immediately, Erekosima presented Plaintiff with an "Immediate Safety Plan" stating DCF was concerned that A.A.'s activity level was resulting in injuries. Erekosima stated she did not believe abuse had occurred but told Plaintiff if she did not sign the plan release would be delayed until a hearing could take place.

147.  Plaintiff told Erekosima that she believed no plan was necessary and did not agree with the plan's contents.

148.  Erekosima stated the plan would be presented to a judge for approval. Plaintiff signed the plan without counsel. The plan reflects an inadvertent handwritten date of "01/10/2023" and was signed by Erekosima on January 10, 2024.

149.  During the interview, Erekosima made comments regarding Plaintiff's mayoral candidacy, Plaintiff's proximity to a daycare, and told Plaintiff to "watch your back."

150.  During a later phone call on the same day, Erekosima questioned Plaintiff's employment and income and questioned a car incident and told Plaintiff the plan would be presented to the judge.

No Court order or Judicial Review

151.  During the January 2024 incident, no court assumed jurisdiction and no judicial determination of custody occurred. Custody, placement, and release decisions were instead handled administratively.

Administrative Handling of Police Protective Custody

152.  In a written email to Plaintiff, Gregg explained the local process used to handle the post-incident administrative process used to handle Police Protective Custody ("PPC") cases in Sedgwick County. Gregg stated that PPC cases are handled through an administrative process involving law enforcement, DCF, and staffing with the district attorney's office. According to Gregg, a detective may be assigned to a PPC case after the initial incident, and DCF and law enforcement jointly collect information for the case. Gregg further stated that PPC cases are staffed with the district attorney's office at approximately 4:00 p.m. on the working day the case is assigned, at which time DCF presents a proposed

plan based on the information collected. The district attorney's office may either accept the proposed plan or request that a Child in Need of Care petition be filed. In Plaintiff's case, according to Gregg, the district attorney's office accepted a plan for the children to be returned home with family preservation services. No Child in Need of Care petition was filed, and no temporary custody hearing occurred. DCF thereafter requested that law enforcement release the children from police protective custody and implemented the agreed-upon plan.

153.    Kansas law permits law enforcement to take a child into Police Protective Custody ("PPC") to the Juvenile Intake and Assessment Center ("JIAC") for assessment of placement. In Sedgwick County, however, DCF has acknowledged in writing that when children are routed by law enforcement to Wichita Children's Home ("WCH"), WCH is responsible for arranging temporary placement, which often includes placement in short-term emergency foster homes licensed by DCF. DCF further acknowledged that DCF CPS does not decide where a child is physically placed during PPC, and that placement decisions are made by WCH when children are processed through WCH or, ultimately, by law enforcement based on routing decisions. The memorandum of agreement governing JIAC procedures in effect on January 8, 2024 does not assign WCH intake authority, custody-determination authority, or judicial functions. Under the described practice, children were routed directly to hospitals and shelter facilities without JIAC assessment, judicial review, or confirmation that statutory custody-application requirements had been satisfied, resulting in continued separation from parents based on administrative workflow rather than individualized emergency necessity.

Return of Children

154. On January 10, 2024, Plaintiff was informed she could retrieve her children from WCH. Plaintiff picked up the children after 4:30 p.m. WCH records list a release time of 15:38 (3:38 p.m.).

155. While A.A. was in continuous Police Protective Custody and subsequent state-directed placement, Wichita Children's Home personnel took photographs documenting tape residue visible on A.A.'s back, which were later provided to Plaintiff by DCF. When Plaintiff regained physical custody of her child, the tape residue was no longer present. Plaintiff did not consent to the removal of the tape residue, and no court order or exigent circumstances authorized any physical manipulation or alteration of A.A.'s body while she remained in state-directed custody.

156. Following Plaintiff's withdrawal of her child from Honey Tree, Kimberly Fielding or a representative acting on behalf of her or Honey Tree, posted a response on Honey Tree's Yelp business page, on March 28, 2024, addressing Plaintiff by her first name and stating that Plaintiff withdrew her child immediately after the child was removed from Plaintiff's home. The post referenced circumstances relating to A.A.'s removal and child-welfare involvement and was publicly accessible to parents and community members associated with Honey Tree.

Continuation of Services Through DCCCA, Inc.

157. On January 22, 2024, Plaintiff met with DCCCA, Inc. ("DCCCA") employee LaVandria Fountain. Plaintiff told Fountain she did not need services. Fountain told Plaintiff that the only reason the judge allowed Plaintiff to get her kids back was because she agreed to services.

158. Fountain also commented on Plaintiff's red patchy skin insinuating there was something medically wrong with Plaintiff.

159. Fountain also looked at the bandages on Plaintiff's knuckles and made remarks implying concern about Plaintiff's well-being. Plaintiff had the bandages from home-renovation work and had recently completed tiling more than 800 square feet.

160. Fountain pressured Plaintiff to enroll in services repeating the same statements originally supplied to police by Honey Tree and Academy LLC's owner Kimberly Fielding including the injury to A.A.'s back and the car incident with her son.

161. Plaintiff requested to read the electronic service documents directly. Fountain did not allow Plaintiff to read the electronic documents directly. Fountain read selected portions aloud and had Plaintiff sign electronically. Fountain told Plaintiff copies would be provided after signing.

162. After the meeting with Fountain concluded, Plaintiff sent text messages to her mother describing the meeting. Plaintiff stated in messages to her mother that Fountain commented about her skin and the bandages on her knuckles. Plaintiff also wrote in text a message, "They are painting pictures of me in a negative light right in front of my face and it's not healthy for anyone to go through that."

163. On January 25, 2024, Plaintiff received the signed DCCCA documents and learned the services were not court-ordered. Plaintiff unenrolled the same day by email. Plaintiff notified DCF Regional Director Dee E. Nighswonger, who forwarded the information to Gregg.

Subsequent Communications Regarding Services

164. On January 30, 2024, Plaintiff received a letter from DCF Prevention and Protection Services Supervisor Jana Vinduska stating that DCF had "received notification that you have declined DCCCA, services as of January 25, 2024." The letter further stated "If DCF continues to receive reports on your child" A.A, "having unexplained marks and bruises, you will run the risk of having her removed from your home, due to not being compliant with DCCCA, services, and discontinuing those services."

165. The letter did not reference a court order or judicial proceeding.

166. After unenrolling, Plaintiff received phone calls from DCF personnel, including CPS Supervisor Ashlie Thomas, regarding reenrollment in services.

167. On February 16th 2024, after Plaintiff received a call from Ashlie Thomas, Plaintiff forwarded to Thomas the email previously sent to Regional Director Nighswonger requesting to be unenrolled from services. Nighswonger responded through email that Thomas had assumed supervisory responsibility over the case.

168. No further communication was provided to Plaintiff stating why further DCF involvement continued after receiving the letter that the findings were unsubstantiated, and after unenrolling from service and after DCF acknowledged the unenrollment.

DCF Findings, Intake Actions, and Record Discrepancies

169. DCF provided Plaintiff a PPS finding reflecting an allegation of "physical abuse" concerning A.A. with a disposition of "unsubstantiated" and "unknown perpetrator."

170. Between February 28, 2024 and November 2025, Hunter and Gregg corresponded with Plaintiff regarding the custody and placement status of Plaintiff's children and the associated medical bills.

171. Emails from Gregg contain timestamps showing the matter was assigned to a PPS worker on January 9, 2024 at approximately 9:22 a.m. A PPS Combined Intake Report produced by DCF states that a welfare check was "not warranted" and that there was "no indication [the] child is at risk of imminent danger." The report contains redactions obscuring the identity of the employee who completed the assessment, identifies LaQuilla Williams as receiving the intake, and references a subsequent "override," later timestamps, reassigned complaint or event numbers, and involvement by Jana Vinduska. Plaintiff requested records reflecting intake, screening, override, and audit history, but DCF's counsel asserted through email that the information was confidential and not subject to disclosure.

172. The PPS Combined Intake Report reflects a report time of January 9, 2024 at 9:09 a.m. and states that A.A. "is still currently at Wesley Woodlawn." At that time and date A.A. was already discharged from the hospital and admitted to WCH.

173. Multiple complaint numbers appear in DCF records for the January 8–10, 2024 incident, and Defendants have not produced records explaining the reassignment of report numbers, overrides, or discrepancies between intake narratives and contemporaneous medical records. The report "Basis" section does not identify the information relied upon to support the intake assignment decision.

174. On January 10, 2024, Lori Clark, acting in her capacity at the Kansas Protection Report Center ("KPRC"), documented on the PPS Combined Intake Report that a PPM 1700 override requested by PPS Supervisor Jana Vinduska was approved. Under DCF policy, PPM 1700 overrides may be approved only by KPRC supervisory personnel.

175. DCF also produced a Session Staffing Report for the incident and the metadata fields of that report for "date" and "facilitator" are marked "hidden." The report completed by

DCF personnel states Plaintiff said she used "duck tape" in place of Band-Aids. However, Plaintiff did not use or say she used "duck tape."  In addition, the report includes information provided by Honey Tree owner Fielding stating they "constantly watch mother and what is going on at the home" since the daycare backs up to the mothers back yard.

176. Plaintiff was provided with a Notice of Department Findings (PPS 2012) for event number 02349898 originally dated 01/19/2024 and reflected an unsubstantiated finding and identified the alleged perpetrator as unknown. An amended PPS 2012 for event number 02349898 was made correcting the last name of A.A. on 11/14/2025 and Plaintiff requested the correction from DCF. DCF has not produced a session staffing report associated with event number 02349898.

177. DCF General Counsel Marc Altenbernt later produced a session staffing report associated with event number 2349962 but did not produce a PPS 2012 Notice of Findings for that event. DCF records indicate that event number 02349898 was overridden or reassigned to event number 2349962.

Medical Billing After Hospital Examination

178. Plaintiff received medical bills from Wesley Woodlawn Hospital & ER for the January 8–9, 2024 examinations. Plaintiff contacted and asked DCF worker Erekosima who was responsible. Erekosima responded through a text message "Miss, that's your bill to pay." Plaintiff thereafter informed Erica Hunter, who at the time was the Deputy Director of Safety and Thriving Families for DCF, that she did not consent to the examinations, did not authorize billing through her private insurance, and objected to personal financial responsibility. DCF advised that payment would have to be processed through Plaintiff's

insurance, which Plaintiff refused. Despite this, the hospital later submitted charges through Plaintiff's insurance without Plaintiff's authorization, and Plaintiff received insurance-processed billing statements. DCF later stated that it paid the remaining balance of the medical bills. Plaintiff's subsequent request for complete medical and billing records from the hospital yielded only partial records, which did not identify the full scope of examinations or who authorized insurance billing.

HIPAA Records Requests and Forensic Photographs

179. Between February and May 2024, Plaintiff submitted multiple HIPAA-compliant requests through Ciox Health, the contracted medical-records vendor for Wesley Woodlawn Hospital & ER, seeking her child's complete medical record, including forensic photographs referenced in the produced records. Plaintiff received partial records that referenced forensic photography, but no photographs were produced. Ciox Health repeatedly advised that a site representative had been contacted to request a rescan and later stated that it did not possess the photographs and had forwarded the request to the facility or radiology. In December 2025, Wesley's Forensic Nursing Program Coordinator informed Plaintiff that forensic photographs are not released to individuals. As of the filing of this Complaint, the referenced forensic photographs have not been produced.

Municipal Policy, Custom, and Practice

180. In Sedgwick County, law enforcement officers, shelter providers, child-welfare personnel, and medical providers follow a recurring operational sequence when children are taken into Police Protective Custody ("PPC"), which includes warrantless removal, transport for non-emergency medical examination, delivery to Wichita Children's Home

("WCH"), and continued separation from parents pending DCF assessment and service planning, prior to any judicial review.

181.   On January 8, 2024, City of Wichita police officers removed Plaintiff's children from her residence and transported them to a hospital for "medical clearance" before delivering them to WCH and later to a foster placement. No officer presented a warrant or court order authorizing removal. Officers observed a bruise on A.A.'s cheek and a scab and scratches on her back.

182.   Officer Ryan, the supervising officer on scene, stated on body-worn camera that he did not know whether A.A. was in danger and explained that officers "err on the side of caution" by taking children for medical clearance. Officer Ryan further stated that the decision to take the children was based on photographs of A.A. and information officers had been told by DCF. (Officer Ryan body-worn camera at 00:22:29-00:22:40 and 00:26:47-00:27:01).

Police Protective Custody as Routine Protocol

183.   WPD maintained and used a standardized Police Protective Custody ("PPC") form. On February 25, 2021, WPD issued a training bulletin addressing the use of the PPC form. The form, which was used to document the placement of Plaintiff's children into PPC on Jan 8-9, required officers to record identifying and custodial information regarding the child and parents and a narrative, but did not require officers to document the officer's belief that the child was a child in need of care, did not require articulation of reasonable grounds, and did not require documentation that the child would be harmed absent immediate custody, as required by K.S.A. 38-2232(c)(3). The training bulletin accompanying the form addressed only administrative handling, distribution, and

transmission of the form and did not instruct officers to record or assess the statutory or constitutional predicates for warrantless custody.

184.    WPD Policy 507, as revised on August 19, 2021, and WPD Policy 508, as revised on September 30, 2021, were in effect between January 8 and January 10, 2024, and at the time this Complaint was filed, and governed child-abuse responses and PPC decisions. Policy 508 authorizes custody by reference to K.S.A. 38-1527, which has been repealed and superseded by the current Child in Need of Care Code, including K.S.A. 38-2231 and 38-2232. At the time of this Complaint, neither policy references the current governing statutes or requires officers to document findings of imminent danger or immediate necessity prior to warrantless custody.

185.    At the time of this Complaint, as written and implemented, Policies 507 and 508 do not instruct officers that warrantless PPC is limited to emergency circumstances requiring immediate removal, nor do they address when continued custody is no longer authorized once initial safety concerns have been resolved.

186.    The training materials produced by WPD do not include instruction on the statutory limits governing warrantless PPC or on the procedural requirements following removal.

187.    Policies 507 and 508 do not require documentation of individualized assessment or separate findings for each child taken into PPC.

188.    Although Policy 508 permits supervisory consultation with DCF and authorizes leaving a child with a caregiver while offering voluntary services, it does not require officers to assess or document whether such alternatives could address identified concerns before resorting to PPC.

Automatic Medical Clearance Without Emergency

189. Supervising Officer Ryan described non-emergency medical clearance as routine, stating they "do it all the time." (Officer Ryan body-worn camera, 00:21:51–00:22:06).

190. DCF personnel confirmed in reference to the events that transpired with Plaintiff's children Jan 8-10 2024, that, in practice, children taken into PPC in Sedgwick County are routinely transported to emergency departments for medical and forensic evaluation prior to shelter placement, and that such examinations are considered part of the normal workflow.

191. In this case, Wesley Woodlawn Hospital & ER conducted examinations on all three children, including X-rays of A.A., without documented medical emergency or parental consent, warrant or court order, and medical evaluation functioned as a prerequisite to release from PPC.

Shelter Placement and Administrative Detention Without Statutory Verification

192. Wichita Children's Home ("WCH") accepted Plaintiff's children from law enforcement, continued to house them, and facilitated placement into a foster home without requiring receipt or confirmation of a written Police Protective Custody application containing the elements required by K.S.A. 38-2232(c), and without documentation that any such application had been delivered to the county or district attorney or that judicial authorization for custody or placement had been obtained.

193. Email communications with Gregg describe a regional workflow in which, after children are taken into Police Protective Custody without a court order, DCF conducts an assessment and develops a proposed plan that is "staffed" with the district attorney's office after assignment of the case and within the Police Protective Custody period. Gregg stated that such staffing occurs by the end of the assigned workday, but in practice

occurs after DCF interviews and assessment are completed but before the 72 hour window, as in Plaintiff's case. According to Gregg, if the district attorney accepts DCF's proposed plan, no Child in Need of Care petition is filed, and DCF requests that law enforcement release the children from Police Protective Custody.

194. Kansas law requires that when a child is taken into Police Protective Custody without a court order and delivered to a shelter facility designated by the court, a written application for custody containing the elements set forth in K.S.A. 38-2232(c) be delivered to the county or district attorney without unnecessary delay, and vests authority to release the child in law enforcement or the county or district attorney. The described workflow does not reflect that the district attorney was provided a written application containing the required statutory elements, nor that such an application was delivered at all.

195. Upon inquiry, the 18th Judicial District Court confirmed that it searched all available record systems and that no record exists in relation to Plaintiff's children for the period of January 8–10, 2024. The Sedgwick County District Attorney's Office likewise confirmed that it possesses no records for that event. These confirmations establish that no written application for custody was delivered, no prosecutorial review occurred, and no judicial authorization or oversight existed during the period in which Plaintiff's children were seized and detained.

196. Although law enforcement retained statutory authority to release the children, release did not occur in the absence of exigent circumstances or following medical clearance, but only after DCF completed its assessment and Plaintiff executed a proposed plan that was presented as the sole means of securing reunification, without a hearing. Plaintiff was not

advised of any alternative mechanism for obtaining release, nor informed when—if at all—a judicial hearing would occur. DCF has stated that it does not determine the legality of Police Protective Custody decisions, yet under established inter-agency practice, release decisions were deferred pending DCF investigation, staffing, and service planning, resulting in continued separation of the children from Plaintiff without prompt judicial authorization.

Routine Hospital Processing of Children Transported by Law Enforcement

197. Gregg described in email that it was a routine practice in Sedgwick County for law enforcement officers to transport children taken into police protective custody through hospital emergency departments prior to placement at Wichita Children's Home. DCF further stated that, under this practice, Wesley forensic nurses (SANE nurses) are frequently involved in conducting head-to-toe assessments and photographing visible injuries, and that these steps are considered "normal processes" and "normal to the flow of the work."

198. As further reflected in written communications from Hunter, stated that the examinations performed in this context were not CARE exams, which Hunter indicated may only be conducted by designated CARE providers. Hunter further stated that Wichita Children's Home maintains specific policies regarding medical clearance of children taken into police protective custody, but DCF has not produced those policies in response to Plaintiff's KORA requests.

199. DCF has not produced any policy, protocol, or documentation describing the procedures followed for medical clearance or non-emergency medical examinations under those circumstances.

200. The medical records and DCF records received by Plaintiff, do not reflect the submission of a Police Protective Custody application containing the elements described in K.S.A. 38-2232(c), nor do they reflect that any such application was presented to the county or the DA. Email correspondence from JIAC on December 4th 2025, stated that JIAC had no record of Plaintiff's children.

201. At the time of placement, Wichita Children's Home accepted physical custody of the children as a shelter facility; however, the records do not reflect compliance with the statutory prerequisites set forth in K.S.A. 38-2232(c)–(e), including the absence of a written application by a law enforcement officer stating reasonable grounds for immediate custody, the absence of furnishing such application to the county or district attorney without unnecessary delay, and the absence of any court order authorizing continued custody.

202. Plaintiff has not been provided documentation showing that the designation relied on for this placement was current and applicable to intake, or that WCH's acceptance occurred in compliance with K.S.A. 38-2232's written application and notice requirements. Accordingly, Defendants treated WCH as a court-designated PPC receiving facility without verifying that a valid, applicable designation was in effect or that the statutory conditions for lawful intake had been satisfied.

203. Plaintiff requested records from the District Court of the Eighteenth Judicial District, Sedgwick County, Kansas concerning all Administrative Orders designating shelter facilities to receive children taken into police protective custody under K.S.A. 38-2232, including Administrative Order 07-MV-32 and any amendments or successors.

204.   In response, the Court produced an administrative order issued in 1995 authorizing Wichita Children's Home to receive children directly from law enforcement; that order expressly expired in 1999.

205.   The Court produced no administrative order, standing designation, or judicial authorization in effect during January 2024 authorizing Wichita Children's Home to receive children directly from law enforcement.

206.   The only other administrative order designating WCH as a shelter facility produced by the Court was dated December 2025 and was created after Plaintiff's records request; it did not purport to retroactively authorize prior placements.

207.   At the time Plaintiff's children were delivered to WCH directly by police, no court designation authorized WCH to receive children directly from law enforcement under K.S.A. 38-2232(a)(2)(A)(i).

Second Removal in 2025 (No Relief Sought)

208.   In September 2025, Plaintiff—then a licensed foster parent—transported a foster child to Wesley West Emergency Room following a motor vehicle incident. Hospital staff evaluated the child, ordered imaging, and medically cleared and discharged the child without identifying any internal injuries. Law enforcement was contacted by hospital staff, and officers responded to the hospital. During the hospital encounter, officers related Plaintiff as a suspected offender, referenced a prior PPC incident (Jan 8-10) involving Plaintiff—the subject of this action—and cited an alleged DCF report that Plaintiff disputes as unfounded and DCF stated did not exist. Despite the absence of a warrant, court order, exigent circumstances, or individualized assessment, officers subsequently placed Plaintiff's biological children into Police Protective Custody and routed them to

Wichita Children's Home. Although the narrative report referenced prior history and generalized allegations, the PPC form itself documented only a nonspecific concern for the child's welfare as the basis for custody, without articulating imminent danger or immediate necessity. At least one child was placed overnight in a foster home before the children were returned to Plaintiff within approximately seventy-two (72) hours. No Child in Need of Care petition was filed, and DCF later classified the incident as unsubstantiated. Prior to release, DCF proposed family preservation services, which Plaintiff declined, stating during a phone call that she did not need services and that, during the January 2024 incident, she had been coerced into services by the conditioning of her children's release on service compliance. Following Plaintiff's refusal and stated prior coercion, DCF did not pursue services and released the children without conditions. Plaintiff seeks no relief for this incident, which is included solely as pattern evidence of repeated custodial placement involving Wichita Children's Home and foster homes absent judicial authorization.

Ongoing Harm and Continuing Effects of Defendants' Conduct

209. As a direct and proximate result of Defendants' actions, Plaintiff has suffered severe and ongoing harm extending well beyond the period of the children's physical detention.

210. From approximately 6:00 a.m. on January 8, 2024, until approximately 10:00 p.m. on January 10, 2024, Plaintiff remained awake continuously—approximately sixty-four (64) hours—while attempting to locate her children, obtain information regarding their status, and secure their release. Plaintiff regained physical custody of her children at approximately 5:00 p.m. on January 10, 2024, but did not sleep until later that evening. This prolonged sleep deprivation occurred as a result of Defendants continuing to detain

Plaintiff's children without court order and without providing clear information or lawful justification, exacerbating the coercive nature of Defendants' conduct and impairing Plaintiff's ability to meaningfully advocate for her family during the period of detention.

211. Plaintiff continues to suffer ongoing emotional and psychological harm arising from learning of the conditions under which her children were held, including unnecessary physical intrusions, prolonged separation of siblings, sleep disruption, and lack of transparency while her children were in custody. These experiences have caused Plaintiff persistent anxiety, hypervigilance, and a reasonable fear of recurrence, given Defendants' continued defense and justification of the same practices. Plaintiff's family security and sense of parental autonomy remained impaired, and absent prospective relief, Plaintiff faces a credible risk that similar unlawful actions will be repeated under the same defended policies and practices.

212. Following the incident, Plaintiff has experienced persistent and reasonable fear of future state intervention. Plaintiff avoids contact with law enforcement, alters her daily activities to avoid police presence, and experiences ongoing anxiety in public spaces after encountering officers involved in the incident. Plaintiff no longer permits school personnel or other mandatory reporters to interact with her children outside her presence due to fear of retaliation, misinterpretation, or renewed escalation. Plaintiff has withdrawn from civic and public life, including discontinuing her pursuit of public office, out of concern that visibility could expose her family to further targeting.

213. Plaintiff also experiences ongoing fear regarding her child A.A.'s safety in ordinary childhood activities. As a direct result of Defendants' actions, Plaintiff now experiences persistent and reasonable fear that any minor injury to her child A.A. could again be

misinterpreted, escalated, or used to justify state intervention without court oversight. Plaintiff finds herself hypervigilant during ordinary childhood play and restricts A.A.'s normal exploration out of fear that even accidental injuries could trigger renewed seizure, investigation, or removal. This state-imposed fear has materially altered Plaintiff's parenting, impaired A.A.'s freedom to engage in age-appropriate activity, and thereby caused Plaintiff ongoing emotional distress and loss of parental autonomy.

214. Defendants' actions also caused lasting emotional harm to Plaintiff's children, resulting in additional injury to Plaintiff as their parent. Prior to the January 2024 removal, Plaintiff's oldest daughter expressed a profound fear of being placed into foster care. Plaintiff reassured her child that she would never allow that to happen. Despite Plaintiff's assurances, Defendants removed the children and placed them into foster care.

215. As a result, Plaintiff's children were forced to confront the sudden reality that their family could be broken apart by state action, even in the absence of court oversight or emergency. Plaintiff has been left to carry the emotional weight of having been unable to protect her children from that outcome, despite her efforts and assurances. This experience undermined the children's sense of safety, trust, and stability, and altered the parent-child relationship by introducing fear and insecurity where reassurance once existed.

216. These harms were not speculative, incidental, or subjective. They were foreseeable consequences of Defendants' seizure, detention, medical examination, and placement of Plaintiff's children without lawful authority, judicial oversight, or adherence to constitutional and statutory safeguards. Plaintiff continues to live with the effects of

Defendants' conduct on her health, her parenting, her family relationships, and her ability to participate freely in public life.

217. As a direct result of Defendants' actions, Plaintiff reasonably believes that she has been perceived as an unfit parent because state actors treated her as such—removing her children, subjecting them to investigation, and placing them into foster care without court oversight or lawful cause, and sending threatening letters to enroll in services.

218. Plaintiff's ongoing harm is intensified by the profound disruption to her identity and role as a parent. Plaintiff breastfed each of her children and has consistently taken deliberate steps to provide them with a healthy, stable environment, including prioritizing their education, safety, and emotional well-being. Learning that her children were subjected to intrusive handling, separation, and placement by the state—despite Plaintiff having done nothing to warrant such intervention—has caused Plaintiff deep distress, shame, and a lasting sense of moral injury. Plaintiff continues to struggle with the emotional impact of having her parental care overridden and her children treated as though they were unsafe in her custody when no lawful basis existed for that conclusion.

219. Plaintiff avoids public spaces, limits social interaction, and experiences anxiety in ordinary settings such as grocery stores, schools, and community events. Plaintiff has encountered law enforcement officers involved in the incident in public places and experiences fear and distress upon seeing them, reinforcing her perception that she is being watched, judged, or targeted.

220. This reputational and psychological harm is not speculative. It flows directly from Defendants' actions, which effectively branded Plaintiff as unfit in the community

without judicial findings, due process, or substantiation, and left Plaintiff to live indefinitely with the social consequences of an unlawful state intervention.

221.  As a result of Defendants' conduct, Plaintiff's professional life was materially disrupted. Plaintiff is a music producer who released thirteen (13) songs in 2023. After the January 2024 seizure of her children and the ensuing trauma and state interference, Plaintiff's ability to produce music was severely impaired. Plaintiff released only two (2) songs in 2024 and only one (1) song in 2025. Plaintiff was forced to redirect substantial time, energy, and emotional resources away from her creative work toward protecting her children, responding to Defendants' actions, and coping with the resulting trauma.

222.  Plaintiff is employed as an Environmental Health, Safety, and Quality ("EHSQ") Manager. In addition to her primary employment, Plaintiff is a published author, music producer, and poet who was actively engaged in creative and community-based work prior to the events described herein. Plaintiff was publicly listed as a candidate for mayor during the 2023 election cycle and had previously volunteered as a coach for her sons' basketball and soccer teams.

223.  Plaintiff's residence is located in immediate and unavoidable proximity to Honey Tree Academy LLC. From Plaintiff's home, the daycare facility, its parking lot, and associated outdoor areas are directly visible from Plaintiff's deck, dining room, and living room windows. Daily daycare operations—including staff presence, vehicle traffic, playground noise, and routine activities—are audible and observable from within Plaintiff's home. As a result, Plaintiff experiences heightened anxiety and distress whenever she is at home, and she feels she is being watched by the daycare. As a result of this proximity, Plaintiff has been unable to avoid ongoing reminders of Defendants' actions, including

the events that led to the removal of her children and the subsequent public disclosures made by Defendants. The physical closeness between Plaintiff's residence and the daycare has deprived Plaintiff of any meaningful opportunity to create distance from the source of her trauma, rendering her home—a place ordinarily associated with safety and privacy—a constant site of distress. This proximity has prolonged and intensified the emotional and psychological impact of Defendants' conduct and has interfered with Plaintiff's ability to regain a sense of security, stability, and normalcy following the events at issue.

224.    Plaintiff's injuries are ongoing and continuing. Following the removal and detention of her children, Plaintiff repeatedly contacted Defendant Elizabeth Gregg, Wichita Region Assistant Regional Director of Programs, seeking information and corrective action regarding the absence of court authorization, the use of foster homes during police protective custody, the nonconsensual medical examinations and forensic photography, and the lack of transparency surrounding placement decisions.

225.    In response, Gregg did not treat these concerns as irregularities requiring intervention. Instead, she affirmatively defended the practices at issue as normal, routine and cited Kansas laws; disclaimed agency responsibility to prevent or correct them; and justified continued secrecy and lack of parental access. By defending and reinforcing the system rather than correcting it, Gregg ratified and perpetuated the unconstitutional practices that caused Plaintiff's injury.

226.    Plaintiff further alleges that official DCF staffing records documenting the removal and related decision-making were generated through the agency's live case-management system in a manner that concealed key identifying information, including the date of the

staffing session and the identity of the facilitator or decision-maker. Plaintiff has been unable to determine who authored, approved, or relied upon these statements, or when they were made, despite repeated efforts to obtain clarification. This lack of transparency has prevented Plaintiff from correcting inaccurate statements, understanding the basis for agency actions taken against her family, and obtaining assurance that similar undocumented decisions will not recur. The continued existence and defense of these nontransparent recordkeeping practices contributes to Plaintiff's ongoing harm and her reasonable fear of future deprivation of parental rights without due process.

227. As a result, Plaintiff continues to suffer ongoing harm, including continued deprivation of parental rights without due process, inability to obtain full medical information regarding what her children endured, financial consequences flowing from state-directed actions, and a reasonable fear that her family remains subject to the same unconstitutional practices in the future. Prospective declaratory and injunctive relief is therefore necessary to prevent continued enforcement of these practices

## V. LEGAL FRAMEWORK

228. Warrantless Seizure of Children. The Fourth Amendment permits state actors to remove a child from a parent without a warrant only when they possess specific, articulable facts showing the child faces imminent danger of serious harm and that immediate removal is necessary.  Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1240-47 (10th Cir. 2003); PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1197-98 (10th Cir. 2010).

229. The Fourth Amendment prohibits not only the initial warrantless seizure of a child absent exigent circumstances, but also the continued detention of a child once the justification for the seizure has ended. Speculation, generalized concerns, or administrative

convenience cannot satisfy this standard.  Once any exigency ends, continued detention becomes an unreasonable seizure.  Jones v. Hunt, 410 F.3d 1221, 1229-30 (10th Cir. 2005).

230. Child-welfare agencies lack independent authority to detain children absent judicial authorization or a properly filed petition. Where state law vests custody or release authority in law enforcement or the court, CPS or DCF officials may not prolong separation by delaying release pending investigation, staffing, service planning, or execution of safety plans. Once no exigent circumstances exist—or where none ever existed—continued detention constitutes an unreasonable seizure under the Fourth Amendment and a deprivation of family integrity without due process under the Fourteenth Amendment. State actors who cause or prolong such detention through administrative practice or inter-agency workflow are liable regardless of formal custody labels.

231. Refusal to Release to an Available, Fit Parent. When a fit, available parent is present, willing, and able to assume custody, officials must release the child unless they can point to specific, articulable facts showing the parent poses an imminent danger to the child. Blanket refusals, administrative convenience, or generalized concerns are unconstitutional, and any continued detention must be independently justified for each child. Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1244–48 (10th Cir. 2003).

232. By January 8, 2024, it was clearly established that officials may not deny release to a fit, available parent absent a warrant, court order, or exigent circumstances; qualified immunity does not protect such conduct. Roska, 328 F.3d at 1244-48; Jones, 410 F.3d at 1228-30.

233. Warrantless Entry onto the Curtilage; Scope of Consent. The Fourth Amendment protects the home and its curtilage to the same degree as the home itself. Florida v. Jardines, 569 U.S. 1, 6–9 (2013); United States v. Carloss, 818 F.3d 988, 993–95 (10th Cir. 2016). Officers may not enter a backyard or side yard to investigate without a warrant, voluntary consent, or a true exigency. Any consent given is limited in scope, and officers violate the Fourth Amendment when they exceed that scope or escalate an encounter into a search or investigative entry without independent justification. See United States v. Kimoana, 383 F.3d 1215, 1221–22 (10th Cir. 2004); United States v. Cos, 498 F.3d 1115, 1125–26 (10th Cir. 2007).

234. Consent to enter a home or its curtilage is limited to the officers expressly permitted entry; summoning and admitting additional officers without separate consent, a warrant, or exigent circumstances exceeds the scope of consent and constitutes a warrantless entry in violation of the Fourth Amendment. Kimoana, 383 F.3d at 1221–22; Cos, 498 F.3d at 1125–26.

235. Excessive Force Against Children. All physical force during a seizure is judged under the Fourth Amendment's objective-reasonableness standard.  Graham v. Connor, 490 U.S. 386, 395-97 (1989).  Very young children are incapable of meaningful resistance, an involuntary movement, crying, or reflexive behavior does not constitute resistance. Because children are uniquely vulnerable, force that might be reasonable against an adult may be excessive when used on a minor, particularly a toddler.  Any force used to prolong an unlawful seizure is unconstitutional.  Roska, 328 F.3d at 1247-48.

236.  Investigative Exams Are Fourth-Amendment Searches. Any non-emergency photographing, physical inspection, or radiological imaging of a child's body for

evidentiary or placement purposes is a search. Investigative photography performed for law-enforcement, child-protection, or placement decision-making purposes—rather than for diagnosis or treatment—constitutes evidence gathering and is subject to the Fourth Amendment's warrant requirement when is primary purpose is investigative or custodial rather than diagnostic or therapeutic.  Dubbs v. Head Start, Inc., 336 F.3d 1194, 1206-07 (10th Cir. 2003); Winston v. Lee, 470 U.S. 753, 760-61 (1985).

237.    Warrant Requirement. Non-emergency searches require (a) a warrant, (b) a court order, (c) voluntary parental consent, or (d) a true medical emergency.  Administrative convenience or investigative interest is not an exigency.  Dubbs, 336 F.3d at 1215-17.

238.    X-Rays Are Invasive. Compelled x-rays of a medically stable child absent judicial or parental authorization are per se unreasonable and expose the child to radiation without constitutional justification and intrude upon both the child's bodily integrity and the parent's protected liberty interest in medical decision-making.  Winston, 470 U.S. at 760-61.

239.    Private Day-Care Providers as State Actors. A mandatory reporter becomes a § 1983 actor when it supplies false or embellished information, coordinates with police, or performs bodily inspections beyond routine care that officers then rely on without independent investigation. Bodily inspections exceeding routing caregiving and undertaken for investigatory purposes constitute searches subject to Fourth Amendment constraints. Dennis v. Sparks, 449 U.S. 24, 27-28 (1980); Price-Cornelison v. Brooks, 524 F.3d 1103, 1115-16 (10th Cir. 2008).

240.    Fundamental Right to Family Integrity. Parents have a Fourteenth-Amendment liberty interest in the care, custody, and control of their children. Troxel v. Granville, 530 U.S.

57, 65–66 (2000). Interference with that relationship—including refusal to place or release a child to a fit, available parent without individualized justification—violates substantive due process, particularly where no court order or exigent circumstances exist. Jones v. Hunt, 410 F.3d 1221, 1229–30 (10th Cir. 2005); Croft v. Westmoreland Cnty. CYS, 103 F.3d 1123, 1126–30 (3d Cir. 1997).

241.  Kansas PPC Statutes. K.S.A. 38-2231 & 38-2232 permit only temporary protective custody upon imminent danger and require immediate delivery to statutorily authorized recipients; non-emergency medical exams or private-shelter placement without lawful custody and statutory delivery are ultra vires.

242.  Clearly Established Law. By January 2024, the principles stated above were firmly established in Supreme Court and Tenth Circuit precedent. No objectively reasonable officer, medical provider, or private actor acting jointly with the state could have believed that continuing detention after the absence of exigent circumstances, non-emergency medical examinations or x-rays without consent or judicial authorization, warrantless entry into the home or onto curtilage, or force used to prolong an unlawful seizure comported with the Fourth or Fourteenth Amendments. Qualified immunity therefore does not apply.

243.  Private Entities Acting Under Color of State Law. A private entity acts under color of state law when it performs functions traditionally reserved to the state, is significantly encouraged or directed by the state, or is entwined with governmental policies or decision-making. Lugar v. Edmondson Oil Co., 457 U.S. 922, 939–42 (1982); Dennis v. Sparks, 449 U.S. 24, 27–28 (1980); Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296–302 (2001). Child-welfare contractors, family-preservation providers,

medical providers, hospitals, and daycare or childcare entities act under color of state law when they jointly participate with law enforcement or child-protection agencies; perform delegated investigative, medical, placement, detention, or reunification functions; or implement, enforce, or threaten custody consequences, safety plans, medical examinations, photographic documentation, or services at the direction of, in coordination with, or with delegated authority from the state. When acting in this capacity, such private actors are subject to the same First and Fourteenth Amendment constraints as state officials and may not misrepresent judicial or statutory authority, coerce parental consent, conduct or facilitate non-emergency investigative examinations, condition reunification or continued custody on non-court-ordered services, or threaten removal absent lawful process.

244. Core Government Functions. The seizure, detention, supervision, and placement of children are core governmental functions. A private entity that receives children from police, holds them during protective custody, controls supervision or placement, or conditions reunification performs a public function and acts under color of state law. See West v. Atkins, 487 U.S. 42, 54–57 (1988); Johnson v. Rodrigues, 293 F.3d 1196, 1205 (10th Cir. 1999).

245. Joint Action Between Police and WCH. Joint action exists where a private entity is a willful participant in state conduct or where state actors rely on the private entity's participation to carry out a seizure or detention. Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447–48 (10th Cir. 1995); Price-Cornelison v. Brooks, 524 F.3d 1103, 1115–16 (10th Cir. 2008).

246. Private Facilities Cannot Exercise Custodial Authority Without Authorization.

Kansas law strictly limits who may receive, detain, or place children taken into police protective custody. Absent court designation or statutory authorization, a private shelter has no authority to accept children from law enforcement, detain children, arrange foster placement, or control release decisions. Actions taken without such authority are ultra vires and violate the Fourth and Fourteenth Amendments.

247. WCH's Participation in Detention and Placement Subjects It to § 1983 Liability. When a private shelter accepts children directly from police, holds them during an alleged protective-custody period, facilitates or arranges foster placement, or defers to police or agency directives rather than judicial authorization, it becomes an integral part of the state's seizure and detention process and acts under color of state law. See Wittner v. Banner Health, 720 F.3d 770, 776–77 (10th Cir. 2013).

248. Medical Providers Acting Under Color of State Law. When a private medical provider performs, authorizes, or ratifies non-emergency medical examinations or radiological imaging of a child at the request of law enforcement, while the child is under police control and without a warrant, court order, parental consent, or true medical emergency, the provider is a willful participant in state action and acts under color of state law for purposes of 42 U.S.C. § 1983. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 939–42 (1982); Dennis v. Sparks, 449 U.S. 24, 27–28 (1980); Dubbs v. Head Start, Inc., 336 F.3d 1194, 1207–15 (10th Cir. 2003); Winston v. Lee, 470 U.S. 753, 760–61 (1985).

249. Qualified immunity may extend to private medical providers only when they perform discretionary functions while acting under color of state law. Filarsky v. Delia, 566 U.S. 377, 383–84 (2012). Such providers are not entitled to qualified immunity when they engage in conduct that violates clearly established constitutional rights, including non-

emergency medical examinations or investigative procedures performed for law-enforcement or child-protection purposes without a warrant, court order, or valid consent. Dubbs v. Head Start, Inc., 336 F.3d 1194, 1215–16 (10th Cir. 2003). Where the constitutional limits on medical examinations of children are clearly established, qualified immunity does not shield participating medical personnel. Id.

250.   Qualified Immunity Does Not Apply to WCH's Conduct. As of January 2024, it was clearly established that only statutorily authorized entities may receive or detain children in protective custody, and participation in unlawful detention violates clearly established Fourth and Fourteenth Amendment rights. No reasonable private actor operating as part of a child-welfare detention pipeline could believe it was lawful to detain or place children absent statutory or judicial authority. Qualified immunity therefore does not apply.

251.   Qualified Immunity (Officers). Qualified immunity shields officers from liability unless their conduct violates a constitutional right that was clearly established at the time of the conduct. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A right is clearly established when existing precedent places the unlawfulness of the conduct beyond debate. Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). By January 2024, it was clearly established that officers may not (a) enter a home without a warrant, exigent circumstances, or valid consent; (b) exceed the scope of any consent given or continue a welfare check after its purpose has been satisfied; (c) seize or continue to detain children absent exigent circumstances or judicial authorization, including refusing to release a child to a fit, available parent without specific, articulable facts demonstrating imminent danger of serious harm; or (d) use physical force or restraints that are objectively unreasonable,

including restraining a young, non-threatening, non-resisting child to effectuate or prolong custody. Qualified immunity does not protect officers who exceed these clearly established limits on warrantless entry, scope of consent, seizure, escalation, or the use of excessive force.

252. Failure to Intervene and Supervisory Liability. It is clearly established that a state actor who observes or has reason to know that a constitutional violation is occurring and has a realistic opportunity to prevent it may be held liable under 42 U.S.C. § 1983 for failing to intervene. See Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1247–48 (10th Cir. 2003); Jones v. Hunt, 410 F.3d 1221, 1229–30 (10th Cir. 2005); PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1197–98 (10th Cir. 2010).

253. Supervisory personnel who reviewed body-worn camera footage, received medical findings negating abuse, were present during detention or hospital procedures, or were notified that no emergency existed, yet failed to order release, stop examinations, or correct unlawful custody, are liable for affirmatively allowing the violation to continue.

254. The duty to intervene was clearly established well before January 2024. No reasonable official could believe it was lawful to allow custody after medical clearance, non-emergency medical exams or x-rays, coercive safety planning, or placement without judicial authorization, once the absence of imminent danger was known or should have been known. Qualified immunity therefore does not apply.

Public Disclosure of Private Facts — Kansas Law

255. Kansas recognizes the tort of public disclosure of private facts, which occurs when a defendant gives publicity to private facts concerning another that would be highly offensive to a reasonable person and are not of legitimate public concern. Froelich v.

Adair, 213 Kan. 357, 360–61, 516 P.2d 993 (1973) (adopting Restatement (Second) of Torts § 652D).

256.  "Publicity" does not require disclosure to the general public at large; disclosure to a sufficient number of persons, or in a manner substantially certain to become public knowledge, is sufficient. Rinsley v. Brandt, 700 F.2d 1304, 1307–08 (10th Cir. 1983) (applying Kansas law).

257.  Information concerning child-welfare investigations, abuse allegations, medical conditions, family relationships, and custody status constitutes private facts protected under Kansas law and is not a matter of legitimate public concern. Werner v. Kliewer, 238 Kan. 289, 293–94, 710 P.2d 1250 (1985).

258.  Statutory confidentiality provisions governing child-welfare and medical records restrict disclosure and do not authorize dissemination beyond a lawful purpose absent express statutory authorization or judicial order. Disclosure outside those limits supports liability where it would be highly offensive to a reasonable person. Froelich, 213 Kan. at 360–61.

259.  State actors and private entities acting under color of state law may be held liable under Kansas law when they disclose or cause the disclosure of protected private information beyond the scope of lawful purpose, including disclosure to schools, childcare providers, contractors, or other third parties, where such disclosure is not required by statute and is unrelated to immediate safety needs. Rinsley, 700 F.2d at 1307–08.

First Amendment—Retaliation for Protected Speech in the Child-Welfare Context

260.  The First Amendment prohibits government officials from retaliating against an individual for engaging in protected speech, including objecting to government conduct, refusing to consent to non-mandatory programs, or expressing intent to seek legal redress.

261. In the child-welfare context, threats of custody interference or continued separation conditioned on silence or compliance constitute adverse action sufficient to support a First Amendment retaliation claim.

262. To state a claim for First Amendment retaliation under 42 U.S.C. § 1983, a plaintiff must allege protected activity, adverse action, and a causal connection between the protected activity and the adverse action. Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000); Shero v. City of Grove, 510 F.3d 1196, 1203 (10th Cir. 2007).

263. An adverse action need not be independently unlawful and may include threats, intimidation, coercion, misuse of discretionary authority, or the leveraging of state power to punish or deter protected speech.

264. Retaliation may include escalation or reinforcement of existing conduct in response to protected activity, even if the underlying conduct began before the protected speech occurred.

265. In the child-welfare setting, adverse action may include conditioning reunification or family integrity on compliance with non-court-ordered services, threatening renewed removal or investigation, continuing monitoring or service pressure absent lawful authority, or invoking or implying state custody power to deter objection.

266. Because parents face the extraordinary consequence of losing custody of their children, even implied threats or discretionary pressure are sufficient to chill a person of ordinary firmness.

267. Where coercive conduct precedes protected speech, it may independently violate the Fourteenth Amendment. Where that same conduct is escalated, reinforced, or leveraged

after a parent objects, refuses services, or asserts constitutional rights, the escalation constitutes a distinct First Amendment violation.

268. A plaintiff may therefore plead both Fourteenth Amendment coercion for the initial conduct and First Amendment retaliation for the subsequent threats, pressure, or punitive actions taken in response to protected activity.

269. Child-welfare officials may not condition reunification, custody, or family integrity on compliance with non-court-ordered services or "safety plans" absent a warrant, court order, or exigent circumstances. Leveraging continued separation to compel parental compliance constitutes coercion and violates the Fourteenth Amendment's protection of family integrity. PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1197–1201 (10th Cir. 2010); Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1244–48 (10th Cir. 2003); Croft v. Westmoreland Cnty. CYS, 103 F.3d 1123, 1126–30 (3d Cir. 1997).

270. By January 2024, this prohibition was clearly established. No reasonable child-welfare official could believe it was lawful to delay reunification or condition release on execution of non-court-ordered safety plans or services where no warrant, court order, or exigent circumstances existed. Qualified immunity therefore does not shield child-welfare workers who engaged in or enforced such coercive practices. PJ ex rel. Jensen, 603 F.3d at 1197–1201; Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1244–48 (10th Cir. 2003); Jones v. Hunt, 410 F.3d 1221, 1228–30 (10th Cir. 2005).

271. Fabrication of Evidence and Due Process. The Fourteenth Amendment prohibits state actors from deliberately fabricating evidence, materially mischaracterizing evidence, or knowingly omitting exculpatory information, where such conduct foreseeably causes or prolongs a deprivation of liberty. The Tenth Circuit has long recognized this principle. See

Pierce v. Gilchrist, 359 F.3d 1279 (10th Cir. 2004); Truman v. Orem City, 1 F.4th 1227 (10th Cir. 2021). The use of fabricated or misleading evidence to justify continued custody or detention violates due process regardless of whether criminal charges are filed.

272. Fabrication in Civil Custody and Child-Seizure Contexts. The constitutional prohibition on fabrication of evidence applies not only in criminal prosecutions but also in child-custody and child-welfare investigations. State actors may not create, endorse, or rely upon investigative evidence that is false, misleading, or materially incomplete in order to justify continued separation of children from their parents absent judicial authorization.

273. Post-Seizure Fabrication and Continued Detention. A fabrication-of-evidence claim arises where evidence is generated or altered after an initial seizure and is then used to justify the continuation of custody after any exigent circumstances have ended. Continued detention based on fabricated or misleading evidence constitutes an unreasonable seizure under the Fourth Amendment and an independent violation of substantive and procedural due process under the Fourteenth Amendment.

274. Medical and Forensic Evidence Used for Investigative Purposes. Medical professionals and institutions act under color of state law when they generate, approve, or transmit medical or forensic opinions for investigative or custody-related purposes, rather than for diagnosis or treatment, with knowledge that such evidence will be relied upon by law enforcement or child-welfare officials in custody decisions. The fabrication or mischaracterization of such evidence for investigative use is not protected medical judgment.

275. Causation and Liberty Deprivation. A plaintiff states a fabrication-of-evidence claim by alleging that fabricated or misleading evidence was a substantial factor in causing or

prolonging detention, placement, or continued separation, even where other evidence may also have been considered. The plaintiff need not show that the fabricated evidence was the sole basis for detention.

276. Clearly Established Law. At the time of the conduct alleged herein, it was clearly established that state actors and private individuals acting jointly with the state may not fabricate, materially mischaracterize, or ratify investigative evidence, or transmit such evidence to law enforcement, where it foreseeably causes or prolongs a deprivation of liberty.

Municipal Liability (Monell Doctrine)

277. A municipality is liable under 42 U.S.C. § 1983 when a constitutional violation is caused by an official policy, widespread custom or practice, failure to train or supervise, unlawful delegation of authority, or ratification by a final policymaker. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–91 (1978). Municipal liability attaches only where the challenged policy, custom, or omission was the moving force behind the constitutional violation, meaning there is a direct causal link between the municipality's action or inaction and the deprivation of federal rights. Monell, 436 U.S. at 694; City of Canton v. Harris, 489 U.S. 378, 385 (1989).

278. Municipal liability under § 1983 applies equally to counties and county-operated systems, including juvenile intake, prosecutorial referral, and child-welfare oversight functions, where constitutional violations result from the county's policies, customs, or deliberate failure to enforce statutory safeguards.

279. Failure to Train or Supervise. A municipality's failure to train or supervise its employees gives rise to § 1983 liability where the failure reflects deliberate indifference to the known

or obvious risk that constitutional violations would occur. City of Canton, 489 U.S. at 388–89. Deliberate indifference may be shown where municipal policymakers were on notice that existing training or supervision was inadequate and likely to result in constitutional injury, yet failed to take corrective action. Connick v. Thompson, 563 U.S. 51, 61 (2011).

280. A municipality may be liable under § 1983 where the need for training is so obvious, and the lack of training so likely to result in constitutional violations, that deliberate indifference may be inferred even from the obviousness of the risk, even in the absence of a pattern of prior violations. City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989). Where officers are entrusted with warrantless child seizure, continued detention, placement, and release decisions, the failure to train on statutory limits, exigency requirements, and release authority presents an obvious and highly predictable risk of constitutional injury.

281. Ratification by Final Policymakers. Municipal liability also arises where a final policymaker knowingly approves, condones, or ratifies unconstitutional conduct by subordinates, including by failing to intervene, discipline, or correct known violations, thereby adopting the conduct as municipal policy. City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); Bryson v. City of Oklahoma City, 627 F.3d 784, 790 (10th Cir. 2010).

282. Unlawful Delegation of Governmental Authority.

Municipal liability attaches where a municipality delegates core governmental functions—such as child custody, detention, placement, medical clearance, or release decisions—to private entities without adequate safeguards, oversight, or judicial authorization, and such

delegation causes constitutional injury. See Monell, 436 U.S. at 694; West v. Atkins, 487 U.S. 42, 56 (1988).

Clearly Established Constitutional Limits Relevant to Municipal Liability

283. At all relevant times, it was clearly established that: Children may not be seized absent specific, articulable facts demonstrating imminent danger; Custody must end once any exigency dissipates; Continued detention without judicial authorization violates the Fourth and Fourteenth Amendments; Warrantless searches of the home or curtilage are presumptively unreasonable absent consent or exigent circumstances; Non-emergency medical examinations, photographs, and radiological imaging of children require parental consent, a court order, or true medical emergency; and Private entities performing delegated child-welfare or detention functions may act under color of state law.

284. Municipal policies, customs, training failures, and ratification that permit or encourage conduct violating these clearly established principles give rise to municipal liability under § 1983. Municipal causation is established where the policy, custom, or omission sets in motion a predictable chain of events that results in constitutional injury, even if intervening actors participate in the violation.

VI. COUNTS

(All Counts arise under 42 U.S.C. § 1983 unless otherwise stated)

VII. COUNT I

Warrantless Seizure of A.A., Y.M., and M.N., interfering with Plaintiff's Custodial Interests.

(Fourth Amendment — Against Officers Robert Dulohery, John Ryan, Mackenzie Van Pelt, Calvin Rusch, Samuel Duncan, Blake Sanchez in their individual capacities, and against

Honey Tree Academy LLC and Kimberly Fielding as joint actors acting under color of state law.)

285. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32, 35-36, 38-41, 46-47, 50-51, 52-57, 59-61, 64-75, 77-86, 88-89, 90-92, and 99 as though fully set forth herein.

286. Defendants Dulohery, Ryan, Van Pelt, Rusch, Duncan, and Sanchez seized Plaintiff's minor children, A.A., Y.M., and M.N., thereby unreasonably interfering with Plaintiff's possessory and custodial interest in the care, custody, and control of her children, without a warrant or court order.

287. At the time of the seizure, no exigent circumstances existed that would justify the warrantless removal of the children.

288. The children had not been reported as runaways, missing persons, trafficking victims, or as experiencing a behavioral-health crisis.

289. Defendants conducted no individualized assessments of Y.M. or M.N., prior to placing them into Police Protective Custody and made no specific findings as to each child that would justify immediate removal.

290. At the time of removal, Defendants had not identified, observed, or documented any facts establishing that any of the children were in immediate danger of serious bodily harm.

291. Defendants did not personally report or observe any emergency or dangerous condition at Plaintiff's home, nor did they observe or document any facts indicating an imminent risk of serious bodily harm requiring immediate removal at the time of seizure.

292. During the encounter, Defendant Officer Ryan was asked whether he believed A.A. was in danger, and Officer Ryan responded that he had no idea.

293. Officer Ryan stated that officers "always err on the side of caution" by removing the child for medical clearance and placing the child into police protective custody.

294. Defendants proceeded with removal despite expressly acknowledging that they did not know whether any child was in danger.

295. Defendants refused Plaintiff's request for a brief delay to obtain medical evaluation and executed removal immediately, despite the absence of individualized facts establishing exigent circumstances.

296. Prior to the seizure, Defendant Kimberly Fielding, owner of Honey Tree Academy LLC, conducted a search of A.A.'s body and created photographic images of the child.

297. Defendant Fielding communicated directly with law enforcement officers and transmitted the photographs and related allegations to officers before any independent assessment of the child by law enforcement.

298. Defendants Dulohery, Ryan, Van Pelt, Rusch, Duncan, and Sanchez relied on the information and images provided by Defendant Fielding in deciding to seize Plaintiff's children and place them into Police Protective Custody.

299. Defendant Fielding and Honey Tree Academy LLC were willful participants in joint activity with law enforcement, acting in concert with officers to initiate and facilitate the warrantless seizure of Plaintiff's children.

300. The conduct of Defendant Fielding and Honey Tree Academy LLC was undertaken under color of state law because it was performed in coordination with and for the purpose of assisting law enforcement in the removal of Plaintiff's children.

301. The seizure of Plaintiff's children constituted a meaningful interference with Plaintiff's fundamental possessory interest in the care, custody, and control of her children.

302. No reasonable officer could have concluded that immediate removal of each child was necessary to prevent imminent serious harm.

303. The right to be free from warrantless seizure of one's children absent exigent circumstances was clearly established at the time of the conduct, and no reasonable officer or joint actor could have believed the seizure alleged herein was lawful.

VIII. COUNT II

Continued Detention of A.A., Y.M., and M.N. and Failure to Release to Plaintiff, Interfering with Plaintiff's Custodial and Liberty Interest.

(Fourth and Fourteenth Amendments — 42 U.S.C. § 1983 — Against Officer Robert Dulohery, Officer John Ryan, Officer Mackenzie Van Pelt, Officer Calvin Rusch, Officer Samuel Duncan, Officer Blake Sanchez; Detective Ohmart; Abiliba Erekosima, Jana Vinduska, and LaQuilla Williams, in their individual capacities; and, as joint actors and causal participants, Kimberly Fielding and Honey Tree Academy, LLC; Wichita Children's Home; and Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER)

304. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32, 40-41, 46-47, 65-75, 77-86, 88-90, 92-93, 96-99, 101, 102, 108-110, 115-117, 120-124, 126-130, 133-135, 137, 141-147, 151-153, and 171-172 as though fully set forth herein.

305. After the initial seizure, no warrant, court order, judicial authorization, or medical emergency existed to justify continued Police Protective Custody of A.A., Y.M., or M.N., and any claimed exigency had ended. This condition persisted through January 9–10, 2024.

306. Defendants Kimberly Fielding and Honey Tree Academy, LLC supplied allegations and information that were relied upon by law enforcement and DCF, which were incorporated into Police Protective Custody documentation and hospital records and relied upon to justify continued custody and detention. By doing so in concert with state actors and with knowledge their allegations would be used to effectuate custody decisions, Fielding and Honey Tree acted under color of state law as joint participants in the continued detention.

307. Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER, acted jointly with law enforcement during Police Protective Custody by retaining the children after medical clearance and documenting their disposition as "medically cleared for admission to Wichita Children's Home," rather than effectuating discharge to a parent. The medical records reflect that the children were medically stable and cleared, yet Wesley affirmatively designated admission to a non-parental custodial facility while the children remained in Police Protective Custody. By retaining the children following medical clearance and directing their admission to Wichita Children's Home as part of the custody disposition, Wesley exercised delegated custodial control and acted under color of state law, thereby substantially contributing to the continued detention.

308. On January 9, 2024, after A.A. had been medically discharged and while she remained in Police Protective Custody, Wesley Medical Center personnel transmitted or caused to be transmitted a Child Abuse Forensic Photography Case Review Addendum to Detective Ohmart stating that the findings constituted "child abuse," for investigative and custody-related purposes rather than medical treatment, and with knowledge that the information would be relied upon by law enforcement and child-welfare officials in decisions to continue detention and placement.

309. Despite medical clearance, Defendant Officers transported the children from the hospital to Wichita Children's Home and continued their detention rather than releasing them to Plaintiff or a fit, available parent.

310. After medical clearance, no Defendant took any step to release the children to Plaintiff or an available parent, and instead continued detention though administrative workflow.

311. Wichita Children's Home accepted physical custody of the children from law enforcement, retained custody, and facilitated foster placement without a court order or valid designation authorizing it to receive, detain, or place children from Police Protective Custody. By receiving children directly from police, exercising custodial control, and effectuating placement decisions as part of the detention pipeline, WCH performed a core governmental custody function and acted under color of state law.

312. LaQuilla Williams received the Combined Intake Report which stated that a welfare check was "not warranted" and that there was "no indication [the] child is at risk of imminent danger."

313. As described in this Count, Defendants knew or were informed that the children had been medically cleared and that no judicial authorization existed, yet continued to cause, facilitate, or allow the detention to persist for the remainder of January 9 through January 10, 2024, through DCF's investigative and staffing workflow rather than effectuate release.

314. No reasonable officer or child-welfare official could conclude that continued detention of A.A., Y.M., or M.N. was necessary to prevent imminent serious harm after medical clearance and in the absence of judicial authorization.

315. No Defendant initiated court proceedings, obtained judicial approval, or completed the statutory prerequisites required to authorize continued Police Protective Custody at any time during the Jan 8-10 detention. No Defendant had statutory authority to deliver the children directly to Wichita Children's Home, and Wichita Children's Home lacked statutory authority to receive or hold the children from law enforcement.

316. Defendants, including DCF worker Abiliba Erekosima, and supervisor Jana Vinduska caused and prolonged the detention of Plaintiff's children by conditioning their release on Plaintiff's execution of an "Immediate Safety Plan," despite admitting abuse was not believed and without judicial authorization.

317. Defendants' continued detention of Plaintiff's children constituted an unreasonable and ongoing seizure that interfered with Plaintiff's possessory and custodial interests in the care, custody, and control of her children, in violation of the Fourth Amendment, and deprived Plaintiff of her fundamental liberty interest in family integrity without due process, in violation of the Fourteenth Amendment.

318. The unlawfulness of continuing to detain children without judicial authorization after any exigency has ended was clearly established at the time of Defendants' conduct.

IX. COUNT III

Unreasonable Search of Plaintiff's Child Interfering with Plaintiff's Parental and Liberty Interests

(Fourth and Fourteenth Amendments — 42 U.S.C. § 1983)—Against Honey Tree Academy LLC, and Kimberly Fielding

319. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs  30-31, 35, 38, 41-43, 47, 50, and 99, as though fully set forth herein.

320. On or about January 8, 2024, Defendant Kimberly Fielding, acting individually and/or through employees of Honey Tree Academy, LLC, physically manipulated A.A.'s clothing and exposed portions of her body to inspect for injuries, beyond routine visual observation associated with ordinary childcare supervision.

321. Plaintiff did not consent to any such examination, was not notified it would occur, and no medical emergency existed requiring examination without parental consent.

322. The physical manipulation and inspection of A.A.'s body without Plaintiff's knowledge or consent interfered with Plaintiff's authority to make decisions regarding her child's bodily integrity, medical care, and supervision.

323. The examination was conducted for the purpose of identifying or documenting information for reporting to authorities, and law enforcement relied on information arising from the examination in initiating or continuing police action involving A.A.

324. The conduct described herein constituted an unreasonable search within the meaning of the Fourth Amendment and was undertaken without a warrant, consent, or exigent circumstances.

325. This conduct further interfered with Plaintiff's fundamental right to make decisions concerning the care, custody, and control of her child, including decisions regarding physical examinations and bodily integrity, thereby violating Plaintiff's substantive due process rights under the Fourteenth Amendment.

X. COUNT IV

Warrantless Home Entry and Expansion Beyond Scope of Consent

(Fourth Amendment — Against Officers Ryan, Van Pelt, Rusch, Duncan, Sanchez in their

individual capacities)

326.  Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 52-53, 56-57, 62-63, 80-81, as though fully set forth herein.

327.  Plaintiff gave limited consent for Officers Dulohery and Ryan to enter her home for a specific and restricted purpose. Plaintiff did not consent to the entry or presence of any additional officers.

328.  Without a warrant, court order, or Plaintiff's consent, Officers Van Pelt, Duncan, Rusch, and Sanchez entered and remained inside Plaintiff's home, despite never having been granted consent by Plaintiff and instead entering based on direction from another officer.

329.  The additional officers entered the home at the direction of Defendant Ryan rather than based on any consent from Plaintiff. Defendant Ryan did not have authority to grant consent on Plaintiff's behalf, and no reasonable officer could believe that an officer's instruction substituted for consent from the occupant.

330.  Officers Dulohery and Ryan were present and observed the entry of additional officers into Plaintiff's home without Plaintiff's consent. Defendant Ryan directed additional officers to enter, and both Defendants failed to prevent or limit the warrantless entry and expansion beyond the scope of consent, despite having the opportunity and authority to do so.

331.  Defendants' warrantless entry into Plaintiff's home, without consent and without exigent circumstances, constituted an unreasonable search in violation of the Fourth Amendment.

332. The right to be free from warrantless entry into the home, and from expansion beyond the scope of consent, was clearly established at the time of Defendants' conduct.

XI. COUNT V

Warrantless Search of the Curtilage of Plaintiff's Home

(Fourth Amendment — Against Officer Lane in his individual capacity)

333. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32-34, and 52-53, and 176 as though fully set forth herein.

334. Officer Lane physically entered and searched the curtilage of Plaintiff's home, including the backyard, which constitutes the immediate and private surroundings of the home, without a warrant.

335. Officer Lane entered areas of the property not open to the general public.

336. The areas entered by Officer Lane were not accessible to the public and were within Plaintiff's reasonable expectation of privacy.

337. Plaintiff was not present at the residence at the time of entry and did not provide consent to Officer Lane to enter or search the curtilage.

338. While within the curtilage, Officer Lane approached and positioned himself at or near the windows, remaining there for a period of time as reflected on body-worn camera, without a warrant or consent.

339. After looking through windows, Officer Lane made statements describing observations of the interior of Plaintiff's home and communicated those observations to other officers at the scene.

340. Officer Lane's entry into the backyard exceeded any implied license to approach the home and was not consistent with customary public access to the property.

341. Officer Lane's warrantless entry into the curtilage of Plaintiff's home, his act of looking into the windows to observe the interior of the residence, and his communication of those observations to other officers, without consent or exigent circumstances, constituted an unreasonable search in violation of the Fourth Amendment.

342. The right to be free from warrantless entry into the curtilage of one's home, including areas not open to the public and within the home's immediate surroundings, was clearly established at the time of the conduct.

XII. COUNT VI

Unreasonable Search — Nonconsensual Radiological Imaging (X-Rays) of Plaintiff's Child Interfering with Plaintiff's Parental Rights

(Fourth and Fourteenth Amendments — 42 U.S.C. § 1983 — Against Defendant Officers Dulohery, Ryan in their individual capacities; Defendant Gregory G. Faimon, MD; Defendant Debbie A. Desilet-Dobbs, MD and Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER)

343. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32, 47, 52-53, 66-67, 70-78, 80, 81, 83-84, 87, 88-90, 92, 100-105, 108, and 111, as though fully set forth herein.

344. Defendants Ryan and Dulohery, caused and affirmatively facilitated the performance of radiological imaging (X-rays) of Plaintiff's minor child, A.A., by transporting her to the hospital for investigative purposes, maintaining physical control over her, without a warrant, court order, judicial authorization, or Plaintiff's consent. At the time the imaging

was performed, no documented Police Protective Custody authorization or judicial approval existed.

345. The absence of documented or judicially authorized custody at the time of the imaging further demonstrates that Defendants lacked authority to consent to or facilitate medical procedures on behalf of Plaintiff's child.

346. Officer Ryan transported A.A. to the hospital and Officers Ryan and Dulohery remained present and in custodial control at the time the radiological imaging was performed.

347. Defendant Gregory G. Faimon MD, ordered the X-rays for A.A.

348. Defendant Debbie A. Desilet-Dobbs, MD personally reviewed the radiological images of A.A., corrected the resident physicians interpretation as necessary, and signed and finalized the diagnostic impression of the skeletal survey performed while A.A. was in police control.

349. Plaintiff did not provide voluntary, informed consent, and no exigent medical circumstances existed requiring immediate imaging.

350. Plaintiff was informed by law enforcement that the medical evaluation would consist of a "standard medical procedure," comparable to a routine doctor's visit and was not informed that radiological imaging or a skeletal survey would be performed.

351. Officer Ryan stated that if medical providers "find anything underneath the skin," they would report those findings to officers, indicating that the evaluation was intended to identify information for investigative purposes. Plaintiff was not informed that such evaluation would include radiological imaging or a skeletal survey.

352. The performance of radiological imaging without Plaintiff's knowledge or consent interfered with Plaintiff's authority to make medical decisions on behalf of her child and to control her child's bodily integrity.

353. The radiological imaging was performed for investigative and custody-related purposes in connection with a law enforcement referral, rather than in response to an emergent medical need.

354. Defendants Gregory G. Faimon, MD, Debbie A. Desilet-Dobbs, MD, and Wesley Medical Center acted in concert with law enforcement by performing and reviewing the imaging while A.A. remained in police custody and for purposes connected to the investigation and custody determination, with knowledge that the imaging was being conducted in coordination with law enforcement, thereby acting under color of state law.

355. The compelled radiological imaging constituted a search that was objectively unreasonable under the Fourth Amendment and interfered with Plaintiff's parental authority and custodial rights, including her right to make medical decisions for her child.

356. The same conduct deprived Plaintiff of her clearly established Fourteenth Amendment rights to direct the medical care of her child and to maintain control over her child's bodily integrity, without due process of law.

357. It was clearly established at the time of the conduct that non-emergency medical procedures, including radiological imaging performed for investigative or administrative purposes, absent parental consent, a court order, or exigent circumstances, violate the Fourth Amendment.

358. No Defendant obtained a court order or judicial authorization prior to the imaging, nor did any Defendant seek Plaintiff's consent before proceeding.

XIII. COUNT VII

Unlawful Non-Emergency Medical Examinations of Plaintiff's Minor Children and Investigative

Photography of A.A.

(Fourth and Fourteenth Amendments — 42 U.S.C. § 1983 — Against Officers Ryan,

Dulohery, Rusch, Van Pelt, Duncan, and Sanchez in their individual capacities; Gregory

G. Faimon, MD; Wendy Hartman, RN; Megan Meier, RN; Beth Heflin MD, Medical

Provider Doe 1; Honey Tree Academy, LLC, and Kimberly Fielding, and Wesley

Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER)

359.   Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 50, 53, 66, 76, 80, 88-89, 99, 100-109, 111-113, and 118-120, as though fully set forth herein.

360.   On January 8, 2024, Defendant Kimberly Fielding, acting on behalf of Honey Tree Academy LLC, stated on body-worn camera that she lifted A.A.'s shirt to inspect her body and took photographs. Fielding displayed the photographs to responding officers, and, at an officers request, transmitted the photographs to law enforcement via email before officers conducted any independent physical examination of A.A. Fielding further reported information to officers that was incorporated into the PPC decision making process.

361.   On January 8–9, 2024, while asserting Police Protective Custody, Officer Defendants Dulohery and Ryan caused, facilitated, or compelled non-emergency medical examinations of all Plaintiff's minor children, at Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER, including examinations requiring removal of clothing,

and caused investigative photographing of Plaintiff's minor child A.A., all without a warrant, court order, judicial authorization, or exigent medical necessity.

362. At the time of the examinations and photographing, the children were medically stable and not experiencing conditions requiring immediate emergency intervention. Plaintiff did not provide voluntary, informed consent to the examinations or photography.

363. The examinations and photographic procedures required exposure and manipulation of the children's bodies and therefore constituted searches within the meaning of the Fourth Amendment.

364. Defendant Wendy Hartman, RN, conducted and/or directly performed investigative and forensic photography of A.A.'s body while A.A. was under law-enforcement control and for purposes connected to the investigation rather than emergent medical care.

365. Defendant Megan Meier, RN acted jointly with law enforcement and other medical defendants by facilitating, assisting, or enabling the initiation and continuation of the non-emergency medical examinations of the children and the investigative photography of A.A. while the children were under police control.

366. Defendant Gregory G. Faimon, MD; Medical Provider Doe 1; and Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER participated in, authorized, approved, or ratified the non-emergency medical examinations of the children and the investigative photography of A.A., including requiring removal of clothing for inspection, despite the absence of exigent medical circumstances.

367. Beth Heflin MD, and Medical Provider Doe 1 reviewed, approved, and signed medical and forensic documentation after A.A. had already been discharged, including the, "Case

Reviewed By" and "Program Coordinator (or Designee)" approvals, thereby retrospectively authorizing and ratifying the conduct.

368. The examinations of the children and the photographic documentation of A.A. were performed in coordination with law enforcement and for investigative, administrative, or placement-related purposes rather than for emergent medical treatment and were conducted without Plaintiff's knowledge or informed consent.

369. Defendants identified in this Count acted in concert with law enforcement and with knowledge that the examinations and photography were being conducted for investigative and custody-related purposes, thereby acting under color of state law.

370. The non-emergency medical examinations of the children and the investigative photography of A.A. constituted searches that were objectively unreasonable under the Fourth Amendment and interfered with Plaintiff's parental authority and custodial rights.

371. The same conduct deprived Plaintiff of her clearly established Fourteenth Amendment rights to family integrity and to direct the medical care and bodily integrity of her children.

372. At the time of the conduct, it was clearly established that non-emergency medical examinations of children and investigative or forensic photography of a child, including requiring removal of clothing, may not be conducted absent voluntary parental consent a court order, or exigent circumstances.

XIV. COUNT VIII

Warrantless and Coercive Search of Plaintiff's Child in the Home

(Fourth Amendment – 42 U.S.C. § 1983 – Against Officers Ryan and Dulohery

373. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 52-59 as though fully set forth herein.

374. While inside Plaintiff's home and without a warrant, court order, or exigent circumstances, Defendant Officer Dulohery stated that he would take photographs of A.A.'s body "without [Plaintiff's] interference" and threatened that Plaintiff would be placed in handcuffs if she did not comply.

375. Under this threat of arrest, Plaintiff submitted to the photographing of her child. Any purported consent was not voluntary but was obtained through coercion and intimidation.

376. The photographing required exposure of A.A.'s body and constituted a search within the meaning of the Fourth Amendment.

## XV. COUNT IX

Unreasonable Search — Warrantless Investigative Photography of Plaintiff's Child A.A. Interfering with Plaintiff's Parental Rights

(Fourth Amendment — 42 U.S.C. § 1983—Against Wichita Children's Home

377. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 53, 101-102, 108, 120, 125, and 155, as though fully set forth herein.

378. While A.A. remained in Police Protective Custody following her transfer from law enforcement, and while under the custodial control of Wichita Children's Home ("WCH"), non-emergency photographic documentation of A.A.'s body was conducted for investigative, evidentiary, or administrative purposes unrelated to immediate medical treatment.

379. The photographic documentation required exposure of A.A.'s body and constituted investigative or forensic photography undertaken while A.A. was seized and not in the care or custody of her parent.

380. No warrant, court order, or judicial authorization existed, and Plaintiff did not provide voluntary parental consent for the investigative photography.

381. The photographic documentation was conducted without Plaintiff's knowledge or informed consent and interfered with Plaintiff's authority to make decisions regarding her child's care, custody, and bodily integrity.

382. At the time of the photography, no medical emergency or exigent circumstances existed, and WCH personnel were exercising custodial authority pursuant to and in coordination with law enforcement and child-welfare agencies.

383. While A.A. was in continuous state-directed custody, tape residue visible on A.A.'s back was documented in photographs taken during custody and later provided to Plaintiff by DCF. When Plaintiff regained physical custody of her child, the tape residue was no longer present. Plaintiff did not consent to any physical manipulation or alteration of A.A.'s body, and no court order or exigent circumstances authorized such conduct.

384. Wichita Children's Home, acting through its personnel and in coordination with state actors, caused or permitted the warrantless investigative photography and associated bodily intrusion while A.A. was seized and not in Plaintiff's custody.

385. The warrantless investigative photography and associated bodily intrusion constituted an unreasonable search in violation of the Fourth Amendment and interfered with Plaintiff's parental authority and custodial rights, including her right to control decisions regarding her child's bodily integrity.

386. It was clearly established at the time of the conduct that non-emergency investigative or forensic photography of a child, including photography requiring exposure of the child's body, may not be conducted absent voluntary parental consent, a court order, or exigent circumstances. A reasonable official or private actor acting under color of state law would have known such conduct was unlawful.

XVI. COUNT X

Excessive Force and Unreasonable Physical Restraint of Plaintiff's Child Interfering with Plaintiff's Custodial Rights

(Fourth Amendment — 42 U.S.C. § 1983 — Against Officer Mackenzie Van Pelt and Officer Samuel Duncan in their individual capacities)

387. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 68, 72, 74-75, 79-81, 83-84, 86, 90-92, 100 and 181-182, as though fully set forth herein.

388. Defendants Officer Mackenzie Van Pelt and Officer Samuel Duncan physically restrained Plaintiff's minor child, A.A., by forcibly securing her into a car seat during removal and transport, preventing her movement.

389. The physical restraint and forced separation interfered with Plaintiff's ability to comfort, supervise, and exercise control over her child.

390. The restraint continued while A.A. cried, called out for her mother, and resisted, and Defendants used a car seat that was not properly sized or suited to A.A., despite her visible distress.

391.    At the time of the restraint, A.A. was a two-year-old child who posed no threat to officer safety, was not attempting to flee, and was under the full physical control of multiple officers.

392.    A.A. posed no threat to officer safety or others, no exigent circumstances existed, and the restraint occurred in a non-emergency setting.  Defendants declined less intrusive alternatives and denied Plaintiff's request to accompany her child.

393.    Defendants' method of restraint and transport was disproportionate to any legitimate governmental need and was not reasonably related to officer safety or child safety.

394.    Under the totality of the circumstances, the physical restraint of a non-threatening child, forced separation from Plaintiff, and method of restraint constituted excessive force and an unreasonable seizure under the Fourth Amendment and interfered with Plaintiff's custodial and parental rights.

395.    It was clearly established at the time of the conduct that officers may not use objectively unreasonable force against a non-threatening child or restrain a child in a manner disproportionate to any legitimate governmental interest.

## XVII. COUNT XI

Denial of Placement With a Fit, Available Parent Interfering With Plaintiff's Custodial Rights

(Fourth and Fourteenth Amendments — 42 U.S.C. § 1983 — Against Wichita Children's Home; and Officers Ryan, Dulohery, Van Pelt, Duncan, Rusch, Sanchez; Detective Ohmart; and Abiliba Erekosima, Jana Vinduska, and LaQuilla Williams, in their individual capacities)

396.    Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 68-69, 72-75, 83-86, 100, 109, 120-126, 127-130, 133-134, 141-143, 147, 151, and 169 as though fully set forth herein.

397. During the initial seizure and transport, Plaintiff requested to accompany her minor child A.A. to the hospital. Defendant Officer Ryan denied that request and prevented Plaintiff from remaining with her child.

398. Defendants' action in preventing Plaintiff from accompanying her child and in controlling the children's placement interfered with Plaintiff's custodial rights and the ability to direct the care and placement of her children.

399. Before and during the continued detention, Plaintiff and the children's father— both fit, non-offending parents—requested that the children be released, and Defendants were informed that a valid custody agreement existed authorizing placement with the father.

400. Y.M. and M.N.'s father appeared in person, requested immediate custody, and was available to take physical custody of the children. No emergency medical condition, court order, or judicial authorization existed requiring continued detention or prohibiting release to him.

401. Defendants failed to make any individualized determination that the father posed a risk to the children, and no statutory basis, court order, or medical necessity existed preventing placement with him.

402. Abiliba Erekosima, Jana Vinduska, LaQuilla Williams, and Detective Ohmart, Wichita Children's Home, acting under color of state law and exercising authority over investigation, custody, and placement decisions, approved, directed, participated in, or ratified the continued detention and third-party placement of the children despite the availability of a fit parent and the absence of exigent circumstances.

403. Defendant officers, Detective Ohmart, and the child-welfare defendants jointly participated in the decision to deny placement with the father and to continue the children's detention and third-party placement.

404. The refusal to release the children to a fit, available parent caused continued detention and third-party placement without lawful justification.

405. This conduct constituted an unreasonable continued seizure of Plaintiff's children in violation of the Fourth Amendment and interfered with Plaintiff's clearly established Fourteenth Amendment rights to family integrity and to make decisions regarding the care, custody, and placement of her children.

406. At all relevant times no Defendant identified any specific safety risk posed by the father, and no individualized determination was made that placement with him would danger Y.M. or M.N.

407. At the time of the conduct, it was clearly established that, absent exigent circumstances or judicial authorization, officials may not continue to detain children or refuse placement with a fit, available parent, and that doing so violates the Fourth Amendment and interferes with a parent's constitutional right to family integrity.

XVIII. COUNT XII

Coercion, Deceptive Safety Planning, Forced Services, and Retaliation

(Fourteenth and First Amendments — 42 U.S.C. § 1983 — Against Individual DCF Employees in their individual capacities and, Defendants DCCCA, Inc.,)

408. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 68-72, 74-75, 100, 120-128, 129-130, 132-139, 141-153, 157-164, 169-170, and 176 as though fully set forth herein.

409. While Plaintiff's children remained out of her custody and in state-controlled placement, and in the absence of any court order, judicial proceeding, or exigent circumstances, Defendants conditioned reunification on Plaintiff's agreement to a non-court-ordered "Immediate Safety Plan" and associated services, thereby interfering with Plaintiff's ability to make decisions regarding the care, custody, and control of her children and in the absence of any substantiated abuse finding, Defendants conditioned reunification on Plaintiff's agreement to a non-court ordered safety plan and services.

410. Defendant Abiliba Erekosima, acting as a DCF caseworker, refused to authorize reunification unless Plaintiff signed the safety plan, despite the absence of a court order, judicial authorization, or exigent circumstances.

411. Defendants stated or implied judicial authority existed or would be obtained if Plaintiff refused to sign the safety plan, including statements that refusal to sign would delay reunification and that a judge would approve or had approved the plan, when no court proceeding or judicial authorization existed. Plaintiff later confirmed through the judicial district that no case had been filed or authorized at any time relevant to these events.

412. After the children were returned to Plaintiff's custody, Defendants continued to enforce the non-court-ordered safety plan and services, despite the absence of any court order or lawful basis, thereby interfering with Plaintiff's parental authority and decision making.

413. Defendant DCCCA, Inc., acting under color of state law and incoordination with DCF, implemented and enforced the plan through Defendant LaVandria Fountain, who stated that a judge required the services and pressured Plaintiff to comply as a condition of avoiding renewed custody interference.

414. After Plaintiff unenrolled from services, DCF supervisory officials, including Jana Vinduska and Ashlie Thomas, threatened renewed removal and pressured re-enrollment, despite no open CINC case, no new allegations, and no judicial authorization, and no documented referral to the district attorney.

415. By conditioning reunification on agreement to a non-court-ordered safety plan, and by threatening renewed removal after reunification absent lawful authority, Defendants violated Plaintiff's clearly established Fourteenth Amendment rights to family integrity and parental decision-making.

416. Plaintiff engaged in protected activity by refusing to agree to non-court-ordered services and by expressing opposition to Defendants' conduct, including stating her intent to pursue legal action. Defendants responded by threatening renewed removal of her children and continued custody interference, actions that would deter a reasonable person from engaging in such protected activity, in violation of the First Amendment.

417. It was clearly established at the time of the conduct that child-welfare officials and their contractors may not condition reunification or continued custody on non-court-ordered services, misrepresent the existence of judicial authority, or threaten removal absent lawful authority.

XIX. COUNT XIII

Failure to Intervene and Supervisory / Decision-Maker Liability

(Fourth and Fourteenth Amendments —42 U.S.C. § 1983 — Against Officer Ryan, Dulohery, Rusch, Van Pelt, Duncan, Sanchez, Detective Gabriel Ohmart, Jana Vinduska, Lori Clark in their individual capacities)

418. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 32-34, 40-41, 46, 52-60, 62-63, 65-75, 80-84, 92, 86, 100, 120-121, 123, 129-130, 133-135, 141-143, 147, and 151, as though fully set forth herein.

419. During the incident, Officers Van Pelt, Duncan, and John Doe 1, referred to Officer Ryan as "boss".

420. Defendants Officers Dulohery, Van Pelt, Duncan, Rusch, Sanchez were physically present during the seizure and participated in the removal of Plaintiff's children. No warrant or court order authorizing removal was present. During the encounter, Officer Ryan stated that he did not know whether A.A. was in danger. None of the other Officers took action to stop or prevent the removal.

421. Officer Ryan observed Officer Lane enter Plaintiff's property without a warrant or consent and took no action to stop or prevent that entry.

422. Defendants Jana Vinduska, Lori Clark, and Detective Gabriel Ohmart possessed and exercised decision-making authority over intake, placement, or release following the seizure and, while the children remained detained and separated from Plaintiff, allowed the detention to continue despite the absence of judicial authorization, thereby prolonging the interference with Plaintiff's custodial rights.

423. Defendant Lori Clark approved an override after the  children had already been seized and detained without a warrant, court order, or judicial custody determination, and no court authorization for continued custody or placement had been issued.

424. Defendants Vinduska, Ohmart, and Clark were aware of the ongoing detention and lack of judicial authorization and had a reasonable opportunity to take action to stop, reverse, or terminate the seizure, detention, or placement, but failed to do so.

425. Defendants Officers Dulohery, Rusch, Van Pelt, Duncan, and Sanchez had a realistic opportunity to halt the unconstitutional seizure but chose not to act; their inaction constituted a failure to intervene that proximately caused Plaintiff's continued deprivation of rights under the Fourth and Fourteenth Amendments, including her custodial and parental rights.

426. Each defendant had sufficient time, proximity, and authority to intervene and prevent or terminate the unlawful entry, seizure, detention, or continued placement , but failed to do so.

427. Officer Ryan exercised supervisory authority at the scene and directed or permitted the actions of the other officers, and thereafter allowed the seizure and detention to continue despite the absence of a warrant or judicial authorization, thereby causing ad prolonging the violation of Plaintiff's constitutional rights.

428. At the time of the conduct, it was clearly established that officers and supervisory or decision-making officials who observe or are aware of ongoing constitutional violations and have a reasonable opportunity to prevent them may not fail to intervene or allow such violations to continue, and that doing so violates the Fourth and Fourteenth Amendments.

XX. COUNT XIV

False and Misleading Information,  Joint Action, and Causation of Unreasonable Seizure and Detention Interfering with Plaintiff's Constitutional Rights

(Fourth and Fourteenth Amendments — 42 U.S.C. § 1983 — Against Honey Tree Academy

LLC and Kimberly Fielding, Detective Gabriel Ohmart in his individual capacity, Beth

Heflin MD, Medical Provider Doe 1, and Wesley Medical Center, LLC, d/b/a Wesley

Woodlawn Hospital & ER)

429.    Plaintiff incorporates by reference the preceding paragraphs relevant to this count,

including, but not limited to, paragraphs 27, 30-32, 35-47, 48-50, 70-71, 99, 101-105,

108-109, 112-114, 118-120,121-124, 129-130, 133-136, 138-139, 141, and 151 as though

fully set forth herein.

430.    Defendants Beth Heflin, MD, and Medical Provider Doe 1, acting within the scope of

their roles at Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER,

signed and approved a Child Abuse Forensic Photography Case Review Addendum that

characterized Plaintiff's child A.A. as having suffered physical abuse and as requiring

protection. The addendum was prepared for investigative and custody-related purposes

and was transmitted to or relied upon by law enforcement and child-welfare officials in

decisions to continue Police Protective Custody and placement.

431.    Defendant Detective Gabriel Ohmart included in the police report narrative medical

information pertaining to a child unrelated to Plaintiff. That information was included as

part of the factual basis supporting continued Police Protective Custody and was relied

upon by law enforcement and child-welfare officials in decisions that prolonged detention

of Plaintiff's children.

432.    Defendant Honey Tree Academy, LLC operated a licensed daycare facility. At all

relevant times, Defendant Kimberly Fielding acted on behalf of Honey Tree Academy,

LLC in connection with the events at issue, and her actions were undertaken within the scope of her authority and are attributable to Honey Tree Academy LLC.

433.   Defendant Fielding conducted a visual inspection of A.A.'s back by lifting her shirt, took photographs, made the state reporting call, and showed officers photographs, including images from prior months. Fielding stated that A.A. wore a shirt with a burn hole and had a "burn mark" on her arm, while omitting information regarding when the burn hole occurred and circumstances known to daycare staff. Fielding knew or reasonably should have known that her statements, photographs, and omissions would be relied upon by law enforcement in determining whether to remove and detain the children.

434.   Officer Dulohery is heard on body-camera repeating character observations originally supplied by Defendant Fielding, demonstrating law-enforcement reliance on daycare-generated subjective characterizations in assessing custody.

435.   Honey Tree allegations were carried over into hospital and third-party intake documents, further amplifying their effect.

436.   Defendant Fielding conducted a physical inspection of A.A.'s body beyond routine childcare, initiated and communicated the report, spoke directly with law-enforcement officers, and provided factual assertions concerning Plaintiff and A.A. that were incomplete or lacking material context.

437.   In doing so, Fielding relayed and vouched for unverified allegations and omitted material facts known to daycare staff, including benign explanations previously provided by Plaintiff and information concerning alleged injuries, attendance, development, and communication abilities.

438. Fielding made subjective characterizations of Plaintiff, and generated photographs that were not disclosed to Plaintiff and were not conducted with parental consent.

439. After removal, Fielding continued to communicate with DCF and investigators, including statements documented by DCF personnel in conversation notes. Those notes reflect that Fielding stated A.A. had a "speech delay," attributed to Plaintiff a statement that "A.A. is terrible at home and she needs help," and described a "small round flat, red mark on wrist." Plaintiff disputes these statements and alleges that they were inaccurate or lacked material context. These statements, as documented and communicated, were relied upon by DCF and other state actors in assessing risk, custody, and continued placement decisions. These statements materially influenced the continued detention and placement of Plaintiff's children.

440. Law-enforcement officers and child-welfare officials relied on statements, omissions, and materials provided by Defendant Fielding, in initiating Police Protective Custody, continuing detention after medical clearance, and refusing release of the children to a fit, available parent. The continued detention and placement decisions were not supported by any independent lawful basis and instead depended on the information and materials described above.

441. By conducting the inspection, creating and providing photographs, communicating directly with law enforcement, and supplying information for use in custody and investigative decision, Defendant Fielding, acting on behalf of Honey Tree Academy LLC, jointly participated with state officials in the events that led to and prolonged the seizure and detention of Plaintiff's children, thereby acting under color of state law.

442. Defendants' conduct was a substantial and proximate cause of the unreasonable seizure and continued detention of Plaintiff's children and interfered with Plaintiff's rights under the Fourth and Fourteenth Amendments including her rights to family integrity and to make decisions regarding the care, custody, and control of her children.

443. It was clearly established at the time of the conduct that private actors who jointly participate with state officials, or who provide materially misleading or incomplete information that is relied upon in child custody or abuse investigations, may not cause or prolong the seizure or detention or children, and that such conduct violates the Fourth Amendment and interferes with a parent's Fourteenth Amendment rights to family integrity and to direct the care, custody and control of their children.

444. Each Defendant knew or should have known that the information provided would be relied upon by law enforcement and child-welfare officials in decisions concerning seizure, detention, and placement.

XXI. COUNT XV

Misleading Investigative Evidence and Causation of Continued Detention

(Fourth and Fourteenth Amendments — 42 U.S.C. § 1983 — Against Gregory G. Faimon, MD; Debbie A. Desilet-Dobbs, MD; Beth Heflin, MD; Medical Provider Doe 1; Wesley Medical Center, LLC, d/b/a Wesley Woodlawn Hospital & ER; and Detective Gabriel Ohmart, in their individual capacities)

445. Plaintiff incorporates by reference all preceding factual allegations relevant to this Count, including but not limited to, paragraphs 101-109, 112-115, 118-120, 129-130, 133-135, 151, and 176 as though fully set forth herein.

446. While A.A. remained in Police Protective Custody and after she had been medically discharged, medical personnel affiliated with Wesley Medical Center prepared, reviewed, approved, signed, or transmitted a Child Abuse Forensic Photography Case Review Addendum for investigative and custody-related purposes, rather than for medical diagnosis or treatment.

447. The addendum characterized the findings as "child abuse" and was transmitted to law enforcement, including Detective Gabriel Ohmart, with knowledge that it would be relied upon in decisions concerning continued detention, placement, and custody.

448. The addendum reflects that it was faxed to law enforcement on January 9, 2024, while the physician signature date reflects January 22, 2024, demonstrating that investigative conclusions were communicated to law enforcement before the addendum was finalized or signed.

449. In preparing, approving, signing, or transmitting the addendum, Defendants characterized A.A.'s condition as "child abuse" after she had been medically cleared and discharged, and transmitted that characterization to law enforcement for investigative and custody-related purposes. At or around the same time, medical records pertaining to a different child were included in or transmitted with materials relating to A.A.'s case and were incorporated into law enforcement reports. Those records did not pertain to A.A. but were nonetheless provided to law enforcement and child-welfare officials in continued detention, custody and placement decisions.

450. Defendant Detective Gabriel Ohmart received and relied upon the addendum in law-enforcement and child-welfare decision-making after A.A. had been medically cleared and in the absence of any court order authorizing continued detention.

451. The underlying child-abuse investigation associated with event number 02349898 was ultimately classified as "unsubstantiated," with no identified perpetrator, further demonstrating that the information relied upon to justify continued detention lacked a factual basis.

452. The preparation, transmission, and reliance on the addendum and related information caused and foreseeably prolonged the continued detention and third-party placement of Plaintiff's children, after ay medical justification had ended and in absence of judicial authorization, constituting an unreasonable and ongoing seizure under the Fourth Amendment, and independently interfering with Plaintiff's rights under the Fourteenth Amendment, including her right to family integrity and to direct the care, custody, and control of her children.

453. At the time of the conduct, it was clearly established that state actors and private individuals acting under color of state law may not provide or rely upon materially misleading or incomplete information in child-custody or abuse investigations where such information foreseeably causes or prolongs a deprivation of liberty, and that doing so violates the Fourth and Fourteenth Amendments.

XXII. COUNT XVI

Municipal Liability (Monell)

(42    U.S.C. § 1983 — Against Municipal and County Defendants)

454. Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 30-46, 50, 52-92, 97-130, 151-153, 176, 180-189, 192-196, and 200-208, as though fully set forth herein.

City of Wichita — Wichita Police Department

455. Plaintiff alleges that the constitutional violations described herein were caused by official policies, customs, and deliberately indifferent training and supervisory practices, of the municipal and county defendants, which were widespread, known to policymakers, and constituted the standard operating procedure for handling child removals and Police Protective Custody.

A. Formal written policies (WPD Policies 507 & 508)

456. At all relevant times, the Wichita Police Department ("WPD"), an operating division of the City of Wichita, maintained written policies, training, and supervisory practices governing Police Protective Custody ("PPC"), placement, and release, including WPD Policies 507 and 508. Final policymaking authority for these policies and training decisions rested with municipal officials responsible for WPD policy and oversight.

457. Policies 507 and 508 governed the initiation of PPC but did not require officers to document findings of imminent danger or immediate necessity, did not address the statutory limits on warrantless PPC once any exigency resolved, and did not require judicial authorization for continued detention or placement.

458. In addition to Policies 507 and 508, WPD adopted and issued a standardized "Police Protective Custody" form for use in warrantless child removals. The form does not require the officer to document the officer's belief that the child is a child in need of care, nor does it require documentation of reasonable grounds to believe that the circumstances or condition of the child are such that the child would be harmed unless placed in the immediate custody of a shelter facility or other person, as required by K.S.A. 38-2232.

459. WPD distributed the PPC form through an accompanying training bulletin. The bulletin did not instruct officers that they must record their belief that the child was a child in need

of care, did not require articulation of reasonable grounds or imminent harm, and did not instruct officers that immediate custody must be necessary to prevent harm. The bulletin likewise failed to instruct officers to document why the child could not safely remain with a fit parent or be released following medical clearance.

460. By adopting a PPC form and training materials that omit the statutory requirement that officers document their belief that the child is in need of care and would be harmed absent immediate custody, WPD trained officers to conduct Police Protective Custody without requiring written justification of exigency, immediate necessity, or individualized findings.

461. In practice, WPD officers completed Police Protective Custody forms using information obtained from private actors, including daycare personnel, without independent verification. In this case, statements and allegations made by daycare staff were incorporated directly in the PPC documentation and relied upon to justify the seizure of Plaintiff's children. The form and training framework did not require officers to distinguish between independently observed facts and unverified third-party allegations, further reinforcing a practice of initiating custody without individualized, constitutionally sufficient findings.

462. Policy 508 identified Wichita Children's Home ("WCH") as a receiving facility for children taken into PPC and treated WCH as court-designated for purposes of placement, without verifying that any valid, current judicial designation was in effect, including during periods in which no such designation existed.

463. WPD policies, training, and supervisory practices permitted officers to remove children without a court order and to deliver them to a shelter facility without requiring

completion of a written statutory PPC application, delivery of that application to the county or district attorney, or prompt judicial review.

464. WPD policies and training did not require individualized assessment or separate findings for each child removed into PPC. The need for training on the constitutional and statutory limits of warrantless child removal was obvious, yet Defendants failed to provide such training.

465. These omissions were not clerical. By requiring officers to complete custodial and demographic information while omitting any requirement to document imminent danger, immediate necessity, individualized findings, or why release to a fit parent was not possible, the City trained and authorized officers to treat Police Protective Custody as an administrative placement process rather than a constitutionally constrained seizure. This policy and training framework was the moving force behind the warrantless seizure of Plaintiff's children, the continuation of custody after any alleged exigency had ended, and the denial of procedural safeguards.

B. Unwritten customs of the City of Wichita

466. City of Wichita WPD officers acted pursuant to customs reflected in officer statements such as, "When we take one, we normally take all the kids that are in the house", "we always err on the side of caution", and in reference to placing the child with a fit parent, "no one can take you from our safe place".

467. Supervisory personnel were involved during the incident and did not require judicial authorization or terminate PPC following medical clearance.

468. By treating these repeated, supervisor-ratified practices as the standard operating procedure, the City caused officers to seize and continue detaining Plaintiff's children

without a warrant, judicial authorization, individualized findings, or exigent circumstances, and to disregard release to a fit, available parent after medical clearance.

469.  These statements were made in the presence or b supervisory personnel and were not corrected, demonstrating ratification and acceptance of these practices as standard operating procedure.

C. "Take-All" Pattern

470.  The September 17, 2025 removal described in paragraph 208 is pled solely to show an ongoing City/County custom of removing children without court approval, placing them at Wichita Children's Home, and then conditioning reunification on services. Plaintiff seeks no damages or other relief for that 2025 incident; it is included only as evidence that the unconstitutional practices alleged in this complaint are part of a persistent municipal policy rather than an isolated event.

D. Custom of Utilizing Private Actors to Conduct Investigative Searches

471.  WPD officers acted pursuant to a custom and practice of soliciting and relied on evidence obtained by private actors, including daycare personnel, to support warrantless seizures of children. In this case, a daycare provider conducted a physical inspection of the child's body and created photographic evidence prior to law enforcement examination. Officers requested and received those photographs and relied upon them in initiating Police Protective Custody. This practice reflects a custom of using private actors as investigative extensions of law enforcement to obtain evidence that would otherwise require compliance with constitutional safeguards.

E. Inter-agency policymaking by Sedgwick County and DCF

472. Sedgwick County, through its statutorily designated child-welfare and juvenile intake framework, was responsible for receiving, reviewing, and acting upon written Police Protective Custody applications and related information required by K.S.A 38-2232.

473. Final policymaking authority for these intake, review, and referral functions rested with County officials responsible for juvenile intake and coordination with law enforcement and DCF.

474. In practice, Sedgwick County maintained or tolerated an inter-agency arrangement in which law enforcement routed children to hospitals and Wichita Children's Home without submitting the required written application to the County or district attorney and without initiating juvenile intake or court review.

475. No court assumed jurisdiction over Plaintiff's children during the period of Police Protective Custody, and no County-initiated juvenile proceeding was opened. The associated child-abuse investigation for event number 02349898 was ultimately classified as unsubstantiated with no identified perpetrator and no session staffing report or documentation reflecting the basis for continued custody or placement decsiions has been produced.

476. During the relevant period, this inter-agency practice included routing children taken into Police Protective Custody to Wichita Children's Home as a purported receiving facility without verifying that a valid court designation was in effect as required by K.S.A 38-2232(a)(2)(A)(i). Records produced by the District Court reflect that the only prior administrative order authorizing Wichita Children Home to receive children directly from law enforcement expired in 1999, and no designation was in effect in January 2024. Despite the absence of any valid judicial authorization, Defendants continued to utilize

Wichita Children's Home as a placement facility for children in Police Protective Custody. This practice reflects a systemic failure to ensure statutory compliance in shelter placement and further demonstrates an inter-agency custom of bypassing required legal prerequisites for custody and detention.

477.  Sedgwick County did not require submission of a written K.S.A. 38-2232 application, did not initiate juvenile intake, and did not seek judicial review before or during the children's detention.

478.  Following medical clearance, reunification timing and conditions were not determined through any court order or CINC adjudication, and the County did not intervene to require judicial authorization.

479.  County officials and supervisors did not exercise their statutory gatekeeping authority to terminate unlawful administrative custody or to compel judicial review.

480.  Kansas law requires that when a child taken into PPC is placed with a receiving facility, a written application and related information be furnished to the county or district attorney without unnecessary delay. The records produced to Plaintiff contain no documentation reflecting that any such application or information was furnished in this case.

481.  By maintaining and enforcing an inter-agency practice in which the statutorily required K.S.A. 38-2232 application, juvenile intake, and court review were not required or initiated—and by failing to require submission of those materials or initiate judicial oversight—Sedgwick County and DCF caused Plaintiff's children to be seized and detained without judicial authorization or procedural safeguards, in violation of the Fourth and Fourteenth Amendments.

482. As a direct result of these practices, Plaintiff's children remained in custody after medical clearance without any judicial authorization, no application was submitted to the district attorney, no juvenile intake or court review was initiated, and Defendants continued detention and placement decisions outside any lawful process, causing the prolonged seizure and interference with Plaintiff's custodial rights.

F. Deliberate Indifference to Constitutional and Statutory Requirements

483. The foregoing policies, customs, and inter-agency practices demonstrate that the need for training and supervision regarding the constitutional and statutory limits of warrantless child removal, continued detention, and judicial authorization was obvious. Defendants were deliberately indifferent to this need, as evidenced by the absence of required documentation, failure to initiate statutory procedures, and maintenance of practices that bypass judicial oversight entirely. Despite this obvious risk of constitutional violations, policymakers failed to correct these deficiencies.

484. The policies, customs, training deficiencies, and inter-agency practices described above were the moving force behind the warrantless seizure, continued detention, denial of release to a fit parent, and lack of judicial authorization or review, thereby causing the deprivation of Plaintiff's Fourth and Fourteenth Amendment rights.

XXIII. COUNT XVII

Prospective Declaratory and Injunctive Relief (Ex parte Young)

(Fourth and Fourteenth Amendments — Against DCF Supervisory Officials in Their Official Capacities)

485. Plaintiff incorporates by reference paragraphs, 8-10, 27, 53, 97, 101-108, 120-131, 146-148, 151-153, 163-167, 169-177, 180-182, and 189-200, as though fully set forth herein.

486. Defendants Elizabeth Gregg and Dee E. Nighswonger are DCF supervisory officials responsible for administering and supervising child-welfare intake, investigation, safety planning, placement practices, and related procedures within the Wichita Region.

487. Defendants are sued solely in their official capacities for prospective declaratory and injunctive relief under Ex parte Young, and Plaintiff seeks no monetary damages or retrospective relief in this Count.

488. As alleged herein, Defendants maintain and enforce practices under which DCF conducts investigation, staffing, and service planning following Police Protective Custody and influences reunification timing without judicial authorization. These practices include (i) conditioning reunification or family integrity on non-court-ordered safety plans or services, (ii) misrepresenting or implying court authority where none exists, (iii) threatening custody or service consequences in response to parental objection or protected activity, and (iv) permitting placement of children in Police Protective Custody into foster homes through DCF-licensed placements without a court order or CINC petition.

489. Communications from DCF personnel, including written correspondence, reflect that these practices are treated as routine operating procedures and are applied notwithstanding statutory requirements or the absence of judicial authorization.

490. DCF permits or does not prevent the performance of medical or forensic examinations of children in Police Protective Custody without a warrant, court order, parental consent, or exigent circumstances.

491. These acknowledged practices demonstrate a continued likelihood that Plaintiff will be subjected to the same conduct again, including coercive safety planning,

misrepresentation of legal authority, and interference with parental rights in the absence of judicial authorization. Plaintiff has been subjected to these practices and faces a continuing risk of their recurrence.

492.   Plaintiff seeks a declaration that DCF officials may not (a) condition reunification on non-court-ordered plans or services absent exigent circumstances or judicial authorization; (b) represent or imply legal mandates or court authority when none exists; or (c) continue or facilitate detention or placement, including foster placement, after medical clearance and in the absence of imminent danger where no lawful custody or court order exists.

493.   Plaintiff seeks a permanent injunction prohibiting Defendants and those acting in concert with them from engaging in the practices described above absent judicial authorization or lawful custody. The requested relief is narrowly tailored, prospective, and necessary to prevent ongoing and irreparable harm for which Plaintiff has no adequate remedy at law.

494.   It was clearly established at the time of the conduct that state officials may not interfere with parental rights, impose conditions on custody or reunification, or continue detention or placement of children without lawful authority, judicial authorization, or exigent circumstances, in violation of the Fourth and Fourteenth Amendments.

XXIV. COUNT XVIII

Invasion of Privacy — Public Disclosure of Private Facts

(Kansas Common Law — Against Honey Tree Academy LLC and Kimberly Fielding)

495.   Plaintiff incorporates by reference the preceding paragraphs relevant to this count, including, but not limited to, paragraphs 30, 35-43, 46-47, 49, 50, 102, 108, and 156, as though fully set forth herein.

496. Defendants obtained private, non-public information concerning Plaintiff and her minor child through their role as the child's daycare provider and through child-welfare communications not available to the general public.

497. In or about January 2024, Defendants publicly disclosed private facts concerning Plaintiff and her minor child on a publicly accessible internet platform, Yelp, in a response posted on behalf of Honey Tree to Plaintiff's review, where the information was viewable by the general public, including members of the local community and prospective customers.

498. The disclosure stated, in substance, that Plaintiff withdrew her child from Honey Tree immediately after the child was removed from Plaintiff's home, and referenced circumstances relating to that removal.

499. The disclosed facts concerned private matters involving a minor child and child-welfare involvement, were not matters of legitimate public concern, and were not necessary to respond to Plaintiff's review or to address Defendants' business practices.

500. Defendants knew or reasonably should have known that Plaintiff and her minor child could be identified from the contextual details disclosed, despite referring to Plaintiff by first name only.

501. The disclosure was public, foreseeably accessible to the community and prospective parents, and involved sensitive information concerning a minor child and child-welfare involvement, such that a reasonable person would find the disclosure highly offensive.

502. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages, including emotional distress, reputational harm, and loss of privacy.

503. Defendants' conduct constitutes invasion of privacy by public disclosure of private facts under Kansas common law

XXV. PRAYER FOR RELIEF

504.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally and grant the following relief:

505.    Declaratory Relief. Plaintiff seeks the following declaratory relief:

506.    A declaration that Defendants' acts and omissions, as alleged herein, violated Plaintiff's rights under the First, Fourth and Fourteenth Amendments to the United States Constitution, including:

    a.  the right to be free from unreasonable seizure and continued detention of her children absent exigent circumstances, judicial authorization, or other lawful basis;

    b.  the right to family integrity and parental decision-making, including the right to placement with a fit, available parent and freedom from extra-judicial separation and placement;

    c.  the right to be free from unreasonable searches, including warrantless home and curtilage intrusion and non-emergency investigative photography, medical examinations, and radiological imaging of Plaintiff's children absent voluntary consent, a court order, or exigent circumstances;

    d.  the right to bodily integrity of Plaintiff's children as protected through parental authority; and

    e.  the right to be free from coercion, intimidation, deception, and retaliation, including the use of non-court-ordered safety plans, service requirements, or threats of renewed removal to compel compliance or suppress the exercise of constitutional rights.

f.    the right to be free from continued detention, shelter placement, or foster-home placement of Plaintiff's children without judicial authorization, including placement in facilities or foster homes not designated or approved by court order, and from detention or placement maintained without the initiation of any judicial process, including the failure to submit an application, referral, or petition to the district attorney or court for review or authorization.

507.    Injunctive and Prospective Relief. Plaintiff requests preliminary and permanent injunctive relief prohibiting Defendants from:

a.    seizing or detaining Plaintiff's children absent a warrant, court order, or true exigent circumstances;

b.    subjecting Plaintiff's children to non-emergency medical examinations, forensic photography, or radiological imaging without parental consent or judicial authorization;

c.    coercing Plaintiff into safety plans, services, or agreements absent court order or statutory authority; and

d.    misrepresenting or implying the existence of judicial or statutory authority in child-welfare interactions.

Plaintiff further requests an order requiring Municipal and County Defendants to:

e.    adopt and enforce constitutionally compliant policies governing police protective custody;

f.    train officers and child-welfare personnel on the statutory limits of K.S.A. 38-2231 and 38-2232;

g.    prohibit routine hospital or shelter placement absent lawful custody;

h. ensure prompt release of children to fit, available parents when no exigency exists; and

i. implement safeguards to prevent continued detention, placement, or medical examination without judicial oversight.

508. Compensatory Damages. Plaintiff requests compensatory damages in an amount to be determined at trial for all injuries proximately caused by Defendants' unlawful conduct, including but not limited to:

a. emotional distress, humiliation, anxiety, fear, loss of dignity, and ongoing psychological harm;

b. trauma suffered by Plaintiff, including trauma arising from witnessing and learning about the unlawful seizure, detention, forced separation, coercive state action, and non-consensual medical intrusion involving her minor children;

c. interference with family integrity, parental autonomy, and Plaintiff's ability to parent free from state intimidation, coercion, and threat of renewed custody interference;

d. reputational harm and community stigma, including Plaintiff's reasonable fear that she is perceived as an unfit or "bad" parent, resulting in social withdrawal, isolation, and lasting reputational injury;

e. loss of use and enjoyment of Plaintiff's home and residential environment, including the destruction of Plaintiff's sense of safety, privacy, and emotional security within her own residence as a direct result of Defendants' conduct and its continuing effects;

f.  constructive displacement and forced relocation harms, including damages arising from Plaintiff's inability to reasonably avoid ongoing exposure to Defendants, their operations, and the associated trauma without relocating her household;

g.  diminution in the value, utility, and habitability of Plaintiff's property resulting from Defendants' actions, the resulting stigma, and the unavoidable proximity and continuing impacts of Defendants' conduct;

h.  economic losses, including but not limited to:

i.  lost wages and missed workdays;

j.  daycare tuition and fees charged after withdrawal, including amounts exceeding $1,300;

k.  costs incurred to relocate Plaintiff's child to a new daycare;

l.  reasonable past and future costs incurred to mitigate, respond to, and recover from Defendants' conduct, including costs associated with securing alternative housing or relocation to comparable housing;

m.  out-of-pocket expenses incurred in protecting Plaintiff's family, pursuing information, and responding to Defendants' actions; and

n.  other consequential financial harms proximately caused by Defendants' conduct.

o.  Compensatory damages for loss of professional, creative, and expressive activity. Plaintiff is a music producer and published author and poet who is an active member of the local poetry and spoken-word community, whose work depends on sustained creative focus, emotional stability, and public

engagement. Prior to Defendants' unlawful conduct, Plaintiff maintained consistent creative and performance activity. In calendar year 2023, Plaintiff released thirteen (13) original songs and performed at multiple poetry and spoken-word events, including a public performance at the Wichita Art Museum.

p.  Following the January 2024 seizure of Plaintiff's children and the resulting trauma, disruption, reputational stigma, and ongoing fear of state re-intervention, Plaintiff's creative and expressive activity sharply declined. In 2024, Plaintiff released only two (2) songs, and in 2025, only one (1) song. Since the removal of her children, Plaintiff has not performed at a single poetry or spoken-word event.

q.  This significant reduction in creative output and complete cessation of public performance was not voluntary, cyclical, or market-driven, but was directly and proximately caused by Defendants' conduct, including emotional distress, psychological burden, reputational harm, loss of personal safety, and the diversion of time, attention, and mental capacity required to respond to Defendants' actions and protect her family. Plaintiff suffered measurable professional, expressive, and personal losses as a result.

r.  Compensatory damages reflecting the heightened reputational, professional, and personal injury suffered by Plaintiff due to her public profile. Plaintiff was publicly listed as a candidate for mayor from approximately March 2022 through the conclusion of the 2023 election cycle. Defendants' actions subjected Plaintiff to amplified stigma, scrutiny, and reputational harm beyond that

experienced by a private individual, intensifying the personal and professional consequences of Defendants' unlawful conduct.

s. Compensatory damages for deprivation of familial association. Plaintiff further seeks compensatory damages for the deprivation of her fundamental liberty interest in the care, custody, and companionship of her children. Defendants' actions caused a forced separation and interference with Plaintiff's family integrity, resulting in emotional distress, loss of parental association, disruption of the parent-child relationship, and psychological harm to Plaintiff.

509. Punitive Damages. Plaintiff requests punitive damages against all Defendants who acted under color of state law in their individual capacities for conduct that was malicious, reckless, callously indifferent, or in knowing disregard of Plaintiff's clearly established constitutional rights, in an amount sufficient to punish and deter similar misconduct.

510. Statutory and Common-Law Relief. Plaintiff requests:

a. All relief available under 42 U.S.C. § 1983 for the constitutional violations alleged herein.

b. All relief available under Kansas common law for invasion of privacy and related torts, including damages for emotional distress and loss of privacy.

511. Costs and Fees. Plaintiff requests:

a. An award of taxable costs as permitted by law and, if applicable, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

512. Interest. Plaintiff requests:

a. Pre-judgment and post-judgment interest as permitted by law.

513. Other Relief. Plaintiff requests:

a. Such other and further relief as the Court deems just, proper, and equitable.

XXVI. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Julie Rose Stroud

Plaintiff, pro se

2115 N. Teal Brook Ct

Wichita, KS, 67235

Telephone: 316-204-8786

Email: JulieRoseStroud@gmail.com

Date: ___04/13/2026_____